**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**In re STANDARD & POOR'S RATING AGENCY LITIGATION**

*This Document Relates to:*

*Arizona ex rel. Horne* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04022 (JMF)

*Arkansas ex rel. McDaniel* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04013 (JMF)

*Colorado ex rel. Suthers* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04010 (JMF)

*Delaware* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04050 (JMF)

*Idaho ex rel. Wasden* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04045 (JMF)

*Indiana ex rel. Naylor* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 05401 (JMF)

*Iowa ex rel. Miller* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04046 (JMF)

*Maine* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 03969 (JMF)

*Mississippi ex rel. Hood* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04049 (JMF)

*Missouri ex rel. Koster* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04044 (JMF)

*North Carolina ex rel. Cooper* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04047 (JMF)

*Pennsylvania ex rel. Kane* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04048 (JMF)

*South Carolina ex rel. Wilson* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04051 (JMF)

*Tennessee ex rel. Cooper* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04098 (JMF)

*Washington* v. *The McGraw-Hill Companies, Inc., et al.*, No. 13 Civ. 04043 (JMF)

13-MD-2446 (JMF)

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTIONS TO REMAND**

Floyd Abrams
Susan Buckley
Jason M. Hall
Adam Zurofsky
Krista Friedrich
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, New York 10005-1702

*Counsel for McGraw Hill Financial, Inc. and
Standard & Poor's Financial Services LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

THE FEDERAL LEGAL LANDSCAPE ................................................................................ 5

ARGUMENT .................................................................................................................... 8

    I.   There Is Federal Question Jurisdiction Over These Cases ................................ 8

        A.  The Applicable Legal Standard and *Grable* ................................ 11

        B.  The State Actions Necessarily Raise Federal Issues ..................... 13

            1.   The States' Claims are Inherently Federal in Nature ............... 13

            2.   The State Statutes Themselves Require Reference to Federal Law ......................... 23

        C.  The Federal Issues Raised by the State Actions Are Extraordinarily Substantial ................................ 29

        D.  Exercise of Federal Question Jurisdiction over the State Actions Is Necessary To Preserve the Proper State/Federal Balance ......................... 31

    II.  S&P Did Not Waive Its Right To Remove The North Carolina State Action ................. 34

CONCLUSION ................................................................................................................. 35

<u>T</u>ABLE OF <u>A</u>UTHORITIES

**Page(s)**

**Cases**

*Am. Well Works Co.* v. *Layne & Bowler Co.*,
   241 U.S. 257 (1916)................................................................11

*Arditi* v. *Lighthouse Int'l*,
   676 F.3d 294 (2d Cir. 2012)......................................................11

*Bd. of Cnty. Comm'rs* v. *Shroyer*,
   662 F. Supp. 1542 (D. Colo. 1987)..............................................27

*Bender* v. *Jordan*,
   623 F.3d 1128 (D.C. Cir. 2010) .................................................22n

*Bracey* v. *Bd. of Educ.*,
   368 F.3d 108 (2d Cir. 2004)......................................................27

*Broder* v. *Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005)....................................................9n, 30

*Campbell* v. *PPL Montana, LLC*,
   2010 WL 2718998 (D. Mont. June 8, 2010), *report and recommendation adopted*, 2010 WL
   2735665 (D. Mont. July 7, 2010)................................................35

*Capece* v. *Depository Trust & Clearing Corp.*,
   2005 WL 4050118 (S.D. Fla. Oct. 11, 2005)....................................21

*Christianson* v. *Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988)...............................................................13

*Cnty. of Orange* v. *McGraw-Hill Cos.*,
   245 B.R. 151 (C.D. Cal. 1999) ..................................................27n

*Compuware Corp.* v. *Moody's Investors Servs., Inc.*,
   499 F.3d 520 (6th Cir. 2007) .................................................27n, 28

*Connecticut* v. *Moody's Corp.*,
   2012 WL 2149408 (Conn. Super. May 10, 2012) ...............................28

*D'Alessio* v. *N.Y. Stock Exch., Inc.*,
   258 F.3d 93 (2d Cir. 2001)................................................... *passim*

*Dri Mark Prods., Inc.* v. *Meyercord Co.*,
   194 F. Supp. 536 (S.D.N.Y. 1961)............................................34-35

*First Equity Corp.* v. *Standard & Poor's Corp.*,
  690 F. Supp. 256 (S.D.N.Y. 1988), *aff'd on other grounds*, 869 F.2d 175 (2d Cir. 1989) ...27n

*Franchise Tax Bd.* v. *Constr. Laborers Vacation Trust*,
  463 U.S. 1 (1983)............................................................................................................11

*Friedlander* v. *Troutman, Sanders, Lockerman & Ashmore*,
  788 F.2d 1500 (11th Cir. 1986) ......................................................................................31

*Gamoran* v. *Neuberger Berman Mgmt., LLC*,
  2010 WL 4537056 (S.D.N.Y. Nov. 8, 2010) ....................................................................5

*Grable & Sons Metal Prod., Inc.* v. *Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005).............................................................................................. *passim*

*Gunn* v. *Minton*,
  133 S. Ct. 1059 (2013)........................................................................... 12, 28-29

*Harper* v. *Massey Coal Servs., Inc.*,
  2011 WL 322558 (S.D.W.Va. Feb. 2, 2011) ....................................................................23

*In re Currency Conversion Fee Antitrust Litig.*,
  2003 WL 22097502 (S.D.N.Y. Sept. 10, 2003)..................................................................9

*In re Enron Corp. Sec., Derivative and "ERISA" Litig*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005) ..........................................................................27n

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  2013 WL 525191 (S.D.N.Y. Feb. 13, 2013).....................................................................21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  205 F.R.D. 369 (D.D.C. 2002).......................................................................................33n

*In re NSA Telcomms. Records Litig.*,
  483 F. Supp. 2d 934 (N.D. Cal. Jan. 18, 2007)................................................................10

*In re Otter Tail Power Co.*,
  116 F.3d 1207 (8th Cir. 1997) .......................................................................................23

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  457 F. Supp. 2d 77 (D. Mass. 2006) ..............................................................................30

*In re Standard & Poor's Rating Agency Litig.*,
  2013 WL 2445043 (J.P.M.L. June 6, 2013) ..............................................................32-33

*Ins. Corp.* v. *Monroe Bus. Corp.*,
  491 F. Supp. 2d 430 (S.D.N.Y. 2007)...........................................................................22n

*Jefferson Cnty. Sch. Dist. No. R-1* v. *Moody's Investors Servs., Inc.*,
   175 F.3d 848 (10th Cir. 1999) ...........................................................................27n

*JP Morgan Chase Bank, N.A.* v. *Reijtenbagh*,
   611 F. Supp. 2d 389 (S.D.N.Y. 2009)................................................................34

*Manning* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   2013 WL 1164838 (D.N.J. Mar. 20, 2013)........................................................22n

*Marcus* v. *AT&T Corp.*,
   138 F.3d 46 (2d Cir. 1998).............................................................................13, 23

*Merrell Dow Pharm. Inc.* v. *Thompson*,
   478 U.S. 804 (1986)..................................................................................... 11-12

*Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*,
   547 U.S. 71 (2006).......................................................................................4, 29

*Mims* v. *Arrow Fin. Serv., LLC*,
   132 S. Ct. 740 (2012).......................................................................................10

*Morgan* v. *Nikko Sec. Co. Int'l*,
   691 F. Supp. 792 (S.D.N.Y. 1988).....................................................................34

*NASDAQ OMX Grp., Inc.* v. *UBS Sec. LLC*,
   2013 WL 3942948 (S.D.N.Y. June 18, 2013) ...............................................21, 23

*New York City Health and Hosps. Corp.* v. *Wellcare of N.Y. Inc.*,
   769 F. Supp. 2d 250 (S.D.N.Y. 2011)................................................................30

*One and Ken Valley Hous. Grp.* v. *Me. State Hous. Auth.*,
   716 F.3d 218 (1st Cir. 2013)..............................................................................30

*Pennsylvania ex rel. Kane* v. *McGraw-Hill Cos. Inc.*,
   2013 WL 1397434 (M.D. Pa. Apr. 5, 2013)..........................................................5

*R.I. Fishermen's Alliance, Inc.* v. *R.I. Dep't of Env't Mgmt.*,
   585 F.3d 42 (1st Cir. 2009)........................................................................ 9, 24-25

*Reserve Mgmt. Co.* v. *Willkie Farr & Gallagher LLP*,
   2012 WL 4378058 (S.D.N.Y. Sept. 25, 2012)....................................................30

*Rice* v. *Charles Schwab*,
   2010 WL 5156654 (C.D. Cal. Oct. 22, 2010)......................................................27n

*Smith* v. *Kansas City Title & Trust Co.*,
   255 U.S. 180 (1921)....................................................................................3, 11

*Sparta Surgical Corp.* v. *Nat'l Ass'n of Sec. Dealers, Inc.*,
    159 F.3d 1209 (9th Cir. 1998) ..................................................................21

*Tolin* v. *Standard & Poor's Fin. Servs., LLC*,
    2013 WL 3192115 (S.D.N.Y. June 24, 2013) ......................................27n

*United Sav. Ass'n* v. *Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988)..................................................................................26

*United States* v. *Dish Network, LLC*,
    2013 WL 1749930 (C.D. Ill., Apr. 24, 2013) ........................................33

*West Virginia ex rel. McGraw* v. *Eli Lilly & Co.*,
    2008 WL 4449655 (E.D.N.Y. Sept. 30, 2008) .............................26, 30

**Congressional Materials**

The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets: Hearing Before
    the S. Comm. on Banking, Housing, and Urban Affairs, 110th Cong. 16 (2007)....................6

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................19, 27

**Law Reviews**

Martin H. Redish, Reassessing the Allocation of Judicial Business Between State and Federal
    Courts: Federal Jurisdiction and "The Martian Chronicles," 78 VA. L. REV. 1769 (1992) .....32

Rory Ryan, No Welcome Mat, No Problem?: Federal-Question Jurisdiction After Grable, 80 ST.
    JOHN'S L. REV. 621 (2006) .....................................................................12

**Regulations**

17 C.F.R.
    § 240.17g-1(i) (2013)..........................................................................7, 18
    § 240.17g-5 (2013)..................................................................................6
    § 240.17g-5(a)(2) (2013) ........................................................................7
    § 240.17g-5(c) (2013)........................................................................6n, 17
    § 240.17g-5(c)(8) (2013) ........................................................................8
    § 240.17g-6 (2013)..................................................................................18

Credit Ratings Roundtable, Exchange Act Release No. 69433, 78 Fed. Reg. 25101 (Apr. 29,
    2013) ......................................................................................................8n

Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating
    Organizations, Exchange Act Release No. 55231, 2007 WL 325688 (Feb. 2, 2007) .............16

Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating
    Organizations, Exchange Act Release No. 55857, 72 Fed. Reg. 33564 (June 18, 2007)...... 6-7

Proposed Rules for Nationally Recognized Statistical Rating Organizations, Exchange Act
    Release No. 64514, 76 Fed. Reg. 33420 (June 8, 2013)..........................................................8

**Statutes - Federal**

15 U.S.C.
    § 78aa...........................................................................................................................29
    § 78o-7(c)(1)...................................................................................................................6
    § 78o-7(h)......................................................................................................................5
    § 78o-7(h)(1)..............................................................................................14, 17, 17n
    § 78o-7(h)(2).................................................................................................................18
    § 78o-7(h)(4)(B)............................................................................................................7
    § 78o-7(q)(1).................................................................................................................18
    § 78u-2(a)(1)(C)............................................................................................................8

28 U.S.C.
    § 1331...................................................................................................................3, 11, 29
    § 1441(a)........................................................................................................................11

Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327 ...............1, 4, 29

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203,
    124 Stat. 1376 ........................................................................................................4, 7, 8n

**Statutes - State**

ARK. CODE ANN. § 4-88-101(3) (2013)........................................................................24n

CAL. PUB. UTIL. CODE § 2891(d)(6) (2013)..................................................................25

COLO. REV. STAT. ANN.
    § 6.1-106 (2013)..............................................................................................................2
    § 6-1-106(1)(a) (2013)...................................................................................................24n

6 DEL. CODE ANN. § 2534(a) (2013)..............................................................................24n

IDAHO CODE ANN.
    § 48-605 (2013).............................................................................................................26
    § 48-605(1) (2013)........................................................................................................24n
    § 48-618 (2013).............................................................................................................26

ME. REV. STAT. ANN. tit. 5, § 208(1) (2013) ..............................................................24n

N.C. GEN. STAT.
    § 7A-45.3 (2013)........................................................................................34n
    § 7A-45.4(a) (2013) ..............................................................................34n, 34

S.C. CODE ANN. § 39-5-40(a) (2013)..............................................................24n

TENN. CODE ANN. § 47-18-111(a)(1) (2013) ...................................................24n

WASH. REV. CODE ANN.
    § 19.86.170 (2013) ...........................................................................2, 24n

## Treatises

13D CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE (3d
    ed. 2008) ....................................................................................... 12-13

15 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 103.31(4)(d)(i) (3d ed. 2013)............9n, 23

## Other Authorities

First Amended Complaint, *Ohio ex rel. Petro* v. *Bristol-Myers Squibb Co.*,
    No. 02-CV-01080 (D.D.C. Apr. 24, 2003), 2003 WL 22331401 ........................................33n

Instructions for Form NRSRO, *available at* http://www.sec.gov/about/forms/formnrsro.pdf........7

IOSCO, CODE OF CONDUCT FUNDAMENTALS FOR CREDIT RATING AGENCIES 7 (Dec. 2004)
    *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD180.pdf. .................... 17-18

IOSCO, REGULATORY IMPLEMENTATION OF THE STATEMENT OF PRINCIPLES REGARDING THE
    ACTIVITIES OF CREDIT RATING AGENCIES FINAL REPORT 28 (Feb. 2011) *available a*t
    http://www.fsa.go.jp/inter/ios/20110302/01.pdf.......................................................... 16n-17n

NC Business Court Frequently Asked Questions ("FAQ's"), *available at*
    http://www.ncbusinesscourt.net/FAQ/business_court_frequently_asked.htm. ....................34n

Opening Remarks at SEC Roundtable on Credit Ratings (May 14, 2013), *available at*
    http://www.sec.gov/News/Speech/Detail/Speech/1365171515666#.Ue3E4Y1OR8E............29

SEC Credit Ratings Roundtable Agenda (last modified Jul. 2, 2013), including link to agenda,
    *available at* http://www.sec.gov/News/Article/Detail/Article/1365171516107....................8n

SEC, Nationally Recognized Statistical Rating Organizations ("NRSROs"), *available at*
    http://www.sec.gov/divisions/marketreg/ratingagency.htm (last modified Jan. 4, 2013) .......31

SEC, REPORT TO CONGRESS ON ASSIGNED CREDIT RATINGS (Dec. 2012), *available at*
    https://www.sec.gov/news/studies/2012/assigned-credit-ratings-study.pdf. ..........................8n

Statement of Interest of the United States in Opposition to Plaintiffs' Motion to Remand at 13,
*Riordan, et al.* v. *Verizon Commc'ns., Inc.*,
No. 06-CV-03574 (VRW) (N.D. Cal. Aug. 4, 2006) (case later consolidated as part of *In re NSA Telcomms. Records Litig.*, MDL No 06-1791 (VRW) (N.D. Cal. 2006)), *available at* https://ecf.cand.uscourts.gov/doc1/03513275660............................................................ 25-26

Third Amended Complaint, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
456 F. Supp. 2d 131 (D. Me. 2006) (MDL No. 1361), 2002 WL 32947273.........................33n

McGraw Hill Financial, Inc. (formerly The McGraw-Hill Companies, Inc.) and Standard & Poor's Financial Services LLC[1] respectfully submit this memorandum in opposition to the Motions to Remand filed by the Attorneys General of Arizona, Arkansas, Colorado, Delaware, Idaho, Indiana, Iowa, Maine, Mississippi, Missouri, North Carolina, Pennsylvania, South Carolina, Tennessee, and Washington in the cases they have brought that are now part of this consolidated proceeding (together, the "State Actions").

PRELIMINARY STATEMENT

Reading the remand brief of the States, as well as the Statement of Interest of the United States,[2] one might think that these cases, commenced under state consumer protection laws, are little different from ones in which states seek to protect their citizens from overhyped advertising by used car dealers.  One would not know that the cases are suffused with federal interests of the highest order, interests that have led Congress to declare that "credit rating agencies are of national importance" and to *require* credit rating agencies such as S&P to adopt and implement the very sorts of conflict of interest policies embodied in the Code of Conduct that is indisputably the centerpiece of the States' cases.  Nor would one know that the "issuer pays" business model, which the States' Complaints unequivocally put at issue and denounce, has been explicitly authorized by the Credit Rating Agency Reform Act of 2006 ("CRARA"), Pub. L. No.

---

[1] As of May 1, 2013, The McGraw-Hill Companies, Inc. was renamed McGraw Hill Financial, Inc. Standard & Poor's Ratings Services ("S&P") includes a business unit of Standard & Poor's Financial Services LLC.

[2] The "interest" of the United States that has led it to submit a brief in these cases appears to be nothing more or less than aiding the states with which it has "cooperated" in the coordinated filing of actions against S&P.  *See* DOJ Statement of Interest (Dkt. 25) at 2-3 n.1.  As we demonstrate later in this memorandum, *infra* pp. 28-29, positions taken by the United States in this case differ markedly from positions it has taken elsewhere.

109-291, 120 Stat. 1327 and its implementing regulations and is overseen on a continuing basis by the SEC.[3]

In an effort to avoid federal jurisdiction, the States' remand brief even goes so far as to ignore entirely the language of the state statutes the States are purporting to enforce.  Just as one would not know from the States' brief anything about the level of federal interests put at issue by these cases, one would hardly suspect that on the face of these statutes themselves, courts must examine federal law to see if the cases may proceed.  Such statutes provide that "[t]his article does not apply to . . . [c]onduct in compliance with the orders or rules of, or a statute administered by, a federal . . . governmental agency," COLO. REV. STAT. ANN. § 6-1-106, that "[n]othing in this chapter shall apply to . . . transactions permitted by any other regulatory body or officer acting under statutory authority of . . . the United States[,]" WASH. REV. CODE ANN. § 19.86.170, and the like.  But the States' brief fails even to acknowledge the existence of such dispositive provisions.

The States' brief does not even mention, let alone discuss, the impact of CRARA, which requires credit rating agencies that use the issuer pays model to "establish, maintain and enforce written policies and procedures"—*i.e.*, codes of conduct and related policies—"reasonably designed . . . to address and manage any conflicts of interest," although proof that S&P failed to do so is a necessary predicate of the States' claims.  And while the States make repeated reference to the fact that S&P supposedly falsely stated that it would adhere to principles set forth in a model Code of Conduct promulgated by a group of international securities regulators (IOSCO), they carefully refrain from disclosing that the very provisions of the IOSCO Code that

---

[3]  The complaints of 12 states, in identical language, state that "the financial incentives and conflicts of interest inherent in the Issuer Pays model have led S&P to violate its public representations of independence and objectivity."Ariz. Cpt. ¶ 57; Ark. Cpt. ¶ 56; Colo. Cpt. ¶ 61; Del. Cpt. ¶ 57; Idaho Cpt. ¶ 75; Ind. Cpt. ¶ 58; Iowa Cpt. ¶ 57; Mo. Cpt. ¶ 67; N.C. Cpt. ¶ 44; S.C. Cpt. ¶ 56; Tenn. Cpt. ¶ 66; Wash. Cpt. ¶ 52.*; see also* Me. Cpt. ¶ 34; Miss. Cpt. and Am. Cpt. ¶ 40; Pa. Cpt. ¶¶ 37, 54-56.

S&P is said to have violated appear in almost identical language—as federal regulatory requirements rather than international suggestions—in CRARA, the federal statute that the States strain not to mention. This tiptoeing around the reality that federal interests are central to the cases is referred to in the case law as "artful pleading," pleading designed to avoid, by not mentioning federal law, the exercise of federal jurisdiction in cases where such jurisdiction is entirely proper. We deal with such matters throughout this brief as we demonstrate that these cases fall comfortably within the realm of those described by the Supreme Court in *Grable & Sons Metal Prod., Inc.* v. *Darue Eng'g & Mfg.*, as ones in which state law claims "that implicate significant federal issues" give rise to federal jurisdiction to vindicate "the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. 308, 312 (2005).

For close to 100 years, the Supreme Court has held that state-law causes of action arise under federal law for jurisdictional purposes where federal law is "directly drawn in question" by those claims. *Smith* v. *Kansas City Title & Trust Co.*, 255 U.S. 180, 201 (1921). Well before *Grable*, the Court of Appeals for this circuit affirmed these same bedrock principles, holding that a case arises under federal law where state law "claims necessarily require a court to construe . . . federal law." *D'Alessio* v. *N.Y. Stock Exch., Inc.*, 258 F.3d 93, 104 (2d Cir. 2001). This body of law effectuates Congress's intent in 28 U.S.C. § 1331 that a case "arises under" federal law for purposes of that statute where the "federal interest underlying [plaintiff's] claims is sufficiently substantial." *Id.* at 104.

Here, the substantial federal interest underlying the States' claims is manifest in the federal legal landscape that the States either leave in darkness or relegate to shadows in their

Complaints.  "The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."  *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 78 (2006).  Although none of the Complaints so much as mentions CRARA, that statute constitutes Congress's explicit recognition of the fact that "credit rating agencies are of national importance," not least because "their ratings, publications, writings, analyses, and reports customarily relate to the purchase and sale of securities traded on securities exchanges and in interstate over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System."  CRARA § 2, 120 Stat. at 1327.  Indeed, "[b]ecause of the systemic importance of credit ratings . . . , the activities and performances of credit rating agencies, including nationally recognized statistical rating organizations, are matters of national public interest."  Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. No. 111-203, § 931, 124 Stat. 1376, 1872.  There is no room for doubt about the enormous federal interests in the uniform regulation of the national securities markets generally, and in the uniform regulation of credit rating agencies specifically.

Looking beyond the States' efforts at artful pleading, it becomes clear that their Complaints implicate all these federal interests.  The States' claims in this MDL require a court to construe CRARA and the complex federal regulatory regime surrounding it to answer the fundamental question these actions raise:  whether state statutes of general application may be used to regulate the federally mandated disclosure and examination regime surrounding rating agency conflicts of interest and the manner in which a credit rating agency conducts its analysis of structured finance securities.  This is just the sort of "pure, abstract issue of law" often held to

provide federal question jurisdiction.  *See Gamoran* v. *Neuberger Berman Mgmt., LLC*, 2010 WL 4537056, at *5 (S.D.N.Y. Nov. 8, 2010).  As Judge Conner of the Middle District of Pennsylvania recognized prior to the consolidation of these cases and their transfer to this Court, in denying Pennsylvania's request to have that case remanded prior to transfer:

> The instant jurisdictional inquiry necessarily demands an expansive review of case law governing the history and application of the *Grable* holding as well as case law and legislative history governing the scope and application of CRARA. The reviewing court will be required to scrutinize the [State's] factual and legal allegations in order to isolate those that implicate CRARA and, thereafter, identify the presence of any federal issues.

*Pennsylvania ex rel. Kane* v. *McGraw-Hill Cos.,* 2013 WL 1397434, at *3 (M.D. Pa. Apr. 5, 2013).[4]  It is to this task—a task the States seek to elide entirely—that we turn in the argument that follows.

### THE FEDERAL LEGAL LANDSCAPE

Examination of the federal regulation of credit rating agencies must begin with CRARA.[5] Among other things, CRARA requires Nationally Recognized Statistical Rating Organizations ("NRSROs") to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to address and manage any conflicts of interest that can arise from [their] business," specifically including conflicts arising from the "issuer pays" compensation model employed by rating agencies such as S&P.  *See* 15 U.S.C. § 78o–7(h).  CRARA also directed the SEC to promulgate regulations either prohibiting or requiring disclosure of such conflicts of interest.  *Id.*

In CRARA, Congress delegated to the SEC "exclusive authority to enforce the provisions of this section in accordance with this chapter with respect to any [NRSRO], if such [NRSRO]

---

[4]   In granting remand in the Connecticut and Illinois cases, those courts found S&P's removals to be untimely because S&P effected removal from state court in 2013 while those actions were brought in 2010 and 2012, respectively.  Although the Illinois court, in *dicta*, looked beyond the state's timeliness argument and saw no federal jurisdiction, that court did not engage in any of the "expansive review" Judge Conner identified as necessary and did not come to grips with the arguments raised in this brief.

[5]   As we explain at length in our Memorandum Opposing the Motions to Dismiss of Tennessee and South Carolina, also filed today, federal involvement in the regulation of NRSROs pre-dates CRARA.

issues credit ratings in material contravention of those procedures relating to such [NRSRO], including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest." 15 U.S.C. § 78o-7(c)(1).  As then-Chairman of the SEC, Christopher Cox, made clear in Congressional testimony, CRARA "struck a sound balance" in its delegation of "authority."  *The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 16 (2007).

Since CRARA's enactment, the SEC has frequently promulgated and amended regulations governing NRSROs to address potential conflicts of interest, including those arising from the "issuer pays" model.  SEC rules (i) prohibit certain conflicts of interest altogether[6] and (ii) permit other potential conflicts of interest if they are disclosed and if the NRSRO maintains and enforces policies to manage them.  *See* Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, Exchange Act Release No. 55857, 72 Fed. Reg. 33564, 33622-23 (June 18, 2007) (adding 17 C.F.R. § 240.17g-5).  The SEC refused to ban conflicts arising from the "issuer pays" compensation model and instead determined that they fall into the group of permitted conflicts "in the public interest and for the protection of investors," based on the SEC's conclusion that prohibiting them outright could "adversely impact the ability of an NRSRO to operate as a credit rating agency."  *Id.* at 33595.  Instead, the SEC determined that a disclosure regime would "ensure that users of credit ratings are made aware of the potential conflicts of interest that arise from an NRSRO's business activities" and permit "users of the credit ratings [to] assess whether the conflict impacts the NRSRO's

---

[6]  *See, e.g.,* 17 C.F.R. § 240.17g–5(c) ("A [NRSRO] is prohibited from having the following conflicts of interest relating to the issuance or maintenance of a credit rating as a credit rating agency . . . (6) The [NRSRO] issues or maintains a credit rating where the fee paid for the rating was negotiated, discussed, or arranged by a person within the [NRSRO] who has responsibility for participating in determining credit ratings or for developing or approving procedures or methodologies used for determining credit ratings, including qualitative and quantitative models.").

judgment." *Id.*

S&P's Code of Conduct, which sets forth governing principles, and S&P's specific policies and procedures to manage and address potential conflicts of interest, including those relating to the issuer pays model, are required by federal mandate and are filed with the SEC as part of the NRSRO registration process. *See* 17 C.F.R. § 240.17g–5(a)(2) ("A person within a [NRSRO] is prohibited from having a conflict of interest relating to the issuance or maintenance of a credit rating identified in paragraph (b) of this section, unless . . . . [t]he [NRSRO] has established and is maintaining and enforcing written policies and procedures to address and manage conflicts of interest in accordance with section 15E(h) of the Act."); *see also* Instructions for Form NRSRO, *available at* http://www.sec.gov/about/forms/formnrsro.pdf (requiring filing in Form NRSRO of "[t]he code of ethics in effect at the credit rating agency," and "[p]olicies and procedures to address and manage conflicts of interest"). Exchange Act Section 15E(h)(4)(B), 15 U.S.C. § 78o-7(h)(4)(B), requires the SEC to review the codes of ethics and conflicts of interest policies of NRSROs at least annually. Similarly, the posting of the Code of Conduct and the policies on S&P's website is federally mandated. *See* 17 C.F.R. § 240.17g-1(i) ("A [NRSRO] must make its current Form NRSRO and information and documents submitted in Exhibits 1 through 9 to form NRSRO publicly available on its Web site, or through another comparable, readily accessible means [.]").

In recent years, Congress has further developed the regulatory scheme governing NRSROs, again focusing upon potential conflicts of interest. In the 2010 Dodd-Frank legislation, Congress required the SEC to promulgate additional regulations "to prevent the sales and marketing considerations of [NRSROs] from influencing [their] production of ratings." Pub. L. No. 111-203, § 932(4)(a), 124 Stat. at 1874. Pursuant to that authority, the SEC proposed

rules in May 2011 that would prohibit conflicts of interest that result when "a person within the

NRSRO who participates in the sales or marketing of a product or service of the NRSRO . . . also

participates in determining or monitoring the credit rating, or developing or approving

procedures or methodologies used for determining the credit rating."  *See* Proposed Rules for

Nationally Recognized Statistical Rating Organizations, Exchange Act Release No. 64514, 76

Fed. Reg. 33420, 33426 (June 8, 2013) (proposing 17 C.F.R. § 240.17g-5(c)(8)).[7]  The SEC is

actively considering additional rules in this area and convened a roundtable discussion on these

topics in May of this year.  Among the SEC's agenda topics for the May 2013 roundtable

discussion was this question:   "What would be the effects of requiring NRSROs to use

compensation systems other than the issuer-pay model?"[8]

       Although CRARA provides the SEC with a number of robust enforcement resources, *see*

15 U.S.C. § 78u-2(a)(1)(C), including authority to revoke NRSRO registration status, the SEC

has continually renewed S&P's NRSRO registration status each year from the time of S&P's

initial registration through the present.

## ARGUMENT

## I.    THERE IS FEDERAL QUESTION JURISDICTION OVER THESE CASES

       The States' remand brief predictably asserts that these actions raise only state law claims

and that these claims require resolution only of whether "S&P misrepresented its independence

and objectivity regarding its credit rating services."  States' Mem. at 5.  But the States fail to

---

[7]  In Dodd-Frank, Congress also required the SEC to complete a study of "the credit rating process for structured finance products and the conflicts of interest associated with the issuer-pay and the subscriber-pay models."  Dodd-Frank § 939F(b)(1), 124 Stat. at 1889.  Dodd-Frank authorized the SEC to promulgate such regulations as it deemed "necessary or appropriate in the public interest or for the protection of investors."  *Id.* § 939F(d)(1), 124 Stat. at 1889-90.  The SEC completed its study and issued its report on December 18, 2012, and identified "potential regulatory or statutory changes the [SEC] could consider."  SEC, REPORT TO CONGRESS ON ASSIGNED CREDIT RATINGS 4 (Dec. 2012), *available at* https://www.sec.gov/news/studies/2012/assigned-credit-ratings-study.pdf.

[8]  *See* SEC Credit Ratings Roundtable Agenda (last modified Jul. 2, 2013), including link to agenda, *available at* http://www.sec.gov/News/Article/Detail/Article/1365171516107; *see also* SEC Credit Ratings Roundtable, Exchange Act Release No. 69433, 78 Fed. Reg. 25101 (Apr. 29, 2013).

explain how they could establish *prima facie* cases, or how the various state courts to which they seek to return might grant the declarations and injunctions they seek, without examining federal law.  As detailed below, this is because they cannot hope to do so.

Rather than engage with the actual jurisdictional questions their cases raise, the States attempt to recast the embedded federal issues in these cases as a simple assertion by S&P of ordinary defensive preemption.  Two things the States say are true:  (i) a preemption defense is not itself sufficient to support federal jurisdiction, and (ii) S&P has a preemption defense, which it will assert at the appropriate time.  It hardly follows, though, as the States would have it, that because S&P plainly has preemption defenses, federal jurisdiction does not exist.[9]  Here, as in *R.I. Fishermen's Alliance, Inc.* v. *R.I. Dep't of Env't Mgmt.*, 585 F.3d 42, 50 (1st Cir. 2009), "although there may well be a preemption defense lurking in the wings, that potential defense is not the hook on which we propose to hang federal question jurisdiction."  *See also In re Currency Conversion Fee Antitrust Litig.*, 2003 WL 22097502, at *3 (S.D.N.Y. Sept. 10, 2003) ("Plaintiff's reliance on preemption jurisprudence to support his motion misses the point. [Defendant] does not rely on preemption in its removal of this action.").  Yet this fundamental logical flaw underlies the entirety of the States' remand argument.  *E.g.*, States' Mem. at 12-24. The extensive discussion of preemption comprising the majority of the States' brief is simply irrelevant to the jurisdictional inquiry now before the Court.[10]

---

[9] The existence of preemption defenses to the State Actions is independent of the grounds for federal question jurisdiction.  *See* 15 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 103.31(4)(d)(i) (3d ed. 2013) (describing "traditional preemption analysis" as "a matter of substantive constitutional law wholly unrelated to the issue of federal question jurisdiction").

[10] Also irrelevant to the jurisdictional issue is the States' contention that CRARA does not reach conduct occurring prior to June 26, 2007.  *See* States' Mem. at 20 n.14.  Even if the States could prevail on this argument, the Complaints indisputably challenge conduct occurring *after* that date and seek injunctive relief going forward, and thus implicate CRARA and the related federal law issues discussed herein.  "A single claim over which federal-question jurisdiction exists is sufficient to allow removal."  *Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005) (internal citations omitted).

The States also attempt to rebut a preemption argument that S&P does not make, pointing to a provision of CRARA that reserves to states the right to bring enforcement actions for fraud and deceit under certain circumstances.   States' Mem. at 11-12, 20.   Even assuming that provision applies to the challenged conduct, and even if the States could ultimately prevail on their argument that these actions are authorized under that provision, nothing in CRARA bars the removal of such actions to federal court or supports the States' argument that such claims may only be heard in state court.   This provision does not require exclusive state court jurisdiction: even in the context of a federal statute that specifically provides for a state-court right of action (as CRARA does not), the Supreme Court has found "no convincing reason to read into the [statute's] permissive grant of jurisdiction to state courts any barrier to the U.S. district courts' exercise of the general federal-question jurisdiction they have possessed since 1875."   *Mims* v. *Arrow Fin. Serv., LLC*, 132 S. Ct. 740, 745 (2012).

The States have joined together, in cases filed in states located in eight federal circuits, in an unprecedented effort to extend their consumer protection statutes to reach – effectively on a national basis – conduct never targeted before.   The very filing of such coordinated complaints trenching so deeply into areas of federal concern raises the question of whether the State Actions exceed permissible bounds.   The States' insistence that any federal issues raised here are mere defenses is not only untrue, but is irrelevant.   Critical threshold issues of this nature transcend any artificial dichotomy between causes of action and defenses for purposes of assessing federal question jurisdiction.   *See In re NSA Telcomms. Records Litig.*, 483 F. Supp. 2d 934, 941-43 (N.D. Cal. Jan. 18, 2007) (finding jurisdiction and noting that "[t]o remand on the grounds that 'evidentiary privileges' cannot form the basis for federal jurisdiction under the embedded federal issue doctrine would elevate form over substance").

## A.  The Applicable Legal Standard and *Grable*

A defendant may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a); *see also Arditi* v. *Lighthouse Int'l*, 676 F.3d 294, 298 (2d Cir. 2012).  A district court has original jurisdiction over "'federal question' cases" or cases "'arising under the Constitution, laws, or treaties of the United States.'"  *Arditi*, 679 F.3d at 298 (quoting 28 U.S.C. § 1331).

In *Smith* v. *Kansas City Title & Trust Co.*, over a dissent by Justice Holmes, the Supreme Court made clear that where a federal law is "directly drawn in question," an action may arise under federal law for purposes of federal subject matter jurisdiction even if only state-law causes of action are alleged.  255 U.S. 180, 201 (1921).  In so doing, the *Smith* Court rejected the more black-and-white test previously set forth by Justice Holmes in *Am. Well Works Co.* v. *Layne & Bowler Co.,* 241 U.S. 257 (1916), under which a plaintiff's cause of action was either created by federal law (in which case federal jurisdiction would be appropriate) or state law (in which case federal jurisdiction would be unavailable).  255 U.S. at 215; *see also Franchise Tax Bd.* v. *Constr. Laborers Vacation Trust*, 463 U.S. 1, 8-9 (1983) ("even the most ardent proponent of the Holmes test has admitted that it has been rejected as an exclusionary principle") (citation omitted).  Thus, where a complaint pleads only state-law causes of action, the existence of federal question jurisdiction depends upon whether "vindication of [the] right[s] under state law necessarily turn[s] on some construction of federal law."  *Franchise Tax Bd.*, 463 U.S. at 9 (citations omitted); *see also D'Alessio*, 258 F.3d at 100.

Notwithstanding the States' heavy reliance on it, the Supreme Court's decision in *Merrell Dow Pharm. Inc.* v. *Thompson*, 478 U.S. 804 (1986), is not to the contrary, and in any event, provides no basis for ignoring the later-decided *Grable* ruling.  While the Court in *Merrell Dow* stated that "the mere presence of a federal issue in a state cause of action does not automatically

11

confer federal-question jurisdiction," 478 U.S. at 813, the Court in *Grable* explicitly rejected the notion that *Merrell Dow* can "be read whole as overturning decades of precedent, as it would have done by effectively adopting the Holmes dissent in *Smith,* and converting a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one," 545 U.S. at 317-18 (noting that *Merrell Dow* "disclaimed the adoption of any bright-line rule").

As set forth in *Grable*, courts focus the jurisdictional inquiry on four factors: "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."[11]  *Gunn* v. *Minton,* 133 S. Ct. 1059, 1065 (2013); *Grable,* 545 U.S. at 314.  Thus, *Grable* upheld "the contextual enquiry that had been *Smith*'s hallmark for over 60 years."  *Grable*, 545 U.S. at 316-18.  *Grable* confirmed that federal question jurisdiction continues "over state-law claims that implicate significant federal issues." *Id.*

*Grable* is often cited as the Supreme Court's "finest effort in this line of cases," 13D CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3562 (3d ed. 2008), and it was unanimously reaffirmed by the Supreme Court just a few months ago in *Gunn*. We rely on it throughout this brief.  But it is useful to look beyond *Grable* to understand the contours of federal jurisdiction in a case such as this one where federal causes of action are not stated.  "Federal-question jurisdiction cannot be understood without its theoretical and historical contexts."  Rory Ryan, *No Welcome Mat, No Problem?: Federal-Question Jurisdiction After Grable*, 80 ST. JOHN'S L. REV. 621, 622 (2006).  This is true because, as *Grable* itself observed,

---

[11] The States' brief addresses three of these four factors.  They concede the "actually disputed" factor. States' Mem. at 9 n.7.  We deal with the remaining three factors in this submission.

there remains no "'single, precise, all-embracing' test for jurisdiction over federal issues embedded in state-law claims." 545 U.S. at 314 (quoting *Christianson* v. *Colt Indus. Operating Corp.*, 486 U.S. 800, 821 (1988) (Stevens J., concurring)); *see also* WRIGHT & MILLER, § 3562 (discussing "the vexing issue of when state-law claims so implicate federal law that they should be seen to invoke federal question jurisdiction").

The States would have this Court revert to a variant of the pre-*Grable* Holmes test and reflexively reject jurisdiction because they did not explicitly acknowledge a federal issue on the face of their Complaints. Such an approach finds no support in currently controlling authorities. A well-established corollary to the "well-pleaded complaint rule," known as the "artful pleading doctrine," "prevents a plaintiff from avoiding removal by framing in terms of state law a complaint the real nature of [which] is federal, regardless of plaintiff's characterization." *See, e.g.*, *Marcus* v. *AT&T Corp.*, 138 F.3d 46, 55 (2d Cir. 1998) (citation and internal quotation marks omitted). That, as will be seen, is precisely what is involved here.

**B. The State Actions Necessarily Raise Federal Issues**

   *1. The States' Claims are Inherently Federal in Nature*

The States' assertion that "[n]one of the States' complaints mention any provision of federal law nor allege that S&P violated a federal statute," States' Mem. at 13, is accurate only in the sense that they have pleaded their Complaints in careful avoidance of even mentioning the federal provisions that their allegations clearly implicate. Yet the Complaints evidence an awareness of the ocean of federal issues into which the States have waded, and they reflect conscious efforts to avoid acknowledging those issues.[12]

---

[12]   Although the States attempt to gloss over S&P's status as a federally regulated entity, they acknowledge S&P's important role in the federal system by alleging that "S&P's rating also acts as a de facto regulatory license." *See, e.g.,* Ariz. Cpt. ¶ 47; Ark. Cpt. ¶ 46; Del. Cpt. ¶ 47; Idaho Cpt. ¶ 61; Ind. Cpt. ¶ 48; Iowa Cpt. ¶ 47; Mo. Cpt. ¶ 57; N.C. Cpt. ¶ 38; S.C. Cpt. ¶ 46; Tenn. Cpt. ¶ 56; Wash. Cpt. ¶ 44.

13

One need look no further than the Complaints themselves, and the state statutes the States invoke, to see that these actions necessarily raise federal issues. At the heart of the States' Complaints are allegations that S&P violated its own Code of Conduct and policies designed to manage conflicts of interests and ensure that S&P's analysis is "independent" and "objective." *See, e.g.*, Tenn. Cpt. ¶ 260(b)(v) ("S&P did not operate its business in conformance with . . . its own Code of Conduct"); Ark. Cpt. ¶ 167(e) (same); Me. Cpt. ¶ 46(B) ("S&P misrepresented that it operated its business in conformance with its codes of conduct"). This is the conduct that all of these actions challenge as "misleading" under the state statutes. The pertinent standard of conduct the States invoke comes from CRARA, but the States fail to say so, as the following comparison makes clear:

| ALLEGED MISLEADING STATEMENT | FEDERAL LAW |
|---|---|
| "S&P understands that the *issuer pays* model creates conflicts of interest but that these **conflicts have been adequately managed and neutralized by the company as demonstrated by the principles set forth in S&P's Code of Conduct**" <br> - Colo. Cpt. ¶ 153(c) (emphasis added).[13] | Credit rating agencies such as S&P that use the "*issuer pays*" model must "**establish, maintain, and enforce written policies and procedures reasonably designed . . . to address and manage any conflicts of interest**" <br> - 15 U.S.C. § 78o-7(h)(1) |

S&P's alleged failure to act in conformity with its Code of Conduct is, as the Iowa Complaint observes, the "gravamen" of the States' claims.[14] The Code of Conduct is mentioned

---

[13] *See also* Ariz. Cpt. ¶ 166(c) ("S&P understands that the Issuer Pays business model creates conflicts of interest but that these conflicts have been adequately managed and neutralized by the company as demonstrated by the principles set forth in S&P's Code of Conduct"); Ark. Cpt. ¶ 166(c) (same); Del. Cpt. ¶ 176(3) (same); Idaho Cpt. Causes of Action I ¶ 11 (same); Mo. Cpt. ¶ 197(c) (same); N.C. Cpt. ¶ 114(c) (same); S.C. Cpt. ¶ 165(c) (same); Tenn. Cpt. ¶ 260(a)(iii) (same); Ind. Cpt. ¶ 171(d) ("S&P represents that it understands that the issuer pays business model creates conflicts of interest, but that these conflicts have been adequately managed by the company as demonstrated by the principles set forth in S&P's Code"); Iowa Cpt. ¶ 87 ("S&P understands that the issuer-pays business model creates conflicts of interest, but that these conflicts have been adequately managed by the company as demonstrated by the principles set forth in S&P's Code"); Wash. Cpt. ¶142(c) ("S&P understands the conflicts created by the Issuer Pays Business Model but that S&P has adequately managed and neutralized the conflicts as demonstrated by the principles set forth in S&P's Code of Conduct").

or referenced no fewer than 234 times in the Complaints.[15]   The States thus plead causes of

action that turn on whether S&P was in compliance with CRARA's provisions requiring it to

maintain and enforce written policies and procedures reasonably designed to manage conflicts of

interest.  The States' own formulation of their claims will necessarily and inevitably require the

Court to evaluate S&P's compliance with federal law.  If S&P was in full compliance with

CRARA, the States will be unable to prove misleading conduct—not because of S&P's

preemption defense, but because the States have chosen to predicate their theory of falsity

coextensively with the federal statute.

Indeed, if the Complaints had explicitly invoked and cited CRARA over 200 times in

setting forth the alleged misconduct by S&P that is the very "gravamen" of these cases—instead

of referring to S&P's federally mandated policies and procedures, including the Code of

Conduct—there would be no question about federal jurisdiction here.  In essence, the States ask

the Court to accept that every case in the *Grable* line would have come out differently if only the

plaintiff in each of those cases had had been savvy enough *not* to mention the relevant federal

---

[14]  *See* Iowa Cpt. ¶¶ 9-10 ("gravamen of this action" is "the fact that S&P represented that its analysis of structured finance securities was independent, objective, and, as stated in its Code of Conduct, 'not . . . affected by the existence of, or potential for, a business relationship between [S&P] . . . and the Issuer . . . or any other party, or the non-existence of any such relationship'").  *See also* Ariz. Cpt. ¶¶ 9-10; Ark. Cpt. ¶¶ 9-10; Colo. Cpt. ¶¶ 9-10; Del. Cpt. ¶¶ 9-10; Idaho Cpt. ¶ 11; Ind. Cpt. ¶¶ 16-17; Me. Cpt. ¶ 34; Miss. Cpt. and Am. Cpt. ¶ 80(D); Mo. Cpt. ¶¶ 24-25; N.C. Cpt. ¶¶ 8-9; Pa. Cpt. ¶¶ 37-39, 89; S.C. Cpt. ¶¶ 16-17, 162; Tenn. Cpt. ¶¶ 12-13; Wash. Cpt. ¶¶ 8-9.

[15]  *See, e.g.*, Ariz. Cpt. ¶¶  4, 10, 52, 69-70, 74-81, 89-93, 148, 166, 167; Ark. Cpt. ¶¶ 4, 10, 51, 68-69, 73-80, 88-92, 146, 166, 167 ; Colo. Cpt. ¶¶ 10, 67-68, 72-78, 90, 93-95, 102, 150, 153, 154; Del. Cpt. ¶¶ 4, 10, 52, 63-64, 69-70, 74-81, 89, 150, 176, 181, 185; Idaho Cpt. ¶¶  9, 11, 69, 81-82, 88-89, 93-100, 102, 178, Causes of Action I ¶ 11, II ¶ 6; Ind. Cpt. ¶¶ 17, 52, 67, 71-72, 76-83, 96, 151, 170-72 ; Iowa Cpt. ¶¶ 4, 10, 52, 66-67, 69-76, 84, 87, 142; Me. Cpt. ¶¶ 26-27, 34, 39, 46, and Relief Requested ¶ 1; Miss. Cpt. and Am. Cpt. ¶¶ 5, 25(b), 25(b)(ii), 40, 53, 80; Mo. Cpt. ¶¶ 19, 25, 62, 80-81, 85-92, 103, 159, 197-98; N.C. Cpt. ¶¶ 3, 9, 52-53, 57-62, 96, 111, 114-15; Pa. Cpt. ¶¶ 39-41, 45-47, 51; S.C. Cpt. ¶¶ 11, 16, 51, 69-70, 74-81, 96, 162, 165-66; Tenn. Cpt. ¶¶ 7, 13, 61, 73, 78-79, 83-91, 99-103, 106, 203, 260(a), 260(b); Wash. Cpt. ¶¶ 4, 9, 47, 63-64, 68-75, 83, 86, 139, 142, 145.  The State complaints also rely heavily upon the Code of Conduct's presence on S&P's website.  *See, e.g.,* Ariz. Cpt. ¶ 81; Ark. Cpt. ¶ 80; Del. Cpt. ¶ 81; Ind. Cpt. ¶ 83; Iowa Cpt. ¶ 76;  Mo. Cpt. ¶ 92; S.C. Cpt. ¶ 81; Tenn. Cpt. ¶ 91; Wash. Cpt. ¶ 75.

statute to which the court would be required to turn to decide the case. That dubious proposition finds no support in the authorities.

A striking example of the States' effort to avoid even mentioning federal law while simultaneously relying on the supposed violation of what are inherently federal standards arises out of their claim that S&P falsely stated: "that S&P agrees with ***and has implemented the principles set forth in the IOSCO Code of Conduct pertaining to its obligation as a credit rating agency to maintain the independence, objectivity and integrity of its analysis of structured finance securities***." Colo. Cpt. ¶ 153(d) (emphasis added).[16] IOSCO, the International Organization of Securities Commissions, promulgated guidelines that Congress and the SEC later incorporated into CRARA and its implementing regulations.[17] In fact, in promulgating its rules implementing CRARA, the SEC both considered and explicitly referenced the IOSCO Code. *See* Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations, Exchange Act Release No. 55231, 2007 WL 325688, at *4 (Feb. 2, 2007) ("The Commission notes that international standards, such as those promulgated by the Technical Committee of the International Organization of Securities Commissions ('IOSCO'), are generally consistent with the Act and the rules the Commission is proposing."); *see also Id.* at *65 ("The Commission believes that larger NRSROs generally would have already established written policies and procedures and recordkeeping systems that would comply with a substantial portion of the requirements in the proposed rules."). The IOSCO itself has recognized that the "conflict of interest" provisions of CRARA mirror the IOSCO Code.[18]

---

[16] *See also* Ariz. Cpt. ¶ 69; Ark. Cpt. ¶¶ 68, 166(d); Colo. Cpt. ¶ 67; Del. Cpt. ¶¶ 69, 176(d); Idaho Cpt. ¶ 88; Ind. Cpt. ¶ 71; Iowa Cpt. ¶ 66; Miss. Cpt. and Am. Cpt. ¶ 25(b)(ii); Mo. Cpt. ¶ 80; N.C. Cpt. ¶ 53; Pa. Cpt. ¶.40; S.C. Cpt. ¶¶ 69, 165(d); Tenn. Cpt. ¶¶ 78, 260(a)(iv); Wash. Cpt. ¶ 64.

[17] In fact, as a member of IOSCO, the SEC played a significant role in drafting the IOSCO Code.

[18] *See* IOSCO, REGULATORY IMPLEMENTATION OF THE STATEMENT OF PRINCIPLES REGARDING THE

The fact that the States refer to the non-binding IOSCO guidelines rather than to the more pertinent, binding federal duties and standards of conduct governing the ratings agencies found in CRARA, Dodd-Frank, and the SEC regulations promulgated thereunder is nothing more than sleight of hand.   For example, § 2.C.2.12 of the IOSCO Code provides:   "*The* [Credit Rating Agency] ***should not have employees who are directly involved in the rating process initiate, or participate in, discussions regarding fees or payments with any entity they rate*.*"   IOSCO, CODE OF CONDUCT FUNDAMENTALS FOR CREDIT RATING AGENCIES 7 (Dec. 2004) *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD180.pdf.   The federal regulation that the States choose not to mention, 17 C.F.R. § 240.17g–5(c), provides, in virtually identical, but mandatory, terms:   "A [NRSRO] is ***prohibited from having*** the following conflicts of interest relating to the issuance or maintenance of a credit rating as a credit rating agency . . . (6) The [NRSRO] issues or maintains ***a credit rating where the fee paid for the rating was negotiated, discussed, or arranged by a person within the [NRSRO] who has responsibility for participating in determining credit ratings*** . . . ."   This is far from the only example of this phenomenon, as the following chart demonstrates:

| IOSCO CODE OF CONDUCT | FEDERAL STATUTES AND REGULATIONS |
|---|---|
| § 2.B.2.6 | 15 U.S.C. § 78o-7(h)(1), |
| The CRA should adopt **written internal procedures and mechanisms to (1) identify, and (2) eliminate, or manage and disclose, as appropriate, any actual or potential conflicts of interest** that may influence the opinions and analyses the CRA makes or the judgment and analyses of the individuals the CRA employs who have an influence on ratings decisions.  The CRA's | Each nationally recognized statistical rating organization **shall establish, maintain, and enforce written policies and procedures** reasonably designed, taking into consideration the nature of the business of such [NRSRO] and affiliated persons and affiliated companies thereof, **to address and manage any conflicts of interest** |

ACTIVITIES OF CREDIT RATING AGENCIES FINAL REPORT 28 (Feb. 2011) *available at* http://www.fsa.go.jp/inter/ios/20110302/01.pdf ("The US CRA regulatory program promotes the second IOSCO CRA Principle by requiring an NRSRO to establish, maintain, and enforce policies and procedures reasonably designed, taking into consideration the nature of its business, to address and manage conflicts of interest." (citing CRARA, 15 U.S.C. § 78o-7(h)(1).)

| IOSCO CODE OF CONDUCT | FEDERAL STATUTES AND REGULATIONS |
|---|---|
| **code of conduct should also state that the CRA will disclose such conflict avoidance and management measures**. | that can arise from such business.<br><br>15 U.S.C. § 78o-7(h)(2)<br><br>**The Commission shall issue final rules in accordance with subsection (n) to prohibit, or require the management and disclosure of, any conflicts of interest** relating to the issuance of credit ratings by a [NRSRO], including, without limitation, conflicts of interest . . . . |
| § 2.B.2.3<br><br>**The determination of a credit rating should be influenced only by factors relevant to the credit assessment**.<br><br>§ 2.B.2.4<br><br>The credit rating a CRA assigns to an issuer or security **should not be affected by the existence of or potential for a business relationship** between the CRA (or its affiliates) and the issuer (or its affiliates) or any other party or the non-existence of such a relationship. | 17 C.F.R. § 240.17g–6<br><br>**A [NRSRO] is prohibited from** engaging in any of the following unfair, coercive, or abusive practices: . . . **[I]ssuing, or offering or threatening to issue, a credit rating that is not determined in accordance with the [NRSRO's] established procedures and methodologies** for determining credit ratings, **based on whether the rated person, or an affiliate of the rated person, purchases or will purchase the credit rating or any other service or product** of the nationally recognized statistical rating organization or any person associated with the nationally recognized statistical rating organization. |
| § 3.A.3.5<br><br>The CRA should **publish sufficient information about its procedures, methodologies and assumptions** (including financial statement adjustments that deviate materially from those contained in the issuer's published financial statements) **so that outside parties can understand how a rating was arrived at by the CRA**. | 15 U.S.C. § 78o-7(q)(1)<br><br>The Commission shall, by rule, **require that each [NRSRO] publicly disclose information on the initial credit  ratings** determined by the nationally recognized statistical  rating organization for each type of obligor, security, and money  market instrument, and any subsequent changes to such credit  ratings, **for the purpose of allowing users of credit ratings  to evaluate the accuracy of ratings** and compare the performance of ratings by different nationally recognized statistical rating organizations. |
| § 4.1<br><br>**The CRA should disclose to the public its code of conduct** and describe how the provisions of its code of conduct fully implement the provisions of the IOSCO Principles Regarding the Activities of Credit Rating Agencies and the IOSCO Code of Conduct Fundamentals for Credit Rating Agencies. | 17 C.F.R. § 240.17g–1(i)<br><br>**A [NRSRO] must make its current Form NRSRO and information and documents submitted in Exhibits 1 through 9 to Form NRSRO publicly available on its Web site**, or through another comparable, readily accessible means. . . . |

18

The Complaints' references to the IOSCO Code are oblique but unmistakable references to the federal regulatory scheme.  Replacing every reference in the Complaints to the IOSCO Code with one to the parallel (and actually binding) provisions of CRARA provides another illustration of the federal issues at stake here.

The question inevitably arises:  Why in setting forth their basic theory that S&P purportedly failed to maintain and enforce polices to manage conflicts of interest did the States quote chapter and verse from the non-binding IOSCO guidelines, while failing to mention the parallel (and substantively identical) CRARA provisions that actually require those policies?  It is as if an American plaintiff in a case involving freedom of speech chose to refer only to Article 19 of the Universal Declaration of Human Rights and not at all to the First Amendment.  The only explanation is that the States hoped doing so would permit them to dodge federal jurisdiction.  But the fact that the States chose to plead their Complaints without reference to the federal law that provides the key predicates of their legal claims, and upon which the viability of their claims turns, cannot erase that law or its effects here.

Put another way, in evaluating whether S&P did in fact adopt, maintain, and enforce policies to guard against conflicts of interest, one must closely review the rules and regulations that required those actions in the first place.  Only by doing so can one decide—consistent with Congress' recognition that ratings are "of national importance" and warrant their own comprehensive regulatory regime—whether, for example, the risks of conflicts of interest can be dealt with sufficiently by separating analytical personnel from those more responsible for considering business-related matters or whether, as Maine would require, S&P must totally refrain "from rating securities when it has a conflict."  Me. Cpt., Relief Requested 4.

Practical reality confirms the appropriateness of a federal forum for these cases.  The State Actions all seek essentially the same relief:  civil penalties, disgorgement and/or restitution on behalf of unidentified "victims" of the alleged deception, and permanent injunctive relief to stop S&P from violating the policies intended to address and manage potential conflicts of interest.[19] The States' injunction requests seek court orders to, among other things, "prevent [S&P's] continued or future deceptive or misleading trade practices or statements," Colo. Cpt., Prayer for Relief ¶ C, and prevent *"S&P from rating securities when it has a conflict and when it is not competent to give the rating,"* Me. Cpt., Relief Requested ¶ 4.[20]  These injunctions go to the very heart of the "sound balance" the federal law strikes, and they unquestionably seek to impose a new "balance" of the States' own making.  The risks inherent in multiple courts in multiple states issuing overlapping or conflicting injunctions addressing what S&P is required to do or say to implement and describe its Code of Conduct are self-apparent.

Courts have found federal jurisdiction over a long line of analogous cases alleging violations of the internal rules that the federal securities laws require self-regulatory organizations ("SROs") to promulgate.  These precedents affirm that, artful pleading aside, the States' causes of action for S&P's alleged non-compliance with the rules it is required to implement under federal law support federal question jurisdiction.  In *D'Alessio* v. *N.Y. Stock Exch., Inc.*, 258 F.3d 93 (2d Cir. 2001), the Court of Appeals affirmed the district court's finding of federal question jurisdiction where the plaintiff alleged violations of the New York Stock

---

[19]  *See, e.g.*, Ariz. Cpt. ¶ 12; Ark. Cpt. ¶ 12; Colo. Cpt. ¶ 12; Del. Cpt. ¶ 13; Idaho Cpt. ¶ 18; Ind. Cpt. Intro, Prayer for Relief; Iowa Cpt. ¶¶ 12, 14; Me. Cpt. Intro.; Miss. Cpt. and Am. Cpt. ¶ 18; Mo. Cpt. ¶ 27; N.C. Cpt. ¶ 12; Pa. Cpt. Intro.; S.C. Cpt. Prayer for Relief ¶¶ 2-4, 7-12; Tenn. Cpt. ¶ 16; Wash. Cpt. Prayer for Relief ¶¶ 3-5.

[20]  *See also* Ark. Cpt. ¶ 12; Colo. Cpt. ¶ 12; Del. Cpt. ¶ 13 (cease and desist order); Idaho Cpt. ¶ 18; Ind. Cpt. Prayer for Relief; Iowa Cpt. ¶ 12; Me. Cpt. Intro.; Miss. Cpt. and Am. Cpt. ¶ 85; Mo. Cpt. Prayer for Relief ¶¶ B, C; N.C. Cpt. Prayer for Relief ¶ 3; Pa. Cpt. ¶¶ 9, 66, 90; S.C. Cpt. Prayer for Relief ¶¶ 2, 7; Tenn. Cpt. Prayer for Relief ¶ D; Wash. Cpt. Prayer for Relief ¶ 3.

Exchange's duty to enforce and monitor its members' compliance with the internal rules it was required to promulgate and enforce under the Exchange Act. *Id.* at 102-104. Even though the claims in *D'Alessio* — like those here — were "cast as state law claims," the court found a federal issue justifying the exercise of jurisdiction because they were "premised, in large part, on the NYSE's failure to enforce and monitor compliance by its members with the Exchange Act and the rules and regulations thereunder, as well as the rules promulgated by the NYSE pursuant to the Exchange Act." *Id.* at 103.

> *D'Alessio* is routinely applied by courts in this district, including earlier this year:

> The interpretation and application of SEC-approved rules and the duties that stem from the Exchange Act in the context of the operation of a national securities exchange are issues of paramount federal concern, which demand uniform federal application, over which federal courts have "special expertise" and state courts and commercial arbitrators do not. Accordingly, there are substantial federal concerns in the instant case to confer subject matter jurisdiction.

*NASDAQ OMX Grp., Inc.* v. *UBS Sec. LLC*, 2013 WL 3942948, at *12 (S.D.N.Y. June 18, 2013); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 525191, at *8 (S.D.N.Y. Feb. 13, 2013) ("Courts in this Circuit and elsewhere have regularly accepted jurisdiction over state law claims asserted against national securities [exchanges] when such claims are founded upon duties imposed under the rules and regulations promulgated pursuant to the Exchange Act."). This type of necessary federal question has also been recognized as one arising under federal law in other jurisdictions. *See, e.g., Sparta Surgical Corp.* v. *Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1212 (9th Cir. 1998) (finding jurisdiction where "[t]he viability of any cause of action founded upon NASD's conduct in de-listing a stock or suspending trading depends on whether the association's rules were violated."); *Capece* v. *Depository Trust & Clearing Corp.*, 2005 WL 4050118, at *8 (S.D. Fla. Oct. 11, 2005) ("Claims that a federally regulated financial institution has violated its own rules are routinely held to invoke a substantial federal interest . . .

21

Whether the federal provisions in question are statutes or regulations is of no moment.  So long as resolution of an action requires review of a substantial question of federal law, federal jurisdiction is proper.").[21]  For all the same reasons that courts recognize federal jurisdiction over causes of action for violations of the internal rules a Self-Regulatory Organization is required to promulgate under federal law, federal jurisdiction lies over Plaintiff's causes of action for an NRSRO's alleged failure to comply with its federally mandated obligation to maintain and enforce its Code of Conduct and related policies.

The States' assertion that they target only statements about independence and objectivity and "do not seek to regulate S&P's ratings or its methodologies nor . . . to interfere with the registration of NRSROs in any way," States' Mem. at 20, misses the point. For one thing, the question of S&P's independence—that is, its adoption of and enforcement of policies designed to guard against conflicts of interest—itself necessarily implicates important federal questions. In any event, to prove their consumer protection claims, the States must establish misleading statements or omissions.  Yet the challenged statements regarding S&P's "independence" and "objectivity" have no capacity to mislead or cause harm outside the context of purchases of securities rated by S&P.  The Department of Justice's Statement of Interest filed in this case acknowledges this indisputable reality.  *See* Statement of Interest at 2 (characterizing the State Actions as "premised on allegations that S&P made false statements regarding its objectivity and independence on which consumers within the states relied in purchasing" rated structure finance

---

[21] *See also Bender* v. *Jordan*, 623 F.3d 1128, 1130-31 (D.C. Cir. 2010) (finding federal jurisdiction over claim for breach of a contract required to be executed under a federal regulation because "[a]t stake is the interpretation of a federal regulation that governs the conduct of a federal agency—the Office of Thrift Supervision—and federally chartered savings associations"); *Manning* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2013 WL 1164838, at *6 (D.N.J. Mar. 20, 2013) (finding federal jurisdiction where "the essence of the Amended Complaint is that violation[s] of Regulation SHO and other federal regulations gave rise to a number of state claims."); *Ins. Corp.* v. *Monroe Bus. Corp.*, 491 F. Supp. 2d 430, 436-37 (S.D.N.Y. 2007) (finding federal jurisdiction over insurance contract claims where "the principal rights and obligations were created by federal law" and the "contractual provisions in question . . . were not just authorized by federal law but were created and required by federal law") (original emphasis omitted).

securities).  Clearly, the States' conclusory assurance that the Complaints do not challenge the ratings does not make it so; rather, these allegations only make clear that such an inquiry is necessary.  The Court need not give any weight to the States' disclaimers in assessing the basis for federal jurisdiction here.  *See In re Otter Tail Power Co.*, 116 F.3d 1207, 1213 (8th Cir. 1997) ("[a] plaintiff's characterization of a claim as based solely on state law is not dispositive of whether federal question jurisdiction exists"); *Harper* v. *Massey Coal Servs., Inc.*, 2011 WL 322558 (S.D.W.Va. Feb. 2, 2011) (finding federal jurisdiction despite disclaimer of reliance on any federal law in complaint).  The States may not evade federal jurisdiction by the simple expedient of making conclusory statements as to what the Complaints are *not* about, particularly when such self-serving statements are belied by the rest of their allegations.

Anywhere the surface of the Complaints is scratched, federal issues bleed through.  The Court is empowered to look beyond the face of the Complaints in assessing the basis for federal jurisdiction.  "[U]nder the artful pleading rule, which exists as an independent corollary to the well-pleaded complaint rule, a party may not avoid federal jurisdiction by omitting to plead necessary federal questions in the complaint."  *NASDAQ OMX Grp.*, 2013 WL 3942948, at *9 (citation and internal quotation marks omitted); *see also Marcus*, 138 F.3d at 55 (describing artful pleading doctrine); MOORE'S FEDERAL PRACTICE, § 103.43 ("A plaintiff cannot avoid federal court simply by omitting a necessary federal question in the complaint; in such a case the necessary federal question will be deemed to be alleged in the complaint.").

### 2.  *The State Statutes Themselves Require Reference to Federal Law*

If there were any doubts about the centrality of federal law to the resolution of these cases, they would be assuaged by focusing on the texts of the statutes upon which the States rely.  The drafters of those laws incorporated provisions unambiguously requiring determinations as to the scope of federal law.  Most state statutes at issue contain exemptions expressly declaring that

they do not reach conduct subject to or in compliance with a federal regulatory regime.[22]   In

other words, because these statutes by their own terms do not reach conduct that is in compliance

with applicable federal regulations, any court hearing these claims will, as a threshold matter,

have to look to those regulations in determining whether the alleged conduct can be actionable

under the terms of the state statutes.  States thus cannot prevail on claims under their consumer

protection statutes absent the resolution in their favor of federal issues as to whether S&P's

conduct was required by or permitted under the federal statutory and regulatory regime.

Under these circumstances, "it is not logically possible for the plaintiffs to prevail on this

cause of action without affirmatively answering the embedded question of . . . federal law. . . . .

That is enough to make out a federal question.  No more is exigible to surmount the first step of

the *Grable* progression."  *R.I. Fishermen's Alliance, Inc.*, 585 F.3d at 49 (internal citation

omitted).  In *Rhode Island Fishermen's Alliance*, the First Circuit affirmed the district court's

denial of a remand motion where plaintiffs alleged a violation of a state law regulating lobster

fishing that prohibited the use of retroactive control dates "unless expressly required by federal

law, regulation or court decision."  *Id.* (citation and quotation marks omitted).  This reference to

---

[22]  *See, e.g.*, ARK. CODE ANN. § 4-88-101(3) ("This chapter does not apply to . . . [a]ctions or transactions permitted under laws administered by . . . [a] regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter . . . ."); COLO. REV. STAT. ANN. § 6-1-106(1)(a) ("This article does not apply to . . . [c]onduct in compliance with the orders or rules of, or a statute administered by, a federal . . . governmental agency[.]"); 6 DEL. CODE ANN. § 2534(a) ("This chapter does not apply to . . . [c]onduct in compliance with the orders or rules of, or a statute administered by, a federal . . . governmental agency . . . ."); IDAHO CODE ANN. § 48-605(1) ("Nothing in this act shall apply to: (1) Actions or transactions permitted under laws administered by . . . [a] regulatory body or officer acting under statutory authority of . . . the United States."); ME. REV. STAT. ANN. tit. 5, § 208(1) ("Nothing in this chapter shall apply to . . . Transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of . . . the United States."); S.C. CODE ANN. § 39-5-40(a) ("Nothing in this article shall apply to . . . [a]ctions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of . . . the United States . . . ."); TENN. CODE ANN. § 47-18-111(a)(1) ("The provisions of this part shall not apply to . . . [a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of . . . the United States[.]"); WASH. REV. CODE ANN. § 19.86.170 ("Nothing in this chapter shall apply to . . . actions or transactions permitted by any other regulatory body or officer acting under statutory authority of . . . the United States.").

24

federal law in the state law that the defendants were alleged to have violated sufficiently embedded a federal issue into the state law cause of action, and the First Circuit held that "the plaintiffs' well-pleaded complaint establishes that their asserted right to relief under state law requires resolution of a federal question." *Id.*

The Department of Justice, despite its stalwart opposition to the exercise of federal jurisdiction in this case, has advocated an identical statutory interpretation analysis in support of federal question jurisdiction in a Statement of Interest it filed relying on the *Grable* decision in another multidistrict litigation. The Department of Justice argues here that statutory provisions that require reference to federal law create only a defense to the statutory claim and therefore do not present a necessary federal issue. *See* Statement of Interest at 9 n.4. But the Department of Justice has argued in the context of analogous statutory provisions implicated in the *In re NSA Telcommunications Records Litigation* that "federal issues regarding lawful process and authorization must be resolved in order [for] Plaintiffs to bring their claims, and are not mere defenses." Statement of Interest of the United States in Opposition to Plaintiffs' Motion to Remand at 13, *Riordan, et al.* v. *Verizon Commc'ns., Inc.*, No. 06-CV-03574 (VRW) (N.D. Cal. Aug. 4, 2006) (case later consolidated as part of *In re NSA Telcomms. Records Litig.*, MDL No 06-1791 (VRW) (N.D. Cal. 2006)), *available at* https://ecf.cand.uscourts.gov/doc1/ 03513275660. In that case, plaintiffs brought suit under a California state statute that provided "that no cause of action exists where "[i]nformation [is] provided to a law enforcement agency in response to lawful process." *Id.* at 11 (quoting CAL. PUB. UTIL. CODE § 2891(d)(6)). In language notably distinct in nature from the Government's Statement of Interest here, the Department of Justice there observed that "[b]ecause Plaintiffs' [statutory] claim depends upon

whether federal law authorized and/or immunized [Defendant's] alleged activities, then under *Grable* this action necessarily raises issues of federal law." *Id.*

State legislatures know well how to create statutory defenses, and the statutory exemption provisions at issue here simply do not state that the exemptions are defenses.  In Idaho, for example, the legislature specifically delineated a defense to the consumer protection act, but it is not the exemption for conduct permitted under federal regulatory authority.  *Compare* IDAHO CODE ANN. § 48-605 ("Nothing in this act shall apply to . . . [a]ctions or transactions permitted under laws administered by [a] regulatory body or officer acting under statutory authority of this state or the United States."), *with*  IDAHO CODE ANN. § 48-618 ("In any action instituted under this act it shall be an absolute defense to show the challenged practices are subject to and comply with statutes administered by the federal trade commission, or any duties, regulations or decisions interpreting such statutes.").  The Idaho legislature's inclusion of a separate provision in Code § 48-618 explicitly creating a defense to its consumer protection act undercuts the notion that it meant Code § 48-605 to be read as anything but a limitation on the scope of its state legislation.  *Cf. United Sav. Ass'n*  v. *Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme. . . .").

Plaintiffs cannot prevail on claims that do not fall within the bounds of their state statutes. Even if these issues were never raised by Defendants, governing principles of statutory interpretation would require the Court to satisfy itself as an initial matter that the statutes relied upon in the Complaints may even apply to the conduct challenged.  *See West Virginia ex rel. McGraw* v. *Eli Lilly & Co.*, 2008 WL 4449655, at *3 (E.D.N.Y. Sept. 30, 2008) ("A federal or

state court interpreting and applying West Virginia's Consumer Credit and Protection Act must necessarily look to federal statutes and federal court decisions in its analysis.").

Because the state statutes by their own terms prohibit liability for conduct permitted by federal law, these statutes also require reference to the federal Constitutional protection that applies to credit ratings. Thus, the First Amendment raises additional necessary federal issues in each of the State Actions. *See Bracey* v. *Bd. of Educ.*, 368 F.3d 108, 116 (2d Cir. 2004) (affirming federal subject matter jurisdiction over claims brought under a state statute that requires court to "look to federal First Amendment law to determine whether [it] gives rise to a cause of action"); *Bd. of Cnty. Comm'rs* v. *Shroyer*, 662 F. Supp. 1542, 1544 (D. Colo. 1987) ("The complaint does *not* seek an injunction muzzling defendant or otherwise restraining him from commenting further . . . . If the complaint did seek such direct relief against defendant, then the First Amendment would be plainly implicated on the face of the complaint. Federal jurisdiction would clearly lie."). It is well established that S&P's credit ratings are protected speech under the First Amendment.[23] Yet, each of the State Actions alleges violations of state statutes that permit the imposition of liability in the absence of proof of actual malice. Indeed, certain of the States have expressly disclaimed that they are required to prove anything at all about S&P's state of mind.[24] The Court will nonetheless be required to consider the satisfaction of the First Amendment state-of-mind requirement as a necessary predicate to a finding of

---

[23] *See Compuware Corp.* v. *Moody's Investors Servs., Inc.*, 499 F.3d 520, 531(6th Cir. 2007); *Jefferson Cnty. Sch. Dist. No. R-1* v. *Moody's Investors Servs., Inc.*, 175 F.3d 848, 854-56 (10th Cir. 1999); *Tolin* v. *Standard & Poor's Fin. Servs., LLC*, 2013 WL 3192115, at *6 (S.D.N.Y. June 24, 2013); *Rice* v. *Charles Schwab*, 2010 WL 5156654 (C.D. Cal. Oct. 22, 2010); *In re Enron Corp. Sec., Derivative and "ERISA" Litig*, 511 F. Supp. 2d 742, 825 (S.D. Tex. 2005); *Cnty. of Orange* v. *McGraw-Hill Cos.*, 245 B.R. 151, 156 (C.D. Cal. 1999); *First Equity Corp.* v. *Standard & Poor's Corp.*, 690 F. Supp. 256, 258-59 (S.D.N.Y. 1988), *aff'd on other grounds*, 869 F.2d 175 (2d Cir. 1989).

[24] A number of the States have asserted that for liability to be imposed, "[t]he state must only prove that S&P's acts and omissions had the tendency or capacity to deceive customers," Idaho Remand Brief at 12, that "an advertised claim need only meet the definition of deception to be actionable, namely, having the tendency or capacity to mislead a substantial number of consumers as to a material fact," Iowa Reply Brief at 3 (emphasis omitted), or the like.

27

liability under these state statutes. *See, e.g.*, *Compuware*, 499 F.3d at 525-26 (requiring plaintiff to show that defendant acted with actual malice in order to impose liability for ratings opinions).

Resolution of the critical—and potentially dispositive—threshold issue of the applicability of the state statutes here requires detailed application and analysis of federal law and regulations. No more is required to satisfy the initial prong of the *Grable* analysis.  *See Gunn*, 133 S. Ct. at 1065.[25]

These necessary federal issues have already manifested in the action upon which many of these complaints are modeled:  the Connecticut Attorney General's action against S&P.  The Connecticut court in that action has already found it necessary to make detailed findings about the scope and nature of CRARA in order to decide at the pleading stage whether S&P's alleged conduct could fit within the scope of Connecticut's parallel unfair trade practices statute.  *See* Ruling on Motion to Strike, *Connecticut* v. *Moody's Corp.*, 2012 WL 2149408 (Conn. Super. May 10, 2012).  That determination was independent of, and quite apart from, preemption analysis.

Before Plaintiffs can prevail on their causes of action here, the Court will need to construe CRARA's provisions requiring NRSROs to maintain and enforce written policies and procedures reasonably designed to manage conflicts of interest and decide threshold issues of whether particular conduct by S&P in its analysis of structured finance securities was in compliance with the federal regulatory scheme or permitted by SEC regulators.  The resolution of those issues will necessarily involve the application and interpretation of federal law, and, contrary to the assertion by the Department of Justice that the federal issues here are "fact-bound and situation-specific" (Statement of Interest at 10-11), will generate decisions with import to the entire

---

[25] That these consolidated actions necessitate the detailed application and analysis of federal law does not mean that every consumer protection claim will similarly give rise to federal jurisdiction; unlike these actions, not all consumer protection actions will satisfy the other *Grable* factors, as demonstrated below.

federal system, the national securities markets, and an ongoing federal rulemaking process. Congress has provided in 28 U.S.C. § 1331 for the application and analysis of federal law required to be performed within the federal judicial system in cases such as this.

### C. The Federal Issues Raised by the State Actions Are Extraordinarily Substantial

As the above discussion demonstrates, the substantiality and extent of the federal interest here is clear.  The States cannot deny and thus ignore that Congress itself has explicitly stated that "credit rating agencies are of national importance."  CRARA § 2, 120 Stat. at 1327.  SEC Chairman Mary Jo White affirmed earlier this year "the systemic importance of credit ratings and that credit rating agencies are central to capital formation, investor confidence, and the efficient performance of the U.S. economy."  Opening Remarks at SEC Roundtable on Credit Ratings (May 14, 2013), *available at* http://www.sec.gov/News/Speech/Detail/Speech/1365171515666#.Ue3E4Y1OR8E.  Still, we turn briefly to the States' half-hearted arguments addressed to *Grable's* "substantiality" prong.  Here again, the States repeat their refrain that any federal issues implicated here are mere preemption defenses.  *See* States' Mem. at 19-24.  In doing so, they fail to deal with the key questions of what federal interests their claims implicate, and the degree of magnitude of those interests.  The States' claims threaten a uniform system of regulation upon which the effective functioning of the national securities markets depends.  As the States acknowledge, the key consideration as to whether a federal issue is substantial is "the importance of the issue to the federal system as a whole."  *Gunn*, 133 S. Ct. at 1066, *see* States' Mem. at 25.  In the words of the Supreme Court, "[t]he magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."  *Dabit*, 547 U.S. at 78; *see also* 15 U.S.C. § 78aa (vesting

federal courts with exclusive jurisdiction over claims alleging securities law violations and enforcement actions under the Exchange Act or rules and regulations promulgated thereunder).

Even outside the context of the national securities markets, state law claims implicating the uniformity of complex federal regulatory regimes have often triggered federal question jurisdiction.  In *Broder*, the Court of Appeals affirmed the district court's denial of a remand motion where the federal issues "involve[d] aspects of the complex federal regulatory scheme applicable to cable television rates, as to which there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'"  418 F.3d at 195 (quoting *Grable*, 545 U.S. at 313).  Similarly, in *Eli Lilly & Co.*, the court found federal jurisdiction over West Virginia's claims related to its payments for prescription drugs in the context of the federal Medicaid program, noting that "[a]t issue here is not simply a federal standard, but also the added factor of an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation."  476 F. Supp. 2d at 234.; *see also New York City Health and Hosps. Corp.* v. *Wellcare of N.Y. Inc.*, 769 F. Supp. 2d 250, 257-58 (S.D.N.Y. 2011) (denying remand because the claims "implicat[ed] the complex reimbursement schemes created by Medicare law"); *One and Ken Valley Hous. Grp.* v. *Me. State Hous. Auth.*, 716 F.3d 218, 220 (1st Cir. 2013) (finding federal jurisdiction over breach of contract claims "aris[ing] in the context of a complex web of statutes and regulations governing federal housing aid"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 457 F. Supp. 2d 77, 80 (D. Mass. 2006) (finding "that the meaning of [Average Wholesale Prices] in the federal Medicare statute is a substantial federal issue that properly belongs in federal court").  These uniformity considerations grow all the more powerful in the context of federal securities regulation.  *See Reserve Mgmt. Co.* v. *Willkie Farr & Gallagher LLP*, 2012 WL 4378058, at *6 (S.D.N.Y. Sept. 25, 2012) ("[G]iven the

comprehensive federal securities regime, and the fact that Congress has granted federal courts exclusive jurisdiction over federal securities law actions, there is a strong federal interest in the federal securities law issues raised in [plaintiff's] malpractice complaint."); *see also Friedlander* v. *Troutman, Sanders, Lockerman & Ashmore*, 788 F.2d 1500, 1504 (11th Cir. 1986) (recognizing the serious federal interest in the "comprehensive scheme of statutes and regulations designed to police the securities industry" even outside of the removal context); *accord D'Alessio*, 258 F.3d at 103 (citing *Friedlander* in finding substantial federal issue in securities-related removal case).

Because Plaintiffs' claims allege violations of S&P's policies and procedures enacted pursuant to the federal scheme that regulates NRSROs, all of the intense federal interests inherent in that scheme are implicated here.

### D. Exercise of Federal Question Jurisdiction over the State Actions Is Necessary To Preserve the Proper State/Federal Balance

As *Grable* reasoned, because the exercise of federal question jurisdiction could potentially "upset[] the state-federal line drawn (or at least assumed) by Congress . . . there must always be an assessment of any disruptive portent in exercising federal jurisdiction."  545 U.S. at 314. Here, federal issues are presented in the context of a nationwide wave of state regulatory actions against the backdrop of a dedicated and comprehensive federal regulatory scheme.  To date, the SEC has granted the registration of a total of only thirteen NRSROs under that regulatory scheme.  *See* SEC, Nationally Recognized Statistical Rating Organizations ("NRSROs"), *available at* http://www.sec.gov/divisions/marketreg/ratingagency.htm (last modified Jan. 4, 2013).  The State Actions themselves represent the vast majority of cases of any sort, including private civil litigation, ever to implicate the federal law and regulations governing NRSROs.

These facts ensure that accepting federal jurisdiction here will not open the floodgates to follow-on federal court cases.

Instead, resolution of these cases in federal court is necessary in order to preserve the balance of state and federal power approved by Congress. The patchwork of injunctive and declaratory relief that could result from the efforts of the fifteen-State phalanx of Plaintiffs here would effectively displace a federal regulatory scheme. Plaintiffs' comity-based arguments are not arguments about the state/federal balance at all, because they fail to acknowledge that a substantial federal interest is implicated here. *See* States' Mem. at 26-29. But "[f]or reasons that have often been catalogued, it makes sense to have, as the primary shapers and enforcers of federal law, judges selected by the federal sovereign. That state courts are, as a matter of constitutional theory and tradition, fully obligated and competent to enforce federal law does not alter this fundamental political and practical reality." Martin H. Redish*, Reassessing the Allocation of Judicial Business Between State and Federal Courts: Federal Jurisdiction and "The Martian Chronicles,"* 78 VA. L. REV. 1769, 1787-88 (1992). The cases Plaintiffs cite in support of their argument that this Court should not exercise jurisdiction over state enforcement actions are simply examples of cases where courts found that any embedded federal issues were not substantial or necessary, and that therefore failed to meet the *Grable* standard for federal question jurisdiction. *See* States' Mem. at 26-27.

The Judicial Panel on Multidistrict Litigation has already considered and rejected similar arguments. *See In re Standard & Poor's Rating Agency Litig.*, 2013 WL 2445043, at *2 (J.P.M.L. June 6, 2013) (noting that "we have never centralized litigation comprised solely of sovereign enforcement actions such as these, [but that] centralization is appropriate in light of the significant factual overlap among all actions"). Moreover, the same State Attorneys General that

in this case protest being placed together for pre-trial activities have regularly chosen to file state law consumer protection enforcement actions together in the federal courts, with no apparent damage to their sovereign powers.[26]   The States even rely on such federal court cases in their own brief.  *See, e.g.*, States' Mem. at 5 n.6 (citing *United States* v. *Dish Network, LLC*, 2013 WL 1749930 (C.D. Ill., Apr. 24, 2013) (action by the United States and certain States alleging violations of the Federal Trade Commission Act, the Telemarketing Act, the Telephone Consumer Protection Act, and state statutes prohibiting certain forms of telephone solicitations)). Nowhere in the States' brief do they identify any specific harm or prejudice to the Attorneys General or the citizens of their states that might result from the exercise of federal jurisdiction here.

Considerations of judicial efficiency further weigh heavily against remand in this action. Because the consolidation of these near-identical actions that has already been achieved is only sustainable in federal court, remand of these actions would indisputably frustrate judicial efficiency.  The Judicial Panel on Multidistrict Litigation has already held that "[c]entralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings . . . and conserve the resources of the parties, and the judiciary."  *See In re Standard & Poor's Rating Agency Litig.*, 2013 WL 2445043, at *1.  Thus the exercise of federal jurisdiction here is entirely "consistent

---

[26]  *See, e.g.*, First Amended Complaint, *Ohio ex rel. Petro* v. *Bristol-Myers Squibb Co.*, No. 02-CV-01080 (D.D.C. Apr. 24, 2003), 2003 WL 22331401 (action by States including Arizona, Arkansas, Colorado, Delaware, Idaho, Indiana, Iowa, Maine, Mississippi, Missouri, North Carolina, Pennsylvania, South Carolina, Tennessee, and Washington alleging violations of state consumer protection, unfair competition, and federal and state antitrust laws); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) (action by States including Arkansas, Colorado, Idaho, Iowa, Maine, Missouri, Pennsylvania, South Carolina, Tennessee, and Washington alleging violations of the Sherman Act, Federal Trade Commission Act, and state antitrust and unfair competition and/or consumer protection laws); Third Amended Complaint, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 456 F. Supp. 2d 131 (D. Me. 2006) (MDL No. 1361), 2002 WL 32947273 (action by States including Arizona, Arkansas, Delaware, Idaho, Indiana, Maine, Mississippi, North Carolina, Pennsylvania, South Carolina, Tennessee, and Washington alleging violations of state antitrust laws, state unfair competition and related laws, and federal antitrust laws).

with congressional judgment about the sound division of labor between state and federal courts."

*Grable*, 545 U.S. at 313.

## II. S&P DID NOT WAIVE ITS RIGHT TO REMOVE THE NORTH CAROLINA STATE ACTION

Prior to removing the North Carolina case to federal court, S&P made an administrative filing to protect its right to have the case heard by a judge with expertise in complex business matters in the event the case remained in state court.[27]  In so doing, S&P neither sought an affirmative ruling nor consideration of the merits of the case by the state court.  N.C. GEN. STAT. § 7A-45.4(a).  Nonetheless, North Carolina seeks to avoid federal jurisdiction as to its case by asserting the improbable argument that S&P's state court filing constituted "active participation" by S&P in the state court proceeding.  That argument finds no support in the authorities.

A defendant does not waive its removal right unless its "intent to so waive and to submit to the jurisdiction of State court [is] clear and unequivocal."  *E.g.*, *Dri Mark Prods., Inc.* v. *Meyercord Co.*, 194 F. Supp. 536, 537 (S.D.N.Y. 1961); *see also JP Morgan Chase Bank, N.A.* v. *Reijtenbagh*, 611 F. Supp. 2d 389, 390 (S.D.N.Y. 2009).  An act in state court that seeks no affirmative relief, such as the simple designation S&P made, does not waive a defendant's right to removal.  *See, e.g.*, *Dri Mark*, 194 F. Supp. at 537 (no waiver where defendant "takes steps to protect [its] rights . . . or uses the processes of the State court while the case is still pending there"); *Morgan* v. *Nikko Sec. Co. Int'l*, 691 F. Supp. 792, 800 (S.D.N.Y. 1988) (motion to compel arbitration does not waive removal right since it does not seek affirmative relief);

---

[27]  Contrary to North Carolina's assertion that "S&P . . . voluntarily elected to submit itself to the jurisdiction of the North Carolina Business Court," States' Mem. at 31, "The Business Court, 'is not a court of independent jurisdiction, but rather an administrative division of the General Court of Justice." *See* NC Business Court Frequently Asked Questions ("FAQ's"), *available at* http://www.ncbusinesscourt.net/FAQ/business_court_frequently_asked.htm.  A case that is assigned to the North Carolina Business Court remains within the jurisdiction of the Superior Court, *id.*, and the only effect of assignment is that the action is heard by a judge who specializes in complex business cases. N.C. GEN.STAT. §§ 7A-45.4(a), 7A-45.3.

*Campbell* v. *PPL Montana, LLC*, 2010 WL 2718998, at *2-3 (D. Mont. June 8, 2010) (in moving to substitute the district court judge, the defendant "took necessary defensive action to avoid losing its statutory right to substitute" since it was required to make any such motion within 30 days after service), *report and recommendation adopted*, 2010 WL 2735665 (D. Mont. July 7, 2010).   Thus, a defendant does waive its right to remove by entering a general appearance, by answering, by serving deposition notices, or even by deposing witnesses prior to removing.   *Dri Mark*, 194 F. Supp. at 537.   The simple state court administrative filing at issue here plainly did not evidence a "clear and unequivocal" intent by S&P to waive its right to remove this case to federal court and does not support remand.

CONCLUSION

For these reasons, and the reasons set forth in Defendants' Notices of Removal, the Motions to Remand should be denied.

Dated:        August 23, 2013

By:    /s Floyd Abrams
Floyd Abrams
Susan Buckley
Jason M. Hall
Adam Zurofsky
Krista Friedrich

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Counsel for McGraw Hill Financial, Inc. and Standard & Poor's Financial Services LLC*