CAHILL GORDON & REINDEL LLP

EIGHTY PINE STREET

NEW YORK, NY 10005-1702

FLOYD ABRAMS
L. HOWARD ADAMS
ROBERT A. ALESSI
HELENE R. BANKS
ANIRUDH BANSAL
LANDIS C. BEST
SUSAN BUCKLEY
KEVIN J. BURKE
JAMES J. CLARK
BENJAMIN J. COHEN
STUART G. DOWNING
ADAM M. DWORKIN
JENNIFER B. EZRING
JOAN MURTAGH FRANKEL
JONATHAN J. FRANKEL
BART FRIEDMAN
CIRO A. GAMBONI
WILLIAM B. GANNETT

CHARLES A. GILMAN
STEPHEN A. GREENE
JASON M. HALL
WILLIAM M. HARTNETT
CRAIG M. HOROWITZ
DOUGLAS S. HOROWITZ
TIMOTHY B. HOWELL
DAVID G. JANUSZEWSKI
ELAI KATZ
THOMAS J. KAVALER
BRIAN S. KELLEHER
DAVID N. KELLEY
CHÉRIE R. KISER*
EDWARD P. KRUGMAN
JOEL KURTZBERG
ALIZA R. LEVINE
JOEL H. LEVITIN
GEOFFREY E. LIEBMANN

TELEPHONE: (212) 701-3000
FACSIMILE: (212) 269-5420

———

1990 K STREET, N.W.
WASHINGTON, DC 20006-1181
(202) 862-8900
FAX: (202) 862-8958

———

AUGUSTINE HOUSE
6A AUSTIN FRIARS
LONDON, ENGLAND EC2N 2HA
(011) 44.20.7920.9800
FAX: (011) 44.20.7920.9825

———

WRITER'S DIRECT NUMBER
(212) 701-3621

ANN S. MAKICH
JONATHAN I. MARK
BRIAN T. MARKLEY
WILLIAM J. MILLER
NOAH B. NEWITZ
MICHAEL J. OHLER
ATHY A. O'KEEFFE
DAVID R. OWEN
JOHN PAPACHRISTOS
LUIS R. PENALVER
DEAN RINGEL
JAMES ROBINSON
THORN ROSENTHAL
TAMMY L. ROY
JONATHAN A. SCHAFFZIN
JOHN SCHUSTER
MICHAEL A. SHERMAN
DARREN SILVER

HOWARD G. SLOANE
JOSIAH M. SLOTNICK
RICHARD A. STIEGLITZ JR.
SUSANNA M. SUH
ANTHONY K. TAMA
JONATHAN D. THIER
JOHN A. TRIPODORO
GLENN J. WALDRIP, JR.
HERBERT S. WASHER
MICHAEL B. WEISS
S. PENNY WINDLE
COREY WRIGHT
DANIEL J. ZUBKOFF
ADAM ZUROFSKY

———

*ADMITTED IN DC ONLY

October 11, 2013

Re:   *In re Standard & Poor's Rating Agency Litigation*,
      No. 13-MD-2446 (JMF)

Dear Judge Furman:

   I write to advise the Court that McGraw Hill Financial, Inc. and Standard & Poor's Financial Services LLC (together, "McGraw Hill") yesterday removed to the United States District Court for the District of New Jersey the case captioned *John J. Hoffman et al. v. McGraw Hill Financial, Inc., et al.*, No. 2:13-cv-6039 (WHW) (CLW) (the "New Jersey Action"), which had been filed on October 9, 2013 in the Superior Court of New Jersey, Essex County.

   Earlier today, McGraw Hill also filed with the Judicial Panel on Multidistrict Litigation a Notice of Tag-Along Action seeking to have the New Jersey Action transferred to this Court as part of the above-referenced MDL. I am attaching for your convenience a courtesy copy of the Notice of Tag-Along Action, which has been served on all parties to this MDL and the Clerk of this Court pursuant to the Rules of Procedure of the Judicial Panel on Multidistrict Litigation.

          Respectfully submitted,

          Floyd Abrams

CAHILL GORDON & REINDEL LLP

- 2 -

Hon. Jesse M. Furman
United States District Court
for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Centre Street, Room 2202
New York, NY 10007

Enclosure

<u>BY ECF</u>

cc:     All Counsel of Record (by e-mail)

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE: STANDARD & POOR'S RATING AGENCY LITIGATION | MDL No. 2446

TO:  Jeffrey N. Lüthi
     Clerk of the Panel
     United States Judicial Panel
     on Multidistrict Litigation
     Thurgood Marshall Federal Judiciary Building
     One Columbus Circle, N.E., Room G-255, North Lobby
     Washington, DC 20544-0005

## NOTICE OF TAG-ALONG ACTION

Pursuant to Rule 7.1(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, McGraw Hill Financial, Inc. ("McGraw Hill") and Standard & Poor's Financial Services LLC ("S&P", and collectively with McGraw Hill, "Defendants"), hereby notify the Clerk of the Judicial Panel on Multidistrict Litigation (the "Panel") of a potential tag-along action and state as follows:

1.  The following potential tag-along action is now pending in the United States District Court for the District of New Jersey: *John J. Hoffman et al.* v. *McGraw Hill Financial, Inc. and Standard & Poor's Financial Services, LLC*, No. 2:13-cv-6039 (WHW) (CLW) (the "New Jersey Action"). A copy of the New Jersey Action docket, summons and complaint is attached hereto as Exhibit A.

2.  On June 6, 2013, the Panel granted Defendants' previously filed Motion to Transfer Actions for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407 (the "Transfer Motion") and transferred to the Southern District of New York fifteen sep-

2

arate actions, filed by fifteen state Attorneys General asserting the same basic claims and involving substantially overlapping legal and factual issues (the "State Actions"). The Panel also transferred two related declaratory judgment actions brought by S&P against the Attorneys General of the State of South Carolina and the State of Tennessee. In ordering the transfer, the Panel cited that the various State Actions "involve common questions of fact" related to plaintiffs' allegations that S&P "intentionally misrepresented that its analysis of structured finance securities was independent, objective, or unaffected by the existence of, or potential for, a business relationship with the issuer of a security." *See In re Standard & Poor's Rating Agency Litigation*, MDL No. 2446, 2013 WL 2445043, at *1 (J.P.M.L. Jun. 6, 2013) (a true and correct copy of the Transfer Order is attached hereto as <u>Exhibit B</u>). In addition, the Panel held that those State Actions should be centralized in the Southern District of New York because such centralization would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *Id.* at *1 ("Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings on the pending motions to remand as well as other pretrial motions, if necessary; and conserve the resources of the parties, their counsel, and the judiciary."). On July 24, 2013, the JPML issued a Conditional Transfer Order which became final on August 1, 2013, transferring the later-filed Indiana State Action to the Southern District of New York.

       3.    The New Jersey Action is substantially similar, if not virtually identical, to the State Actions that the Panel has already transferred. As such, it is a "tag-along action" because it involves questions of fact common to those raised in the other State Actions. *See* JPML Rule 1.1(h) (defining "tag-along action" to include "a civil action pending in a district court which involves common questions of fact with . . . actions previously transferred to an existing MDL"). Like the other State Actions, the New Jersey Action alleges that S&P yielded to pressure from issuers of securities to assign higher credit ratings than it otherwise would have, thereby rendering "false" various statements S&P has made over the years about the independence of its credit rating pro-

3

cess. *See* New Jersey Compl. ¶¶ 2, 60.  The complaint also alleges that S&P's methodology for rating certain structured finance securities was compromised by a desire for increased revenue and market share resulting from the fact that S&P, like all of the major credit rating agencies, uses an "issuer pays" compensation model. *See id.* ¶¶ 3-4.

4.    These are the same basic theories and allegations at issue in the other State Actions. *Compare* New Jersey Compl. ¶¶ 2, 60, *with In re Standard & Poor's Rating Agency Litigation*, 2013 WL 2445043, at *1 (noting "the complaints in each action are highly similar, if not identical in some respects" and "the crux of the state allegations is that, by misrepresenting factors it considered when analyzing structured finance securities, S&P misleadingly offered a product materially different from what it purported to provide the marketplace").

5.    In addition, the New Jersey Action seeks essentially the same relief — in the form of civil penalties, disgorgement and/or restitution, and permanent injunctive relief aimed at regulating aspects of S&P's credit rating activities — as that sought in each of the State Actions. *Compare* New Jersey Compl., Prayer for Relief, *with, e.g.*, Complaint at ¶ 12, *Arizona, ex rel. Horne* v. *The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services, LLC*, 2:13-cv-00463-DKD (D. Ariz. Mar. 8, 2013).[1]

6.    Given the commonality of factual and legal issues present in the New Jersey Action and the other State Actions, the transfer of the New Jersey Action to Judge Furman in the Southern District of New York will conserve the resources of the judiciary and the parties. The efforts of the district court in New Jersey would be largely duplicative, and thus wasteful, of those in the existing MDL in New York.  Moreover, centralizing the New Jersey Action with the other State Actions will reduce the burden on witnesses and prevent the parties from undertaking duplicative discovery for the same legal and factual issues, thereby preserving judicial resources

---

[1]    A copy of the Arizona complaint is attached hereto as <u>Exhibit C</u>.

4

and allowing the parties to avoid unnecessary and substantial expense.  *See In re Standard &*
*Poor's Rating Agency Litigation*, 2013 WL 2445043, at *2.  Consolidation with the other State
Actions will also avoid the prospect of "inconsistent pretrial rulings on the pending motions to
remand as well as other pretrial motions, if necessary." *Id.* at *1.

      WHEREFORE, the undersigned Defendants hereby notify the MDL Panel of
the foregoing tag-along action.

Dated:       October 11, 2013
          New York, New York

          Respectfully submitted,

          CAHILL GORDON & REINDEL LLP


          By:   /s/ Floyd Abrams
                    Floyd Abrams
          Office and P.O. Address:
          80 Pine Street
          New York, New York 10005-1772
          (212) 701-3000

          *Attorneys for Defendants McGraw Hill Finan-*
          *cial, Inc. and Standard & Poor's Financial Ser-*
          *vices LLC*

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: STANDARD & POOR'S RATING AGENCY LITIGATION | MDL No. 2446 |

## PROOF OF SERVICE

I hereby certify that on October 11, 2013, the foregoing Notice of Tag-Along Action was filed with the Clerk of the Panel for the United States Judicial Panel on Multidistrict Litigation and served by United States Mail, First Class Delivery, postage prepaid, to the individuals listed on the attached service list.

Maura A. McLoughlin

# BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE: STANDARD & POOR'S RATING AGENCY LITIGATION

MDL No. 2446

## SERVICE LIST

Floyd Abrams (Fabrams@cahill.com)
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
  *Attorney for McGraw Hill Financial, Inc. and Standard & Poor's Financial Services LLC*

Clerk of the Panel
United States Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room G-255, North Lobby
Washington, DC 20544-0005

Clerk of the Court
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Clerk of the Court
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Attorney General for the State of Arizona
  Attn. Nancy M. Bonnell
1275 West Washington Street
Phoenix, AZ 85007-2997
  *Attorney for the State of Arizona*

Attorney General for the State of Arkansas
   Attn. James B. DePriest (jim.depriest@arkansasag.gov)
323 Center Street, Suite 500
Little Rock, AR 72201
   *Attorney for the State of Arkansas*

Attorney General for the State of Colorado
   Attn. Andrew P. McCallin (andrew.mccallin@state.co.us)
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
   *Attorney for the State of Colorado*

Attorney General for the State of Delaware
   Attn. Gregory C. Strong (gregory.strong@state.de.us)
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
   *Attorney for the State of Delaware*

Attorney General for the District of Columbia
   Attn. Bennett Rushkoff (bennett.rushkoff@dc.gov)
441 4th Street, N.W., Suite 600S
Washington, D.C. 20001
   *Attorney for the District of Columbia*

Attorney General for the State of Idaho
   Attn. Brett T. Delange (brett.delange@ag.idaho.gov)
954 W. Jefferson, 2d Floor
Boise, ID 83720-0010
   *Attorney for the State of Idaho*

Attorney General for the State of Indiana
   Attn. Lisa S. Wolf (lisa.wolf@atg.in.gov)
302 West Washington Street, 5th Floor
Indianapolis, IN 46204
   *Attorney for the State of Indiana*

Attorney General for the State of Iowa
   Attn. Jeffrey Thompson (jeffrey.thompson@iowa.gov)
Hoover Building 2d Floor
1305 E. Walnut Street
Des Moines, IA 50319
   *Attorney for the State of Iowa*

Attorney General for the State of Maine
   Attn. Linda J. Conti (linda.conti@maine.gov)
6 State House Station
Augusta, ME 04333-0006
   *Attorney for the State of Maine*

Attorney General for the State of Mississippi
   Attn. Geoffrey Morgan
Office of the Mississippi Attorney General
PO Box 220
Jackson, MS 39205
   *Attorney for the State of Mississippi*

Attorney General for the State of Missouri
   Attn. Joseph P. Bindbeute (joseph.bindbeute@ago.mo.gov)
207 W. High St.
Jefferson City, MO 65102
   *Attorney for the State of Missouri*

Attorney General for the State of New Jersey
   Attn. John J. Hoffman
   Attn. Brian F. McDonough (brian.mcdonough@dol.lps.state.nj.us)
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, NJ 07101
   *Attorneys for the State of New Jersey*

Attorney General for the State of North Carolina
   Attn. Philip A. Lehman (plehman@ncdoj.gov)
9001 Mail Service Center
Raleigh, NC 27699-9001
   *Attorney for the State of North Carolina*

Attorney General for the Commonwealth of Pennsylvania
   Attn. John M. Abel (jabel@attorneygeneral.gov)
Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
   *Attorney for the Commonwealth of Pennsylvania*

Attorney General for the State of South Carolina
   Attn. Robert D. Cook (rcook@scag.gov)
Rembert Dennis Building
1000 Assembly Street, Room 519
Columbia, S.C. 29201
   *Attorney for the State of South Carolina*

Attorney General for the State of Tennessee
   Attn. Jeffrey I. Hill (jeff.hill@ag.tn.gov)
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN  37202-0207
   *Attorney for the State of Tennessee*

Attorney General for the State of Washington
  Attn. Shannon Smith (shannon@atg.wa.gov)
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
  *Attorney for the State of Washington*

Dated:       October 11, 2013
             New York, New York

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By:   /s/ Floyd Abrams
                Floyd Abrams
*Attorneys for Defendants McGraw Hill Financial, Inc. and Standard & Poor's Financial Services LLC*
Office and P.O. Address:
80 Pine Street
New York, New York 10005-1772
(212) 701-3000

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: STANDARD & POOR'S RATING AGENCY LITIGATION | MDL No. 2446 |

### SERVICE LIST

Floyd Abrams (Fabrams@cahill.com)
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
  *Attorney for McGraw Hill Financial, Inc. and Standard & Poor's Financial Services
  LLC*

Clerk of the Panel
United States Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room G-255, North Lobby
Washington, DC 20544-0005

Clerk of the Court
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Clerk of the Court
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Attorney General for the State of Arizona
  Attn. Nancy M. Bonnell
1275 West Washington Street
Phoenix, AZ 85007-2997
  *Attorney for the State of Arizona*

Attorney General for the State of Arkansas
    Attn. James B. DePriest (jim.depriest@arkansasag.gov)
323 Center Street, Suite 500
Little Rock, AR 72201
    *Attorney for the State of Arkansas*

Attorney General for the State of Colorado
    Attn. Andrew P. McCallin (andrew.mccallin@state.co.us)
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
    *Attorney for the State of Colorado*

Attorney General for the State of Delaware
    Attn. Gregory C. Strong (gregory.strong@state.de.us)
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
    *Attorney for the State of Delaware*

Attorney General for the District of Columbia
    Attn. Bennett Rushkoff (bennett.rushkoff@dc.gov)
441 4th Street, N.W., Suite 600S
Washington, D.C. 20001
    *Attorney for the District of Columbia*

Attorney General for the State of Idaho
    Attn. Brett T. Delange (brett.delange@ag.idaho.gov)
954 W. Jefferson, 2d Floor
Boise, ID 83720-0010
    *Attorney for the State of Idaho*

Attorney General for the State of Indiana
    Attn. Lisa S. Wolf (lisa.wolf@atg.in.gov)
302 West Washington Street, 5th Floor
Indianapolis, IN 46204
    *Attorney for the State of Indiana*

Attorney General for the State of Iowa
    Attn. Jeffrey Thompson (jeffrey.thompson@iowa.gov)
Hoover Building 2d Floor
1305 E. Walnut Street
Des Moines, IA 50319
    *Attorney for the State of Iowa*

Attorney General for the State of Maine
    Attn. Linda J. Conti (linda.conti@maine.gov)
6 State House Station
Augusta, ME 04333-0006
    *Attorney for the State of Maine*

Attorney General for the State of Mississippi
   Attn. Geoffrey Morgan
Office of the Mississippi Attorney General
PO Box 220
Jackson, MS 39205
   *Attorney for the State of Mississippi*

Attorney General for the State of Missouri
   Attn. Joseph P. Bindbeute (joseph.bindbeute@ago.mo.gov)
207 W. High St.
Jefferson City, MO 65102
   *Attorney for the State of Missouri*

Attorney General for the State of New Jersey
   Attn. John J. Hoffman
   Attn. Edward J. Mullins III (edward.mullins@dol.lps.state.nj.us)
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, NJ 07101
   *Attorneys for the State of New Jersey*

Attorney General for the State of North Carolina
   Attn. Philip A. Lehman (plehman@ncdoj.gov)
9001 Mail Service Center
Raleigh, NC 27699-9001
   *Attorney for the State of North Carolina*

Attorney General for the Commonwealth of Pennsylvania
   Attn. John M. Abel (jabel@attorneygeneral.gov)
Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
   *Attorney for the Commonwealth of Pennsylvania*

Attorney General for the State of South Carolina
   Attn. Robert D. Cook (rcook@scag.gov)
Rembert Dennis Building
1000 Assembly Street, Room 519
Columbia, S.C. 29201
   *Attorney for the State of South Carolina*

Attorney General for the State of Tennessee
   Attn. Jeffrey I. Hill (jeff.hill@ag.tn.gov)
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
   *Attorney for the State of Tennessee*

Attorney General for the State of Washington
  Attn. Shannon Smith (shannon@atg.wa.gov)
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
  *Attorney for the State of Washington*


Dated:        October 11, 2013
              New York, New York

                              Respectfully submitted,

                              CAHILL GORDON & REINDEL LLP


                              By:___/s/ Floyd Abrams_____
                                        Floyd Abrams
                              *Attorneys for Defendants McGraw Hill Finan-
                              cial, Inc. and Standard & Poor's Financial Ser-
                              vices LLC*
                              Office and P.O. Address:
                              80 Pine Street
                              New York, New York 10005-1772
                              (212) 701-3000

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| IN RE: STANDARD & POOR'S RATING AGENCY LITIGATION | MDL No. 2446 |
|---|---|

## SCHEDULE OF POTENTIAL TAG-ALONG ACTION

| Parties | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiffs**: John J. Hoffman, Acting Attorney General of the State of New Jersey, and Eric T. Kanefsky, Director of the New Jersey Division of Consumer Affairs<br><br>**Defendants**: McGraw Hill Financial, Inc. and Standard & Poor's Financial Services LLC | District of New Jersey | 2:13-cv-6039 | Hon. William H. Walls |

# EXHIBIT A

**U.S. District Court**
**District of New Jersey [LIVE] (Newark)**
**CIVIL DOCKET FOR CASE #: 2:13-cv-06039-WHW-CLW**

HOFFMAN et al v. MCGRAW HILL FINANCIAL, INC. et al
Assigned to: Judge William H. Walls
Referred to: Magistrate Judge Cathy L. Waldor
Case in other court: NJ Sup. Crt. Chancery Division: Essex County, ESX-C-000216-13
Cause: 28:1441 Notice of Removal

Date Filed: 10/10/2013
Jury Demand: None
Nature of Suit: 850 Securities/Commodities
Jurisdiction: Federal Question

**Plaintiff**

**JOHN J. HOFFMAN**
*Acting Attorney General of the State of new Jersey*

represented by **EDWARD JAMES MULLINS , III**
Office of the Attorney General
Division of Law
124 Halsey Street
P.O. Box 45029-5029
Newark, NJ 07101
(973) 648-3146
Fax: (973) 648-3879
Email: edward.mullins@dol.lps.state.nj.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ERIC T. KANEFSKY**
*Director of the New Jersey Division of Consumer Affairs*

represented by **EDWARD JAMES MULLINS , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MCGRAW HILL FINANCIAL, INC.**

represented by **BRIAN PATRICK BARRETT**
CAHILL GORDON & REINDEL LLP
80 PINE STREET
NEW YORK, NY 10005
212-701-3246
Email: bbarrett@cahill.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**STANDARD & POOR'S FINANCIAL SERVICES, LLC**

represented by **BRIAN PATRICK BARRETT**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/10/2013 | 1 | NOTICE OF REMOVAL by STANDARD & POOR'S FINANCIAL SERVICES, LLC, MCGRAW HILL FINANCIAL, INC. from NJ SUPERIOR COURT, CHANCERY DIVISION: ESSEX COUNTY, case number ESX-C-000216-13. ( Filing and Admin fee $ 400 receipt number 5285792), filed by STANDARD & POOR'S FINANCIAL SERVICES, LLC, MCGRAW HILL FINANCIAL, INC.. (Attachments: # 1 Exhibit Complaint, # 2 Civil Cover Sheet)(ld, ) (Entered: 10/11/2013) |
| 10/10/2013 | 2 | Corporate Disclosure Statement by MCGRAW HILL FINANCIAL, INC. identifying NONE as Corporate Parent, STANDARD & POOR'S FINANCIAL SERVICES, LLC identifying MCGRAW HILL FINANCIAL, INC. as Corporate Parent. (ld, ) (Entered: 10/11/2013) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/11/2013 12:29:31 | | | |
| **PACER Login:** | cg0002 | **Client Code:** | 56750.219 |
| **Description:** | Docket Report | **Search Criteria:** | 2:13-cv-06039-WHW-CLW Start date: 1/1/1970 End date: 10/11/2013 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:   Brian F. McDonough (#026121980)
      Assistant Attorney General
      (973) 648-4742
      brian.mcdonough@dol.lps.state.nj.us
      Edward J. Mullins III (#027892006)
      Deputy Attorney General
      (973) 648-3146
      edward.mullins@dol.lps.state.nj.us
      Steven Scutti (#037362010)
      Krima D. Shah (#014132009)
      Special Deputy Attorneys General

|  |  |
|---|---|
| | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION, GENERAL EQUITY: ESSEX COUNTY DOCKET NO. ESX-C-_____ |
| JOHN J. HOFFMAN, Acting Attorney General of the State of New Jersey, and ERIC T. KANEFSKY, Director of the New Jersey Division of Consumer Affairs, | |
| Plaintiffs, | Civil Action |
| v. | |
| MCGRAW HILL FINANCIAL, INC. and STANDARD & POOR'S FINANCIAL SERVICES, LLC, | SUMMONS |
| Defendants. | |

From The State of New Jersey To The Defendants Named Above:

The Plaintiffs, named above, have filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of

the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/ pro_se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to Plaintiffs' attorney whose name and address appear above, or to Plaintiffs, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief Plaintiffs demand, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.


                                    /s/ Elisabeth Ann Strom
                                    Clerk of the Superior Court

DATED:  October 9, 2013

Name of Defendant to Be Served:    McGraw Hill Financial, Inc.

Address of Defendant to Be Served: c/o Prentice Hall Corp. System (registered agent)
                                   830 Bear Tavern Road
                                   West Trenton, NJ 08628

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiffs

By:   Brian F. McDonough (#026121980)
      Assistant Attorney General
      (973) 648-4742
      brian.mcdonough@dol.lps.state.nj.us
      Edward J. Mullins III (#027892006)
      Deputy Attorney General
      (973) 648-3146
      edward.mullins@dol.lps.state.nj.us
      Steven Scutti (#037362010)
      Krima D. Shah (#014132009)
      Special Deputy Attorneys General

OCT   9 2013

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, GENERAL
EQUITY: ESSEX COUNTY
DOCKET NO. ESX-C-_____

| | |
|---|---|
| JOHN J. HOFFMAN, Acting Attorney General of the State of New Jersey, and ERIC T. KANEFSKY, Director of the New Jersey Division of Consumer Affairs, | |
| Plaintiffs, | <u>Civil Action</u> |
| v. | |
| MCGRAW HILL FINANCIAL, INC. and STANDARD & POOR'S FINANCIAL SERVICES, LLC, | **COMPLAINT** |
| Defendants. | |

Plaintiffs John J. Hoffman, Acting Attorney General of the State of New Jersey

("Attorney General"), with offices located at 124 Halsey Street, Fifth Floor, Newark, New Jersey

07101, and Eric T. Kanefsky, Director of the New Jersey Division of Consumer Affairs

("Director"), with offices located at 124 Halsey Street, Seventh Floor, Newark, New Jersey 07101 (collectively, "Plaintiffs"), by way of Complaint state:

## PRELIMINARY STATEMENT

1.     The Attorney General and Director bring this action pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("CFA"), to redress years of unconscionable commercial practices, misrepresentations, and knowing omissions of material fact by Defendants McGraw Hill Financial, Inc. and Standard & Poor's Financial Services, LLC (collectively, "S&P") that they were independent and objective in analyzing credit ratings for structured finance securities.

2.     S&P has represented and continues to represent to consumers in the State of New Jersey ("New Jersey") that its analysis of structured finance securities is independent, objective, and the result of the highest quality credit analytics that are available to S&P.  It has made these representations on its web site, in its annual reports, in Congressional testimony, and in numerous other public statements.  Those representations were false.

3.     In contrast to S&P's public representations about its independence and objectivity, the truth was far different.  As demonstrated in this Complaint, S&P failed to disclose that it was allowing its desire for revenue and market share to influence and undermine the integrity of the analytical models that it used to evaluate the risk of and to issue ratings on structured finance securities.  S&P further omitted to disclose that these business considerations also relaxed the process by which S&P monitored the performance of structured finance securities that it had already rated.  S&P favored the interests of its investment banking clients, which issued these structured finance securities, over the interests of New Jersey's consumers.

2

S&P thus engaged in unconscionable commercial practices by allowing this inherent conflict of interest to corrupt its analytics and compromise its integrity.

4.    The reason S&P allowed the interests of its investment banking clients to undermine its independence and objectivity was simple.  The investment banking clients paid S&P's fees under what is known as the "issuer pays" model.  These fees were a significant and increasing source of revenue for S&P, and thus the threat of losing market share to competitors such as Moody's Investors Service or Fitch Ratings caused S&P to utilize out-of-date and incomplete creditworthiness modeling analytics, and to devote insufficient resources and support to its surveillance of the securities it had already rated.

5.    A credit rating by S&P purports to represent S&P's independent qualitative and quantitative analysis of the issuer's ability to meet its financial obligations or, in the case of structured finance securities, whether the underlying assets are likely to experience delinquency and default.  The independent and objective methodology behind these ratings is of critical importance to consumers.

6.    This action does not challenge S&P's judgment or opinion regarding which rating to apply to any specific structured finance security.  Nor is this action brought for the purpose of demonstrating that any particular rating was incorrect.  Instead, Plaintiffs maintain that S&P violated the CFA by misrepresenting that it was at all times independent and objective.  Plaintiffs also maintain that S&P violated the CFA by failing to disclose that S&P's desire to maximize its revenues and market share caused it to utilize issuer-friendly analytical models, as well as to provide insufficient monitoring of the instruments that it had already rated.

7.    S&P's conduct, as described herein, constitutes multiple violations of the CFA, as well as the Regulations Governing General Advertising, N.J.A.C. 13:45A-9.1 et seq.

("Advertising Regulations"). Accordingly, Plaintiffs seek, among other things, disgorgement, restitution, civil penalties, and injunctive and equitable relief to redress and halt these deceptive practices, which have adversely impacted New Jersey's consumers.

## PARTIES AND JURISDICTION

8.      The Attorney General is charged with the responsibility of enforcing the CFA and all the regulations promulgated thereunder, N.J.A.C. 13:45A-1.1 et seq. ("CFA Regulations"), including the Advertising Regulations.  The Director is charged with the responsibility of administering the CFA and the CFA Regulations on behalf of the Attorney General.

9.      By this action, Plaintiffs seek injunctive and other relief for violations of the CFA. Plaintiffs bring this action pursuant to their authority under the CFA, specifically N.J.S.A. 56:8-8, 8-11, 8-13, and/or 8-19.

10.     Defendant McGraw Hill Financial, Inc. ("McGraw Hill"), formerly The McGraw-Hill Companies, Inc. before May 1, 2013, is a publicly traded New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, New York 10020. McGraw Hill is registered to conduct business within New Jersey, and maintains a business address at 148 Princeton-Hightstown Road, Hightstown, New Jersey 08520.

11.     Defendant Standard & Poor's Financial Services LLC ("S&P Financial") is a Delaware limited liability company and wholly owned subsidiary of McGraw Hill, with its principal place of business at 55 Water Street, New York, New York 10041. Standard & Poor's Ratings Services is a business unit or division of S&P Financial.  S&P Financial is the successor entity to a unit that previously operated within an unincorporated division of McGraw Hill.  S&P Financial is registered to conduct business within New Jersey.

4.

12.     Venue is proper in Essex County, pursuant to R. 4:3-2, because this is a county in which the cause of action arose, and Defendants McGraw Hill and/or S&P Financial do business here.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

A.      **S&P's Ratings of the Structured Finance Market**

13.     S&P plays a dominant role in the marketplace with respect to the analysis of structured finance securities.

14.     Structured finance securities are asset-backed securities ("ABS"), a financial product whose value is derived from the stream of revenue flowing from a pool of underlying assets.  These securities are in turn sold to investors who rely upon the revenue stream generated from the underlying asset pool for repayment of the investors' principal and collection of interest.

15.     Among the common types of structured finance securities rated by S&P are residential mortgage backed securities ("RMBS"), which are secured by a pool of residential mortgages that often include subprime mortgages.

16.     RMBSs are created when an issuer, usually an investment bank, packages mortgage loans into a pool and transfers them to a trust that issues securities collateralized by the pool.  The trust purchases the loan pool and becomes entitled to the interest and principal payments made by the mortgagors, which are then used to make monthly distribution to the RMBS investors.

17.     The trust, in an effort to attract investors seeking various degrees of risk, creates different classes of RMBSs known as tranches.  The tranches offer a sliding scale of payment priorities based on the level of risk and credit protection provided to each tranche.

18.     Credit protection is designed to shield the securities within a tranche from the loss of interest and principal due to defaults of mortgage loans in the overall pool. The amount of credit protection afforded to a tranche is called a credit enhancement.

19.     Subordination is a type of credit enhancement where the issuer will create a hierarchy among the different tranches. The lowest tranches are the first to absorb any losses of principal and interest payments due to defaults and delinquencies. These are allocated to the lowest tranche until that tranche loses its entire principal amount, and then to the next lowest tranche up the hierarchy. Accordingly, the lower tranches usually receive lower credit ratings than the senior tranches, which enjoy greater protection from default losses by virtue of the cushion provided by the lower tranches and the overcollateralization.

20.     A collateralized debt obligation ("CDO") is another structured finance security or ABS rated by S&P, and is the most common structured finance security collateralized by other securities.

21.     A CDO is formed when an issuer creates a trust or other special purpose entity to hold assets and issue securities. Instead of mortgage loans held in the RMBS pool, a CDO trust is typically comprised of multiple debt securities such as RMBS and other CDOs. The trust then uses the interest and principal payments from the underlying debt securities to make payments to investors of the securities issued by the CDO trust.

22.     Like a RMBS, a CDO trust also issues different classes of securities divided into tranches that provide different levels of credit protection through the use of subordination and other forms of credit enhancement.

23.     After an ABS is created by an issuer, the ABS is then sent to S&P for analytical review.

24.     S&P uses its analytical models to determine how much credit enhancement a given tranche would need to receive a particular credit rating. If S&P determines that the issuer's proposed capital structure does not allow for sufficient credit enhancement to receive a "AAA" or other investment grade rating, the issuer must adjust the capital structure if it wishes to receive such a rating. This could require the issuer to include additional mortgages or collateral in the capital structure, thus increasing the issuer's cost and decreasing its profit margins. The smaller the credit enhancement, the more profitable the security is to the issuer.

25.     S&P charges the issuer a fee in exchange for assigning and publishing a credit rating grade measuring the creditworthiness of the ABS. Because S&P is selected and paid by the same entities that issue the security that S&P analyzes and rates, the fee arrangement is referred to as the "issuer pays" model.

26.     The market for analyzing structured finance securities is very lucrative. S&P charges three or four times as much to analyze a structured finance security as it does to rate a corporate bond. In 2006, S&P's revenues rose approximately 15% to $12.7 billion, with approximately one-half of that growth derived from increased fees from structured finance ratings. Indeed, industry publications estimate that in both 2006 and 2007, as much as 40% of S&P's revenue was derived from its analysis of structured finance securities.

27.     The market for structured finance securities is also dominated by a narrow group of sellers, consisting of the major investment banks that issue RMBSs, CDOs, and other ABSs on a regular basis. S&P has allowed the market dominance of those sellers to influence it to provide unjustifiably favorable ratings.

28.  According to the industry publication Asset-Backed Alert, S&P rated 97.5% of CDOs issued in 2006.  As of 2009, S&P had rated and was monitoring ratings of approximately 198,000 structured finance securities.

29.  As the volume of RMBS and CDO offerings increased, so did the opportunity for S&P to derive significant fees for issuing such favorable ratings on these securities.  For S&P to capitalize on these revenue driven opportunities, it channeled its efforts on pleasing this relatively small group of investment banks and financial institutions that issued structured finance securities and were repeat customers of S&P, thus allowing S&P to avoid the risk of losing the business of these issuers in the future.

30.  Credit agencies such as S&P distinguish between different grades of creditworthiness.  Creditworthiness refers to the likelihood that the issuer of a particular security will meet its financial obligations as they become due or, in the case of structured finance securities, that the underlying assets will experience delinquencies and defaults. .

31.  S&P's credit ratings use a scale of letter grades from AAA to D:  AAA, AA, A, BBB, BB, B, CCC, CC, C, and D.  "AAA" is the highest grade and indicates the lowest risk of default.  "D" is the lowest grade and indicates the highest risk of default or that a default has already occurred.  Ratings from AA to CCC may be modified by the addition of a plus (+) or minus (-) sign.

32.  An S&P credit rating of BBB- and above is "investment grade," while a lower S&P rating is non-investment or "speculative grade."

33.  S&P not only rates but also monitors the ongoing creditworthiness of an ABS through surveillance after it has rated it.

34.     The ratings issued, published, and monitored by S&P for ABSs are crucial to consumers because structured finance securities are extremely complex in nature, and there is limited information available to the investing public about the underlying loans used to create RMBSs and CDOs.

35.     Additionally, investors in ABSs include pension and retirement funds, and other institutional investors, that are subject to regulations or other requirements that they only invest in investment grade securities with a rating of BBB- or above.

36.     Consumer evaluation of and interest in an issuer's ABS, and the marketability and profitability of that ABS, is directly impacted by the credit rating grade assigned to it by S&P.

**B.     S&P's Representations about the Independence of Its Credit Ratings**

37.     The publicized independence and objectivity of S&P's credit ratings of securities is essential to the credibility of the ratings to consumers.

38.     Since at least 2004, S&P represented to the public that its credit ratings are independent and free of outside influence on numerous occasions.

39.     Specifically, in S&P's 2004 "Code of Practices and Procedures" ("Practices and Procedures") S&P stated that it "endeavors to conduct the ratings and surveillance process in a manner that is transparent and credible and that also ensures that the integrity and independence of such processes are not compromised by conflicts of interest, abuse of confidential information, or other undue influences."

40.     Elsewhere in the same Practices and Procedures, S&P claimed that its "mission has always remained the same – to provide high-quality, objective, independent, and rigorous analytical information to the market place" and that "in all analytic processes, [S&P] must preserve the objectivity integrity and independence of its ratings.  In particular, the fact that

[S&P] receives a fee from the issuer must not be a factor in the decision to rate an issuer or in the analysis and the rating opinion."

41.    In October of 2005, S&P instituted a publicly available "Code of Professional Conduct" ("Code"). S&P's Code also contains sections dedicated to the manner in which S&P maintains the independence and objectivity of its analysis and avoids conflicts of interest with issuers. The Code and its representations, including Sections 1.9, 1.12, and 2.1 through 2.4, currently remain in effect as purported limitations on the factors that S&P considers when rating structured finance securities.

42.    Section 1.9 of S&P's Code states: "[O]nce a rating is assigned [S&P] shall monitor on an ongoing basis and update the rating by: (a) regularly reviewing the issuer's creditworthiness; (b) initiating review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a Rating Action (including withdrawal of a rating), consistent with the applicable rating criteria and methodology; and (c) updating on a timely basis the rating, as appropriate, based on the results of such review."

43.    Section 1.12 of S&P's Code states: "[S&P] and its employees shall deal fairly and honestly with issuers, investors, other market participants, and the public."

44.    Section 2.1 of S&P's Code states: "[S&P] shall not forbear or refrain from taking a Rating Action, if appropriate, based on the potential effect (economic, political, or otherwise) of the Rating Action on [S&P], an issuer, an investor, or other market participant."

45.    Section 2.2 of S&P's Code states: "[S&P] and its Analysts shall use care and analytic judgment to maintain both the substance and appearance of independence and objectivity."

46.     Section 2.3 of S&P's Code states: "The determination of a rating by a rating committee shall be based only on factors known to the rating committee that are believed by it to be relevant to the credit analysis."

47.     Section 2.4 of S&P's Code states: "Ratings assigned by [S&P] to an issuer or issue shall not be affected by the existence of, or potential for, a business relationship between [S&P] (or any Non-Ratings Business) and the Issuer (or its affiliates), or any other party, or the non-existence of any such relationship."

48.     The Code of Professional Conduct is available on S&P's web site, and S&P has referenced the foregoing and other tenets of S&P's Code in numerous public statements.

49.     For example, in a 2006 report about the Code's implementation, S&P trumpeted the independence and objectivity of its ratings practices, and also acknowledged its substantial role in the financial markets, declaring:

a.      "[S&P] recognizes its role in the global capital markets and is committed to providing ratings that are objective, independent and credible";

b.      "[I]t is a central tenet of [S&P] that its ratings decisions not be influenced by the fact that S&P receives fees from issuers"; and

c.      "Ratings are monitored on an ongoing basis in accordance with [S&P's] policies unless a rating is a point in time confidential rating without surveillance."

50.     The report explains that S&P's Code of Professional Conduct sought to "further align" policies and procedures with the International Organization of Securities Commissions ("IOSCO") Code of Conduct of Conduct Fundamentals for Credit Rating Agencies ("IOSCO Code"), noting that "[S&P] fully supports the essential purpose of the IOSCO Code, which is to promote investor protection by safeguarding the integrity of the rating process. [S&P] believes

that the Code is consistent with the IOSCO Code and appropriately implements IOSCO's Statements of Principles Regarding the Activities of Credit Rating Agencies.".

51.    First published in December of 2004, the IOSCO Code describes the need for credit rating agencies like S&P to maintain independence from the issuers who pay for the ratings, explaining: "[T]he essential purpose of the Code Fundamentals is to promote investor protection by safeguarding the integrity of the rating process. IOSCO members recognize that credit ratings, despite their numerous other uses, exist primarily to help investors assess the credit risks they face when making certain kinds of investments. Maintaining the independence of credit rating agencies vis-à-vis the issuers they rate is vital to achieving this goal. Provisions of the Code Fundamentals dealing with credit rating obligations to issuers are designed to improve the quality of credit ratings and their usefulness to investors."

52.    Furthermore, the IOSCO Code also emphasizes that "[r]ating analyses of low quality or produced through a process of questionable integrity are of little use to market participants," and that "[w]here conflicts of interest or a lack of independence is common at a [credit rating agency] and hidden from investors, overall investor confidence in the transparency and integrity of a market can be harmed."

53.    In 2006, McGraw Hill's Annual Report continued to highlight S&P's long history of "independence and objectivity." Specifically, McGraw Hill stated that "[m]any investors know [S&P] for its respected role as an independent provider of credit ratings . . . . As financial markets grow more complex, the independent analysis, critical thinking, opinions, news and data offered by [S&P] are an integral part of the global financial infrastructure."

54.    Similarly, in its 2007 Annual Report, McGraw Hill emphasized that: "Since

1916, markets across the globe have relied on the independent analysis and integrity of [S&P's] credit ratings . . . . S&P is highly valued by investors and financial decision-makers everywhere for its analytical independence, its market expertise and its incisive thought leadership."

55.     Furthermore, in April 2007, S&P's then Managing Director of RMBSs, Susan Barnes, testified before the United States Senate Committee on Banking, Housing and Urban Affairs regarding S&P's commitment to "ongoing" monitoring of the accuracy and integrity of its ratings: "After a rating is assigned, S&P monitors or 'surveils' the ratings to adjust for any developments that would impact the original rating. The purpose of this surveillance process is to ensure that the rating continues to reflect our credit opinion based on our assumption of the future performance of the transaction."

56.     Ms. Barnes also stressed that S&P's credit ratings are "grounded in the cornerstone principles of independence, transparency, credibility, and quality. These principles have driven our long-standing track record of analytical excellence and objective commentary."

57. .    In its 2008 Annual Report, McGraw Hill reiterated that "[i]t is important to note that S&P has effectively served the global capital markets with high quality, independent and transparent credit ratings for many decades" and underscored that "[t]o ensure the continued integrity and relevance of its ratings business, [S&P] . . . has undertaken a series of actions which further enhance transparency and the independence of its ratings process."

58.     In October of 2008, Deven Sharma, the then President of S&P Financial testified before the United States House Committee on Oversight and Government Reform that "[t]he real question is not whether there are potential conflicts of interest in the 'issuer pays' model, but whether they can be effectively managed . . . . S&P maintains rigorous policies and procedures around the integrity of our analytical processes through a number of checks and balances . . . .

13

Taken together, we believe these measures provide robust safeguards against the potential conflict of interest inherent in the 'issuer pays' model."

59.     Mr. Sharma further explained that "[t]he key question for any approach, whether it be investor or issuer paid, is then whether the rating agency takes appropriate steps to preserve its independence.  For S&P, that independence is a core principle of our business."

60.     As demonstrated below, however, the representations made by S&P in its codes, web site, public filings, public statements by its officers and executives, and other public statements were false and misrepresented the following to consumers in New Jersey.

  a.     First, that S&P's analysis of structured finance securities has been, and continues to be, independent, objective and free from consideration of S&P's desire for revenue or winning additional business from issuers.

  b.     Second, recognizing that S&P holds a dominant position of trust in the marketplace, that S&P deals fairly and honestly with the public, including New Jersey's consumers.

  c.     Third, that S&P agrees with and has implemented the principles set forth in the IOSCO Code by maintaining independence, objectivity, and integrity of its analysis of structured finance securities.

  d.     Fourth, that S&P understands that the "issuer pays" business model creates conflicts of interest, but that these conflicts have been adequately managed by the company as demonstrated by the principles set forth in S&P's Code so as to ensure that its credit ratings are purely a function of credit analytics.  S&P also understands that consumers depend on S&P to properly manage this conflict and reasonably interpret S&P's representations to understand that S&P does so.

e.  Fifth, that S&P dedicates the resources necessary and does in fact conduct timely

and thorough surveillance on its analysis of structured finance securities to ensure

that the rating assigned by S&P continues to reflect S&P's assessment of the

credit risk associated with the obligation.

61.  The above representations made by S&P were material to consumers.  None of

them were true.  These representations were not mere commercial puffery.  They were

representations of fact about the way in which S&P conducted its structured finance ratings

business and the standards by which it purported to abide.

**C.  S&P Ratings Were Guided by the Desire to Increase Revenues, Not Analytics**

62.  Rather than maintain its independence and objectivity when rating structured

finance securities, S&P opted to cater to a small group of repeat issuers who pay S&P to rate

their securities.  As a result, when S&P rated structured finance securities, S&P allowed its credit

analytics to be unduly influenced by the very market share and revenue considerations that its

public statements consistently and explicitly disavowed.

63.  S&P catered to these specific issuers by participating in a process known as

"ratings shopping."

64.  "Ratings shopping" refers to the practice of an issuer offering its business to the

rating agency requiring the least amount of credit enhancement necessary to achieve the issuer's

desired rating.

65.  In describing the effect of ratings shopping, a former S&P executive has been

quoted as follows: "The discussion tends to proceed in this sort of way.  'Look, I know that you

aren't comfortable with such and such assumption but apparently Moody's are even lower and if

that is the only thing standing between rating this deal and not rating this deal, are we really hung

up on this assumption?' You don't have infinite information. Nothing is perfect. So the line in the sand shifts and shifts, and can shift quite a bit."

66.     Between at least 2004 and 2007, when the markets for RMBSs and CDOs were particularly active, S&P experienced this pressure on a daily basis and the pressure did in fact influence S&P's analysis, the ratings that S&P assigned to structured finance securities, the recommendations that S&P's analysts made to their superiors, and the feedback that S&P provided to repeat issuers.

67.     S&P did not disclose in a public statement that these outside influences affected S&P's analysis of structured finance securities. To the contrary, S&P represented quite the opposite by repeatedly stating that its analyses were not influenced by its business relationships.

68.     S&P's desire for more revenue unduly influenced its decision to make adjustments to the assumptions built into its analytical models used to rate RMBSs and CDOs, or, alternatively, to refrain from updating its analytical models based on the best information available to S&P in order to preserve the use of analytical models that were appealing to repeat issuers.

69.     By at least 2001, S&P's focus on monitoring and growing its market share and generating additional revenue dominated the attention of S&P's senior management. This compulsion to maximize revenue influenced the analytical models that S&P developed and implemented for rating RMBSs and other structured finance securities.

70.     S&P believed that the only way for it to successfully compete for an issuer's structured finance business was to adjust its analytical models so that S&P's levels of proposed credit enhancement reflected the issuer's expectations. As a result, S&P focused on meeting the

demands of the repeat issuers that paid its fees, rather than providing an objective credit analysis that was not influenced by the financial interests of either S&P or its issuer clients.

71.     S&P's adjustment to its analytical models based on revenue and market share concerns began as early as 2001.

72.     For example, beginning in approximately 1996, S&P used an analytical model it developed called "LEVELS," for "Loan Evaluation and Estimate of Loss System," which used a database that aggregated loan performance going back five or more years for approximately 500,000 residential loans across the United States.  The LEVELS model was S&P's analytical model for evaluating RMBSs.

73.     S&P's LEVELS model used a statistically based methodology to estimate the default and loss experience of residential home loans and loan pools based in part on historical loan performance data.  Put simply, based on how other loans have performed over time, S&P's LEVELS model estimates the default probability and expected loss for a particular pool of loans and structure proposed by an issuer of an RMBS.

74.     Upon implementing LEVELS and publicizing its use to market participants, S&P represented to the public that it would refine and improve the model annually by adding additional loan performance data to its database.  This plan was a function of the fact that the predictive quality of its LEVELS model was only as accurate as the quality of the historical data underlying its predictions.

75.     Consistent with this principle, S&P updated LEVELS in early 1999 by adding loan performance data going back six to eight years for approximately 900,000 loans.

76.     As acknowledged by a former senior S&P executive responsible for rating RMBSs, these updates were critical to the LEVELS model's success because each new version

17

was built with more current data on both traditional and new mortgage products, particularly with respect to the growing, riskier subprime mortgage market for which the older default and payment data provided little guidance.

77.     Beginning in 2001, S&P's upper level management stopped the process of adding new loan data to refine S&P's LEVELS model.

78.     S&P adopted this new approach even though its senior managers in the residential mortgage backed securities group repeatedly emphasized the importance of keeping the analytical model up to date given the constantly changing nature of the residential mortgages issuers sought to securitize.  For example, at the insistence of the managing director responsible for rating RMBSs, S&P's LEVELS development team continued to collect data on historical loan performance.  Based on this work, in 2001 S&P developed a new version of its LEVELS model based on significant and more current performance data for 2.5 million loans.  Although this would have made the LEVELS evaluations far more current and meaningful, S&P upper level management, however, opted not to release and implement this update.

79.     Similarly, in early 2004, S&P's residential mortgage backed securities unit completed another update of the LEVELS model based on performance data from approximately 9.5 million loans covering the full spectrum of new mortgage products, particularly those in the area of subprime lending, which was the fastest growing segment of residential lending.  Despite the urgings of the managing director in charge of rating RMBSs, S&P did not implement this more comprehensive model for rating RMBSs upon its completion in 2004 to avoid negatively impacting S&P's revenues and market share.

80.     Furthermore, one former senior S&P managing director testified before Congress that, although S&P still maintained a trove of additional and more accurate residential loan data,

it still had not implemented any meaningful updates to its LEVELS model as of October 1988 based on the much more comprehensive and current database developed by its analysts. Thus, LEVELS continued to evaluate RMBS (which included subprime and other less traditional mortgages that had become far more prevalent during the housing boom) based upon outdated data that largely predated the era of subprime and other more aggressive mortgage lending such as Alt-A loans.

81.    S&P's decision between at least 2001 and 2008 to use an outdated version of its LEVELS model for analyzing RMBSs, and to ignore the potential risk of default and delinquency in the loan pools underlying RMBSs, was motivated by S&P's desire to continue to assign its "AAA" ratings with minimal credit enhancement, which issuers coveted, thus preserving S&P's market share and earning much more revenue for the company.

82.    In the words of one former senior S&P managing director in charge of rating RMBS, a primary factor in S&P's break down in ratings standards and lack of interest in keeping the LEVELS model current was that "the RMBS group enjoyed the largest ratings market share among the three major rating agencies (often 92% or better), and improving the model would not add to S&P's revenues."

83.    Rather than run the risk of disrupting its already dominant and highly profitable business of rating RMBSs, S&P simply kept using an outdated model because the model already provided the "AAA" ratings with minimal levels of credit enhancement that S&P's most important customers desired.

84.    Indeed, this reality was acknowledged in 2005 by a frustrated member of the S&P team responsible for the LEVELS model when he stated: "[LEVELS] Version 6.0 could have been released months ago and resources assigned elsewhere if we didn't have to massage the

subprime and Alt-A numbers to preserve market share." In the same email chain, another S&P

employee said, "We have known for some time (based on pool level data and LEVELS 6.0

testing) that . . . . Subprime: B and BB levels need to be raised . . . . ALT A: B, BB and BBB

levels need to be raised (we have had a disproportionate number of downgrades)."

85.    Another aggravated S&P director wrote to a coworker in an email, "Remember

the dream of being able to defend the model with sound empirical research? The sort of activity

a true quant[itative] . . . should be doing perhaps? If we are just going to make it up in order to

rate deals, then quants are of precious little value."

86.    As succinctly noted by another S&P analyst to senior S&P executives, S&P's

consideration of market share and revenue when conducting its analysis had dire consequences

both for S&P and the financial markets as a whole: "Screwing with the criteria to 'get the deal'

is putting the entire S&P franchise at risk – it's a bad idea."

87.    Furthermore, a former senior S&P executive stated that, between at least 2001 and

2008, when analyzing RMBSs, S&P's internal business strategy valued revenues over ratings

quality, while at the same time promising independence and objectivity in its public statements:

> Well, profits were what drove it starting in about 2001 at
> [S&P]. It was the growth in the market and the growth – profits
> were running the show. In a nutshell, that was the simple answer.
> And the business managers that were in charge just wanted to get
> as much of the [revenue] as they saw like this, growing out in the
> street, into their coffers.
>
> . . . .
>
> I believe that [S&P] at this time, there was a raging debate
> between the business managers and the analysts. The analysts
> were in the trenches. We saw the transactions coming in. We
> could see the shifts that were taking place in the collateral. And
> we were asking for more staff and more investment in being able
> to build the databases and the models that would allow us to track
> what was going on. The corporation, on the other hand was
> interested in trying to maximize the money that was being sent up

to McGraw Hill, and the requests were routinely denied. So, by 2005 . . . we did have two very excellent models that were developed but not implemented. And it's my opinion that had we built the databases and been allowed to run those models and continually populated that base and do the analysis on a monthly quarterly basis, we could have identified the problems as they occurred.

88.    The analysis of the underlying assets such as RMBS was an essential factor in S&P's CDO ratings.

89.    S&P CDO analysts needed to know if the ratings of RMBS assets underlying the CDOs they were rating were being considered for possible downgrade by the S&P analysts covering them because a downgrade of these ratings would mean that the CDO posed a greater credit risk, which in turn would lead to an overstated credit rating of the CDO if the risk was not addressed by some sort of credit enhancement.

90.    S&P CDO analysts, however, typically were not told that S&P RMBS surveillance was considering downgrading RMBS tranches underlying the CDOs they were rating unless S&P had already placed the RMBS tranches on a public list known as Credit Watch Negative, which publicly identified RMBS tranches being considered for possible downgrade.

91.    S&P's decision to sacrifice the independence and accuracy of its ratings for business considerations was not limited to RMBSs. It occurred with respect to S&P's ratings of CDOs as well, as demonstrated below.

92.    In August of 2004, one of S&P's managing directors informed her colleagues as follows: "We are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets . . . because of the ongoing threat of losing deals . . . . [B]onds below 'AAA' are pricing wider which impacts the weighted average pricing on the deals. Ultimately issuers will react by taking the path of least resistance and making sure Moody's is on the deals.

Thereafter, it's only a matter of time before their rating is also mandated for the primary deals as well."

93.   The head of S&P's CDO unit and a member of its Executive Committee endorsed lessening the standards by responding:

>          Ok with me to revise criteria . . . .
>
>          I 'predict' that Moody's will not be able to make any significant issue out of this. They have attacked us on the basis of criteria before in a number of asset classes (e.g. RMBS) to no avail in the past. This will blow over too with no lasting impact. To the extent that spreads on [commercial mortgage backed securities] collateral without Moody's ratings continue to trade wider than those with it is something the CDO group cannot do much about at this point in time. We maintain a higher market penetration than Moody's in CDOs across all types. [The Structured Finance Leadership Team] is aware of the competitive threats that Moody's is taking in CDOs and has authorized us to take certain actions.

94.   Similarly, as succinctly stated in S&P's 2005 CDO Strategic Plan: "Ratings criteria and associated credit support levels for the rated tranches in any CDO transaction are another key revenue driver. Criteria is one of the key competitive elements among the main rating agencies globally and regionally . . . . [H]aving criteria and analytical tools that enable us to rate the transactions and meet the needs of the players in the market will ensure that S&P will continue to be the one agency rating the largest share of transactions."

95.   S&P demonstrated that market share was more important to it than issuing accurate ratings in 2005, when the release of S&P's revised CDO Evaluator v3.0 ("E3") model was specifically delayed due to negative feedback from S&P's CDO issuer clients. In the words of senior leaders in S&P's structured finance department: "Due to the not insignificant impact on lowly rated (BBB and down) synthetic reference pools . . . we have toned down and slowed down our roll out of E3 to the market, pending further measures to deal with such negative results . . . . Bear Stearns pointed out that the potential business opportunities we would miss by

22

effectively having to walk away from such high yield structures would NOT be compensated for by any increase in rating volume for highly rated collateral pools."

96.    S&P was concerned about the business impact of the update and considered grandfathering in deals to avoid adverse market reaction.

97.    By way of example, in a 2005 email sent by an S&P managing director regarding the CDO Evaluator updates, the S&P managing director wrote:

> This has proven to be a complex update and review, and many issues have arisen and continue to arise. The overarching issue at this point is what to do with currently rated transactions if we do release a new version of Evaluator. Some believe for both logistical and market reasons that the existing deals should mainly be "grand fathered". Others believe that we should run all deals using the new Evaluator. The problem with running all deals using E3 is twofold: we don't have the model or resource capacity to do so, nor do we believe that even if we did have the capability, it would be the responsible thing to do to the market.

98.    Similarly, another S&P employee wrote the following regarding whether S&P would downgrade existing deals based on their new model: "My best guess is for existing rated deals, if [CDO Evaluator v.]2.4.3 does not differ from the final version of E3 by a couple notches, no rating action will be taken. If more, we will have intensive scrutiny and depending on the circumstances upgrade or downgrade. Needless to say, we are minimizing the number in the latter category."

99.    In response, an S&P managing director emphasized, "The trick is of course to minimize impact on deals." The same managing director later wrote the following in an internal email regarding S&P's rollout of Evaluator 3.0: "Lord help our [expletive] scam . . . this has to be the stupidest place I have worked at."

100.    Failing to utilize the CDO Evaluator updates directly contradicted S&P's previous assertions that it ensured issued ratings continued to neglect S&P's assessment of credit risk.

101.    The recognition that the integrity of S&P's ratings was being compromised for the sake of business was not limited to S&P's management; S&P analysts were also aware that their CDO analysis was not comprehensive.  On or about April 5, 2007, two S&P CDO analysts conversed via instant messenger discussing whether S&P's CDO ratings model was properly assessing credit risks:

> [Analyst 1]:  btw - that deal is ridiculous

> [Analyst 2]:  i know right . . . model def[initely] does not capture half of the . . . risk

> [Analyst 1]:  we should not be rating it

> [Analyst 2]:  we rate every deal . . . it could be structured by cows and we would rate it

> [Analyst 1]:  but there's a lot of risk associated with it - I personally don't feel comfy signing off as a committee member.

102.    Also in April of 2007, S&P privately acknowledged the full extent that its desire for increased revenue and market share had played, and was continuing to play, in its analysis of CDOs as part of a presentation made to the senior leaders of S&P's structured finance group.  In particular, in a slide titled, "A Better Mousetrap," S&P summarized its past analytical approach as follows:  "To come up with [probability of default]s and asset correlations in [CDO Evaluator v.]2.4.3, we look at our raw data and come up with a statistical best fit.  When this does not meet our business needs, we have to change our parameters ex-post to accommodate."  The correlating diagram is called, "The Old way:  One Way Street."

103.    This private acknowledgment directly contradicts all of S&P's representations to the public with respect to the factors it considers when analyzing CDOs and other structured finance securities.  But S&P's admissions went even further.

104.   The "Better Mousetrap" that S&P was developing called for S&P to first start with a set of assumptions that were best for its ratings business and then try to fit those assumptions into the available data. In the words of the analysts making the presentation: "So we came up with a new methodology emphasizing on flexibility. We decide on a number of business friendly [probability of default] matrices first" and then decide whether that "set is reasonable." If the selected matrices were not "reasonable" for some reason, S&P simply tried a different set of issuer-friendly matrices and started the process anew.

105.   Illustrated under the name, "The New way: Two Way Street," this proposal for how S&P should conduct its analysis going forward was met with approval from S&P's structured finance leadership.

106.   S&P continued to trumpet its ratings and methods even in the wake of the mass downgrades that occurred in July 2007 leading up to the subprime mortgage crisis. On August 14, 2007, S&P published an article improvidently titled, "Structured Investment Vehicle Ratings are Weathering the Current Market Disruptions," that discussed the tests S&P used to rate structured investment vehicles (SIVs) and the factors that are considered when S&P issues a rating. The article also praised SIVs for their "sustained performance during both calm and volatile markets."

107.   Those S&P employees who resisted S&P management's drive to adjust S&P's analysis in order to maximize revenue were ignored within the company and marginalized. In the words of frustrated S&P analysts shocked by S&P's new extremely lax correlation assumptions for CDOs made up of parts of other CDOs: "I am interested to see if any career consequences occur. Does company care about deal volume or sound credit standards? Some people try to hold line (like you) on arb and don't get recognition – or get held back."

108.   The undisclosed influences of market share and increased revenue outlined above did not just drive S&P's analysis in the years leading up to the financial crisis, but persisted during its onset and beyond.

109.   S&P's desire for increased revenue and maintenance of its high market share also led S&P to make several adjustments (or ignore necessary adjustments) to the analytical model used by S&P to rate RMBSs and CDOs to make them more business friendly and appealing to issuers. As a result, S&P issued ratings that were not objectively warranted.

### D.   S&P's Surveillance Group Was Ignored and Designed to Fail

110.   S&P's focus on business considerations also influenced the manner in which it monitored the structured finance securities that it had already rated.

111.   Prior to 2008, S&P performed only a sporadic and cursory review of its RMBS ratings and did not use the best surveillance tools that were at its disposal. This reality was in sharp contrast to the public representations of S&P's senior executives, including the managing director of RMBSs. These statements falsely represented that the company maintained a robust surveillance process with substantial resources at its disposal that allowed S&P to timely and thoroughly monitor the performance of previously rated RMBS. The truth was far different.

112.   S&P did not dedicate the necessary resources to conduct effective surveillance on previously rated RMBSs, and failed to use its analytical models as part of the monitoring process of these obligations. As noted by a senior S&P managing director in Congressional testimony:

> [T]here are two sides to the rating.  You have an initial
> rating when the bonds are sold, and then you have the surveillance.
> And at some point in the mid-1990s, the management in [S&P]
> decided to make surveillance a profit center instead of an adjunct
> critical key part of keeping investors informed as to how their
> investments were performing after they bought bonds.  And as a
> result, they didn't have the staff or the information.  They didn't
> even run the ratings model in the surveillance area which would

have allowed them to have basically re-rated every deal S&P had
rated to that time and see exactly what was going on and whether
the support was there for those triple-A bonds.

The [internal] reason [S&P management] gave for not
doing it was because they were concerned that the ratings would
get volatile and people would start to feel like all triple-As aren't
the same.  And it was a much more pragmatic business decision
than really focusing on how to protect the franchise and the
reputation by doing the right thing for the investors.

113.    As this candid statement demonstrates, S&P knew that there was very little profit
in diligently monitoring the performance of previously rated RMBSs because S&P had already
been paid its fee and issuers continued to want only AAA ratings.  Indeed, proper surveillance
would have led to S&P earning less revenue because it could be perceived as calling S&P's
initial analysis into question.

114.    Accordingly, S&P failed to properly fund and dedicate the appropriate number of
personnel to surveillance, and did not use the best tools that it had available to conduct
surveillance on previously rated RMBSs.  This failure by S&P reached a breaking point in late
2006 and early 2007.  In the words of one of the leaders of S&P's surveillance team: "[W]hat
can we do now?  My group is under serious pressure to respond to the burgeoning poor
performance of sub-prime deals . . . .  [W]e are really falling behind.  We need to talk about
getting more resources in general.  I am seeing evidence that I really need to add to staff to keep
up with what is going on with sub prime and mortgage performance in general, NOW."

115.    In response to the suggestion that additional resources may be available by
August of 2007, the same surveillance executive noted in early February of 2007 as follows:
"Let's talk about anything that we might be able to do in the interim.  I talked to [a senior S&P
executive] yesterday and he thinks that the ratings are not going to hold through 2007.  He asked
me to begin discussing taking rating actions earlier on the poor performing deals . . . .  We do not

have the resources to support what we are doing now. A new process, without the right support, would be overwhelming."

116.   Influenced by its desire for increased revenue and market share, S&P also ignored the recommendations of its surveillance group and delayed the downgrade of impaired RMBSs in order to further its own financial interests, as well as the financial interests of its issuer clients. Specifically, despite the meager resources allocated to it, by January of 2007, S&P's surveillance group concluded that it needed to intensify review of 2006 vintage subprime RMBSs and begin taking large scale negative rating action. In February of 2007, S&P's surveillance team made formal recommendations to that effect to S&P senior management.

117.   S&P senior management overruled the recommendations of S&P's surveillance group. S&P's delay in taking action on its surveillance group's recommendations was directly influenced by its desire to continue earning lucrative fees by rating CDOs and not upsetting its investment banking clients.

118.   As an S&P employee noted on July 5, 2007, when S&P was in crisis mode in the days immediately preceding S&P's mass downgrades of impaired RMBSs: "The fact is, there was a lot of internal pressure in S&P to downgrade lots of deals earlier on before this thing started blowing up. But the leadership was concerned of p*ssing off too many clients and jumping the gun ahead of Fitch and Moody's." Indeed, on July 8, 2007, as the task of assigning blame began within S&P, S&P's surveillance leadership noted: "[W]e were ahead of the curve with our original recommendations in February. We had a process in place, but we were told it was too stressful."

119.   Moreover, on or about June 11, 2007, S&P's surveillance group determined that, on average, tranches of subprime RMBSs rated BBB and lower had greater than 100% severe

delinquencies versus available credit support, which meant that the ratings of these RMBS tranches were, on average, almost certainly to be lowered.  Despite this determination, after June 11, 2007, S&P continued to assign and confirm ratings for CDOs exposed to significant amounts of subprime RMBS tranches rated BBB and below.  In sum, S&P took these RMBS ratings at face value as inputs for its analytical model and did nothing to account for the fact that many of the underlying RMBS tranches would almost certainly be downgraded.  S&P engaged in this conduct in part because it wanted to maximize its revenue and continue to please its CDO issuer clients.

120.    This conduct is yet another example of how S&P's internal business decisions – motivated by its desire to achieve or maintain revenue and market share goals – corrupted its analytic judgment and directly contradicted S&P's Code and other public representations about maintaining independence and objectivity in its analysis of structured finance securities.

## COUNT I

### MISREPRESENTATIONS AND KNOWING OMISSIONS OF MATERIAL FACT BY DEFENDANTS IN VIOLATION OF THE CFA

121.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 120 above as if more fully set forth herein.

122.    The CFA prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . .

> [N.J.S.A. 56:8-2.]

123.    The CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). The "services" provided by S & P in providing purportedly independent and objective ratings of structured finance securities, and the ratings themselves, were "merchandise" within the meaning of the CFA.

124.    In issuing credit ratings that were not independent and objective, S&P has engaged in misrepresentations and knowing omissions of material fact.

125.    S&P's has made misrepresentations including, but not limited to:

a.      That S&P and its business models were independent, objective and free of influence from those paying for the ratings;

b.      That S&P dealt fairly and honestly with the public, including the consumers of New Jersey;

c.      That S&P operated its business in conformance with the IOSCO Code;

d.      That S&P adequately managed conflicts of interests created by the "issuer pays" business model to ensure that its credit ratings are purely a function of credit analytics; and

e.      That S&P allocated sufficient resources to its surveillance activities in order to ensure that the ratings assigned by S&P continue to reflect S&P's assessment of the credit risk associated with the obligations.

126.    S&P engaged in knowing omissions of material fact including, but not limited to:

a.      That S&P had a conflict of interest when rating RMBS and CDOs that corrupted its ratings; and

b.   That S&P was influenced by its desire to please repeat, issuer clients, increase market share, and enhance revenue.

127.   Each misrepresentation and/or knowing omission of material fact by S&P constitutes a separate violation under the CFA, N.J.S.A. 56:8-2.

## COUNT II

### UNCONSCIONABLE COMMERCIAL PRACTICES BY DEFENDANTS IN VIOLATION OF THE CFA

128.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 127 above as if more fully set forth herein.

129.   S&P's affirmative misrepresentations about its ratings services and deception of the structured finance markets, its failure to disclose material facts to market participants, and its sacrificing of its independence and objectivity for business considerations, as alleged herein, constituted unconscionable commercial practices that were pervasive throughout S&P's RMBS and CDO ratings business.

130.   Each unconscionable commercial practice by S&P constitutes a separate violation under the CFA, N.J.S.A. 56:8-2.

## COUNT III

### MISREPRESENTATIONS AND KNOWING OMISSIONS OF MATERIAL FACT BY DEFENDANTS IN VIOLATION OF THE ADVERTISING REGULATIONS

131.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 130 above as if more fully set forth herein.

132.   The Advertising Regulations, among other things, govern general advertising practices.

133.   Specifically, the Advertising Regulations provide, in relevant part:

31

(a) Without limiting the application of <u>N.J.S.A.</u> 56:8-1 <u>et seq.</u>, the following practices shall be unlawful with respect to all advertisements:

. . . .

9. The making of false or misleading representations of facts concerning the reasons for, existence or amounts of price reductions, the nature of an offering or the quantity of advertised merchandise available for sale.

[<u>N.J.A.C.</u> 13:45A-9.2(a)(9).]

134.   S&P violated the Advertising Regulations by making false and misleading representations of fact through its web site and other public statements, including, but not limited to:

    a.   That S&P and its business models were independent, objective and free of influence from those paying for the ratings;

    b.   That S&P dealt fairly and honestly with the public, including the consumers of New Jersey;

    c.   That S&P operated its business in conformance with the IOSCO Code;

    d.   That S&P adequately managed conflicts of interests created by the "issuer pays" business model to ensure that its credit ratings are purely a function of credit analytics; and

    e.   That S&P allocated sufficient resources to its surveillance activities in order to ensure that the ratings assigned by S&P continue to reflect S&P's assessment of the credit risk associated with the obligations.

135.   Each violation of the Advertising Regulations by S&P constitutes a <u>per se</u> violation of the CFA.

32

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing allegations, Plaintiffs respectfully request that the Court enter judgment against S&P as follows:

a.   Finding that the acts and omissions of Defendants constitute multiple instances of unlawful practices in violation of the CFA, N.J.S.A. 56:8-1 et seq., and the regulations promulgated thereunder, specifically the Advertising Regulations, N.J.A.C. 13:45A-9.1 et seq.;

b.   Permanently enjoining Defendants and their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors and all other persons or entities directly under their control, from engaging in, continuing to engage in, or doing any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 et seq., and the regulations promulgated thereunder, specifically the Advertising Regulations, N.J.A.C. 13:45A-9.1 et seq., including, but not limited to, the acts and practices alleged in this Complaint;

c.   Ordering Defendants to submit to an accounting to determine the amount of improper fees and revenue paid to S&P as a result of any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 et seq., and the Advertising Regulations, N.J.A.C. 13:45A-9.1 et seq., including, but not limited to, the acts and practices alleged in this Complaint;

d.   Ordering Defendants to disgorge all funds and property (real and personal) acquired and/or retained as a result of any acts or practices in violation of the CFA, N.J.S.A. 56:8-1 et seq., and the Advertising Regulations,

N.J.A.C. 13:45A-9.1 et seq., including, but not limited to, the acts and practices alleged in this Complaint;

e. Directing Defendants, jointly and severally, to restore to any affected person, whether or not named in this Complaint, any money or real or personal property acquired by means of any alleged practice herein to be unlawful and found to be unlawful, as authorized by the CFA, N.J.S.A. 56:8-8;

f. Assessing the maximum statutory civil penalties against Defendants, jointly and severally, for each and every violation of the CFA, in accordance with N.J.S.A. 56:8-13;

g. Directing the assessment of costs and fees, including attorneys' fees, against Defendants, jointly and severally, for the use of the State of New Jersey, as authorized by the CFA, N.J.S.A. 56:8-11 and 56:8-19; and

h. Granting such other relief as the interests of justice may require.

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____

Brian F. McDonough
 Assistant Attorney General
Edward J. Mullins III
 Deputy Attorney General
Steven Scutti
Krima D. Shah
 Special Deputy Attorneys General

Dated: October 9, 2013

34

## RULE 4:5-1 CERTIFICATION

I certify, to the best of my information and belief, that the matter in controversy in this action involving the aforementioned violations of the Consumer Fraud Act, is not the subject of any other action pending in any other court of this State. I further certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated.

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____

Edward J. Mullins III
Deputy Attorney General

Dated: October 9, 2013

## RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiffs

By: _____
Edward J. Mullins III
Deputy Attorney General

Dated: October 9, 2013

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Assistant Attorney General Brian F. McDonough and Deputy

Attorney General Edward J. Mullins III are hereby designated as trial counsel for the Plaintiffs in

this action.

> JOHN J. HOFFMAN
> ACTING ATTORNEY GENERAL OF NEW JERSEY
> Attorney for Plaintiffs

> By: _____
> Edward J. Mullins III
> Deputy Attorney General

Dated:  October 9, 2013

# EXHIBIT B

In re: Standard & Poor's Rating Agency Litigation, --- F.Supp.2d ---- (2013)

2013 WL 2445043
Only the Westlaw citation is currently available.
United States Judicial Panel on
Multidistrict Litigation.

IN RE: STANDARD & POOR'S
RATING AGENCY LITIGATION.

MDL No. 2446.   |   June 6, 2013.

**Synopsis**
**Background:** Financial services provider sought centralization of 17 state-law consumer-fraud and securities actions filed against it and two related declaratory judgment actions it filed arising from its rating of structured finance securities.

**Holdings:** The Judicial Panel on Multidistrict Litigation, Kathryn H. Vratil, Acting Chairman, held that:

[1] centralization was warranted, and

[2] Southern District of New York was appropriate transferee forum.

Ordered accordingly.

West Headnotes (2)

[1]     **Federal Courts**
        ⟜ Particular Transferable Cases
        **Federal Courts**
        ⟜ Securities Regulation and Internal Corporate Affairs
        Centralization of 17 state-law consumer-fraud and securities actions filed against financial services provider and two related declaratory judgment actions it filed was warranted; actions involved common factual questions surrounding plaintiffs' general allegations that provider intentionally misrepresented that its analysis of structured finance securities was independent, objective, and unaffected by existence of, or potential for, a business relationship with issuer

of a security, and centralization allowed parties to obtain substantial efficiencies in dealing with common issues. 28 U.S.C.A. § 1407.

[2]     **Federal Courts**
        ⟜ Particular Transferable Cases
        **Federal Courts**
        ⟜ Securities Regulation and Internal Corporate Affairs
        Southern District of New York was appropriate transferee forum for 17 state-law consumer-fraud and securities actions filed against financial services provider and two related declaratory judgment actions it filed arising from its rating of structured finance securities; provider had its principal place of business in Southern District, and witnesses and evidence relating to plaintiffs' claims could be found there. 28 U.S.C.A. § 1407.

Before KATHRYN H. VRATIL, Acting Chairman, W. ROYAL FURGESON, JR., PAUL J. BARBADORO, MARJORIE O. RENDELL, CHARLES R. BREYER, and LEWIS A. KAPLAN, Judges of the Panel.

**Opinion**

**TRANSFER ORDER**

KATHRYN H. VRATIL, Acting Chairman.

**\*1 Before the Panel:**[*] Pursuant to 28 U.S.C. § 1407, defendants The McGraw–Hill Companies, Inc., and Standard & Poor's Financial Services LLC (collectively S & P) seek centralization of actions challenging S & P's representations about its impartiality and objectivity in the rating of structured finance securities in the Southern District of New York. This litigation currently consists of seventeen state law consumer fraud and securities actions brought by the attorneys general of fifteen states and two related declaratory judgment actions brought by S & P that are pending in fifteen districts, as listed on Schedule A.[1]

All fourteen state plaintiffs and the District of Columbia oppose centralization. Several plaintiffs suggest that the

Panel defer its transfer decision until the judges assigned to the individual cases rule on their pending motions to remand to state court. Plaintiffs that alternatively specify a transferee district suggest centralization in either the District of Connecticut or the District of Delaware.

Defendants Moody's Corp. and Moody's Investors Service, Inc. (collectively Moody's) in the Southern District of Mississippi action oppose transfer of the action to the extent that transfer would include the claims against Moody's. If the Panel centralizes the litigation, Moody's requests separation and remand of the claims against it. Mississippi opposes separation and remand of the claims against Moody's.

[1]   On the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization of all actions in the Southern District of New York will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. The actions involve common factual questions surrounding plaintiffs' general allegations that S & P (through statements by executives and the S & P code of conduct, among other sources) intentionally misrepresented that its analysis of structured finance securities was independent, objective, or unaffected by the existence of, or potential for, a business relationship with the issuer of a security. Plaintiffs disclaim that their suits question S & P's methodology in rating a security or challenge the correctness of such rating; rather, the crux of the state allegations is that, by misrepresenting factors it considered when analyzing structured finance securities, S & P misleadingly offered a product materially different from what it purported to provide the marketplace. The factual overlap among the actions is unsurprising, given that most actions were filed in state court on the same day in February 2013; additionally, the complaints in each action are highly similar, if not identical in some respects. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings on the pending motions to remand as well as other pretrial motions, if necessary; and conserve the resources of the parties, their counsel, and the judiciary.

*2   Plaintiffs oppose centralization and argue, *inter alia,* that the Panel has never centralized litigation of this type, that transfer to a distant forum will inconvenience the states, and that transfer is unnecessary in light of the historic cooperation among state attorneys general. We respectfully disagree that these considerations weigh against centralization in these circumstances. Even though we have never centralized

litigation comprised solely of sovereign enforcement actions such as these, centralization is appropriate in light of the significant factual overlap among all actions. The inconvenience to S & P of litigating in numerous different districts, as well as state courts, is high, and centralization allows for all parties to obtain substantial efficiencies in dealing with common issues. If the actions were properly removed to federal court—a question which we are neither empowered nor inclined to answer—then S & P could be subjected to conflicting pretrial schedules and, perhaps, discovery and other dispositive motion rulings. There is also the risk, despite plaintiffs' current assurances of cooperation, that they may individually seek overlapping discovery or relitigation of rulings with which they disagree in the various courts. Relatedly, the plaintiffs' promises of cooperation are belied by their filing of fifteen separate, albeit similar, briefs regarding the relatively narrow issue of centralization. Judicial efficiency will be enhanced by allowing a single judge—as opposed to fifteen—to rule on the remand motions and other pretrial matters, if necessary.

Several states suggest deferring our decision pending rulings on the remand motions. We deny this request. If the various courts disagree as to the existence of federal question jurisdiction over the cases, delaying our decision may cause the very conflicting results and obligations and undue expenditure of judicial resources that centralization would help to avoid.

We deny Moody's request that the claims against it be separated and remanded to the Southern District of Mississippi. Transfer of the entirety of the Southern District of Mississippi action will avoid conflicting rulings on the pending motion to remand. If the case remains in federal court after the remand issue is resolved, the transferee judge can suggest Section 1407 remand of the claims against Moody's at that time. If the action were against Moody's only, the question of whether it should be included in the MDL would be closer, given our typical reluctance to transfer actions involving parallel similar conduct involving separate and competing defendants. In its briefs, Moody's also argues that transfer of the Southern District of Mississippi action is barred by CAFA's "mass action" provision. CAFA's "mass action" provision, however, permits transfer where a "majority of the plaintiffs in the action request transfer pursuant to section 1407." 28 U.S.C. § 1332(d)(11)(C)(i). Mississippi expressly requested transfer, if the Panel was inclined to centralize the litigation, and CAFA's "mass action" provision is no bar to transfer of the Southern District of Mississippi action here.

*3   [2]   On balance, we are of the opinion that the Southern District of New York is an appropriate transferee forum for this litigation. This district provides a convenient and accessible forum for this litigation. Importantly, S & P has its principal place of business in this district, and the witnesses and evidence relating to the states' claims may be found there. New York is also where some of the alleged misconduct occurred: several statements about S & P's independence and objectivity appear to have been made in New York, as were S & P's ratings of structured finance products.

IT IS THEREFORE ORDERED that pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A are transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Jesse M. Furman for coordinated or consolidated pretrial proceedings.

### SCHEDULE A

**MDL No. 2446 — IN RE: STANDARD & POOR'S RATING AGENCY LITIGATION**

#### District of Arizona

*State of Arizona, ex rel. Thomas C. Horne v. The McGraw–Hill Companies Inc., et al.,* C.A. No. 2:13–00463

#### Eastern District of Arkansas

*State of Arkansas, ex rel. Dustin McDaniel v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 4:13–00117

#### District of Colorado

*State of Colorado, ex rel. John W. Suthers v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 1:13–00572

#### District of Delaware

*State of Delaware v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 1:13–00363

#### District of District of Columbia

*District of Columbia v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 1:13–00292

#### District of Idaho

*State of Idaho, ex rel. Lawrence Wasden v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 1:13–00108

#### Southern District of Iowa

*State of Iowa, ex rel. Thomas J. Miller v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 4:13–00111

#### District of Maine

*State of Maine v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 1:13–00067

#### Southern District of Mississippi

*State of Mississippi, ex rel. Jim Hood v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 3:11–00343

#### Western District of Missouri

*State of Missouri, ex rel. Chris Koster, et al. v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 4:13–00221

#### Eastern District of North Carolina

*State of North Carolina, ex rel. Roy Cooper v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 5:13–00163

#### Middle District of Pennsylvania

*Commonwealth of Pennsylvania by Attorney General Kathleen G. Kane v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 1:13–00605

#### District of South Carolina

*The McGraw–Hill Companies, Inc., et al. v. Alan Wilson,* C.A. No. 3:13–00322

*State of South Carolina, ex rel. Alan Wilson v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 3:13–00596

#### Middle District of Tennessee

*The McGraw–Hill Companies, Inc., et al. v. Robert E. Cooper, Jr.,* C.A. No. 3:13–00089

*State of Tennessee, ex rel. Robert E. Cooper, Jr., Attorney General and Reporter v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 3:13–00193

In re: Standard & Poor's Rating Agency Litigation, --- F.Supp.2d ---- (2013)

*Western District of Washington*

**\*4**  *State of Washington v. The McGraw–Hill Companies, Inc., et al.,* C.A. No. 2:13–00398

Footnotes

\*      Judge John G. Heyburn II did not participate in the decision of this matter.

1      S & P's motion originally included a District of Connecticut action and a Northern District of Illinois action, both of which were remanded to state court during the pendency of the Section 1407 motion.

**End of Document**                           © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

COPY

FEB 0 5 2013

MICHAEL K. JEANES, CLERK
S. LaSPALUTO
DEPUTY CLERK

1   THOMAS C. HORNE
    Arizona Attorney General
2   Firm State Bar No. 14000
    NANCY M. BONNELL, #016382
3   Antitrust Unit Chief
    SUSAN V. MYERS, # 021949
4   Assistant Attorney General
    1275 West Washington Street
5   Phoenix, Arizona 85007-2997
    Telephone: (602) 542-7752
6   Facsimile: (602) 542-9088
7   consumer@azag.gov
8   Attorneys for Plaintiff

9

10          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11            IN AND FOR THE COUNTY OF MARICOPA

12

13   STATE OF ARIZONA, *ex rel*. THOMAS C.
     HORNE, Attorney General,                    Case No:   CV2013-001188
14
                    Plaintiff,
15
            -vs-                                  COMPLAINT FOR INJUNCTIVE AND
16                                                OTHER RELIEF
     THE MCGRAW-HILL COMPANIES, INC.
17   and STANDARD & POOR'S
     FINANCIALSERVICES, LLC,
18
                    Defendants.
19

20

21   I.     SUMMARY OF THE CASE

22          1.      This lawsuit seeks redress for The McGraw-Hill Companies, Inc.'s, Standard &

23   Poor's Financial Services LLC's, and its business unit Standard & Poor's Ratings Services'

24   (referred to herein collectively as "S&P") unlawful business practices of systematically and

25
26   intentionally misrepresenting that its analysis of structured finance securities was objective,

independent and not influenced by either S&P's or its clients' financial interests. These representations were untrue and S&P knew they were untrue.

2.      S&P represents that its analysis of structured finance securities is independent, objective, and the result of the highest quality credit analytics that are available to S&P. Indeed, S&P's reputation for independence, objectivity and integrity is emphasized by S&P to the users of its ratings at nearly every turn.

3.      As a senior S&P executive publicly stated in 2005:  "Since any structured finance transaction involves complex structures and the transfer of complex credit risks, the key to a successful transaction is an independent and objective analysis of both the structure and the credit risk.  And it is in this function that [S&P's] Structured Finance ratings have excelled."

4.      This principle has been further emphasized by S&P in its publicly available Code of Conduct in which S&P explicitly pledges that its analysis of structured finance securities is objective and uninfluenced by "the potential effect . . . [on S&P,] an issuer, an investor, or other market participant."

5.      Despite this intentional and explicit representation, S&P failed to live up to its statements of independence and objectivity when analyzing structured finance securities and thereby violated the trust that it successfully cultivated with the marketplace.  Moreover, S&P knew its false representations of independence and objectivity were especially misleading and harmful to participants in the structured finance securities market because

structured finance securities are particularly complex and their creditworthiness is difficult, if not impossible, to evaluate even for the most sophisticated financial entities.

6.      Starting in at least 2001, S&P knowingly allowed its desire for increased revenue and market share in the structured finance ratings market to influence the analytical models it developed for analyzing structured finance securities and, ultimately, the ratings that were assigned to these investments.  Similar revenue and market share concerns dictated the manner in which S&P monitored the performance of structured finance securities that S&P had already rated.

7.      In particular, by at least 2001, S&P's desire to maximize revenue and market share by rating as many structured finance deals as possible led S&P to cater to the preferences of large investment banks and other repeat issuers of structured finance securities that dominated S&P's revenue base, rather than focusing on what S&P said it was doing, which was providing independent and objective credit analysis.

8.      Thus, when formulating its analytical models for rating structured finance securities S&P made adjustments to its models based on what would maximize its revenue and, therefore, be best for it business.  As a result, starting in at least 2001, S&P utilized analytical models that its senior managers knew were influenced by market share and revenue considerations.  Similarly, S&P knowingly failed to use the best analytic tools available to it to conduct surveillance on those structured finance securities that it already had rated.  S&P engaged in this conduct because it enabled S&P to continue to assign the

high ratings that S&P's frequent customers desired, thus enabling S&P to maximize its revenue and preserve its already high market share for rating structured finance securities.

9.     This lawsuit does not challenge S&P's judgment regarding which rating methodology to use, or how to apply it, when rating any specific structured finance security. Similarly, this lawsuit is not brought for the purpose of demonstrating that any particular S&P rating on a structured finance security was incorrect (*i.e.*, too high or too low).

10.    Rather, the State's lawsuit takes issue with the fact that S&P represented that its analysis of structured finance securities was independent, objective and, as stated in its Code of Conduct, "not . . . affected by the existence of, or potential for, a business relationship between [S&P] . . . and the Issuer . . . or any other party, or the non-existence of any such relationship." This representation by S&P was false and S&P knew it.

11.    By intentionally and knowingly misrepresenting and / or omitting factors it considered when analyzing structured finance securities, S&P offered a product and / or service that was materially different from what it purported to provide to the marketplace.

12.    S&P's conduct as described herein constitutes an unlawful business practice in violation of the Arizona Consumer Fraud Act, Arizona Revised Statutes ("A.R.S.") § 44-1521 *et seq.* (the "Consumer Fraud Act").  Pursuant to A.R.S. §§ 44-1528, 44-1531, 44-1534, the Arizona Attorney General, in the name of the State of Arizona, seeks restitution, civil penalties, attorneys' fees and costs, as well as other injunctive and equitable relief to prevent these unlawful business practices from happening in the future.

## II.   PARTIES

13.   Thomas C. Horne is the Attorney General and chief legal officer of Plaintiff, the State of Arizona, and is here acting in his official capacity on behalf of the State.

14.   The Attorney General is charged with the enforcement of the Arizona Consumer Fraud Act, A.R.S. § 44-1521, et seq.  The Attorney General has determined that bringing this Complaint is in the public interest.

15.   Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, NY 10020.  McGraw-Hill is registered with the Arizona Corporation Commission to conduct business within the State of Arizona.

16.   Standard & Poor's Financial Services LLC is a Delaware limited liability company and wholly owned subsidiary of defendant McGraw-Hill with a principal place of business at 55 Water Street, New York, NY 10041.  Within Standard & Poor's Financial Services LLC is the business unit Standard & Poor's Ratings Services ("S&P"), which operates as a credit rating agency that assigns credit ratings on a broad range of securities, including structured finance securities, issued in domestic and international financial markets.   Standard & Poor's Financial Services LLC is the successor entity to a unit that previously operated within an unincorporated division of McGraw-Hill.

17.   S&P holds a dominant position in the credit rating agency market, particularly with respect to the analysis of structured finance securities.  For example, S&P routinely assigns ratings to over 90% of the structured finance securities issued into the global capital

markets.   As of 2009, S&P had rated and currently monitored ratings on approximately 198,000 structured finance obligations.

18.    S&P regularly transacts business in the State of Arizona and derives substantial revenue from its business within the State of Arizona.   S&P rates structured finance securities issued by issuers located within Arizona.   Additionally, S&P's analysis of structured finance securities is routinely used and relied on by investors, government regulators, and other participants in the financial markets located within the State of Arizona. Based on S&P's public representations, these individuals and entities depend on S&P to provide independent and objective analysis of the credit risk of structured finance securities that is not affected by S&P's or its clients' financial interests.

## III.    BACKGROUND

### A.    The Creation and Rating of Structured Finance Securities

#### 1.    What is a Structured Finance Security?

19.    Broadly stated, structured finance securities are Asset-Backed Securities ("ABS"), which are financial products whose value is derived from the revenue stream flowing from a pool of underlying assets.  These securities are sold to buyers / investors who rely upon the repayment of their principal and interest from the revenue stream generated from the underlying asset pool.  Many different types of assets can serve as collateral for ABS. Some of the most common types of assets used to support an ABS are residential and commercial mortgages.

20.    The largest type of structured finance securities are securities backed by residential mortgages ("RMBS").   During 2006, approximately $2.5 trillion in mortgages were originated in the United States.    Approximately 80% of those mortgages were securitized into RMBS.  Approximately 25% of all RMBS issued were backed by subprime mortgages.  Between 2002 and 2005 the annual volume of mortgage securities sold to private investors tripled to $1.2 trillion and the subprime portion of these obligations rose to approximately $456 billion.

21.    Structured finance securities can also be backed by a variety of other types of assets, such as commercial mortgages ("CMBS"), student loans, and credit card balances.

22.    Collections or "pools" of asset backed securities such as RMBS can themselves serve as the collateral for structured finance securities that gather together an asset pool of various ABS securities and then issue a further round of derivative securities.

23.    The most common type of structured finance securities collateralized by other securities are known as collateralized debt obligations ("CDOs").   According to the Securities Industry and Financial Markets Association, the value of CDOs backed by RMBS during 2005 was $177 billion, during 2006 was $314 billion, and during 2007 was $263 billion.  Additionally, from 2005-2007 there were hundreds of billions of dollars of CDOs backed by bonds and by high yield loans called collateralized loan obligations ("CLOs").

24.    As the market for mortgage related structured finance securities grew, the securities that provided the underlying value for these investments became increasingly complex. In addition to issuing CDOs made up of RMBS or other CDOs ("CDOs squared"),

issuers began to use credit default swaps and other derivative securities to serve as the underlying collateral of the obligation, which were designed to replicate the performance of subprime RMBS and CDOs. In this case, rather than purchasing subprime RMBS or CDOs, the CDO primarily entered into credit default swaps referencing subprime RMBS or CDOs. These CDOs, which are extremely complex financial products, in some cases are composed entirely of credit default swaps (*i.e.*, "synthetic CDOs") or a combination of credit default swaps and actual cash RMBS (*i.e.*, "hybrid CDOs").

25.    While the asset pool underlying a structured finance security may vary, the mechanism for transforming the pool of assets into an ABS by way of the securitization process is generally the same.

26.    The process for creating a RMBS begins when an arranger, generally an investment bank, packages mortgage loans into a pool and transfers them to a trust that will issue securities collateralized by the pool. The trust purchases the loan pool and becomes entitled to the interest and principal payments made by the borrowers, which is used to make monthly interest and principal payments to the investors in the RMBS.

27.    To appeal to investors with different risk appetites, the trust issues different classes of RMBS, known as tranches, which offer a sliding scale of interest rates based on the level of credit protection afforded to the tranche. Credit protection is designed to shield the securities within a tranche from the loss of interest and principal due to defaults of the loans in the overall pool. The degree of credit protection afforded any tranche of securities is known as credit enhancement.

28.    The main source of credit enhancement is subordination.  Subordination refers to the hierarchy of loss absorption among the tranches where any loss of interest and principal experienced by the trust from delinquencies and defaults in loans in the pool are allocated first to the lowest tranche until it loses all of its principal amount and then to the next lowest tranche up the capital structure.  Consequently, the most senior tranche, and therefore the highest rated, would not incur any loss until all the lower tranches have absorbed losses from the underlying loans.

29.    The process for creating a typical CDO is similar to that of an RMBS. Specifically, a sponsor creates a trust or other special purpose entity to hold assets and issue securities.  Instead of the mortgage loans that are held in RMBS pools, a CDO trust is typically comprised of approximately 200 debt securities such as RMBS or other CDOs. The trust then uses the interest and principal payments from the underlying debt securities to make interest and principal payments to investors in the CDO securities issued by the trust. CDO trusts are among the largest purchasers of subprime RMBS and have been one of the biggest drivers of demand for these securities.

30.    A CDO trust also issues different classes of securities divided into tranches that provide differing levels of credit enhancement to the securities it issues through the use of subordination and other forms of credit enhancement.  So long as the underlying assets continue to perform, the cash flow continues and the performance of each of the tranches of the CDO remains strong.  Just as is the case with RMBS, the senior CDO tranches are paid first from the incoming cash flow generated from the collateral, followed by each

1   subordinate tranche in the capital structure.   Conversely, if the underlying assets begin to

2   default, the cash flow diminishes and the investors at each CDO tranche level are subjected

3

4   to risk starting from the bottom or equity tranches and proceeding upward.

5           **2.**     **The Need for a Credit Rating**

6        31.   A necessary step in the process of creating and ultimately selling any ABS,

7   including an RMBS or a CDO, is the assignment of a credit rating for each of the tranches

8

9   issued by the trust.   Indeed, many institutional investors can invest only in securities that

10   have received a certain rating level from S&P or another credit rating agency recognized by

11   the Securities and Exchange Commission ("SEC").

12        32.   S&P engages in the following steps when rating a RMBS.   First, upon

13

14   receiving a range of data on a pool of mortgage loans from an investment bank or some other

15   arranger, S&P assigns a lead analyst to the transaction.   Information provided to the lead

16   analyst about the transaction includes principal amount, geographic location of the property,

17   credit history and FICO score of the borrower, loan to value ratio, type of loan, as well as the

18

19   proposed capital structure of the trust and the proposed levels of credit enhancement to be

20   provided to each tranche.   The lead analyst is responsible for analyzing the loan pool,

21   proposed capital structure and proposed credit enhancement levels provided by the issuer.

22        33.   The next step in the process is for the S&P analyst to use S&P's analytical

23

24   models to develop predictions as to how many loans in the collateral pool would default

25   individually and in correlation with each other under varying levels of stress.   S&P's

26   analytical models are built on a series of assumptions with respect to probability of default

and asset correlation and, like any model, their output is subject to adjustment based on changes made by S&P to S&P's underlying assumptions.

34.     The purpose of S&P using its analytical models to carry out a default and loss analysis is to determine how much credit enhancement a given tranche security would need for a particular category of rating.  S&P runs the most severe stress test to determine the credit enhancement required for a RMBS tranche to receive its highest "AAA" rating.  The next most severe stress test is run to determine the amount of credit enhancement required of the next highest tranche, and so on down the capital structure.

35.     After determining the level of credit enhancement required for each credit rating category, S&P checks the proposed capital structure of the RMBS trust against S&P's requirements for a particular credit rating.

36.     Upon analyzing the proposed capital structure based on S&P's analytical models, if S&P determines that the issuer's proposal does not allow for sufficient credit enhancement to receive a "AAA," then S&P is supposed to let the issuer know that the most senior class of securities could only receive a "AA" or lower rating.  Presented with this information, the issuer could accept that determination and have the trust issue the securities with the proposed capital structure and lower rating or it could adjust the structure to provide the requisite credit enhancement for the senior tranche to receive the desired "AAA" rating.

37.     Similarly, the steps that S&P follows for assigning ratings to CDOs involves a review of the creditworthiness of each tranche of CDO.  The process centers on an examination of the pool of assets held by the trust and, through the use of analytical models

developed by S&P, an analysis of how these assets would perform both individually and in correlation with each other during various stress scenarios. With respect to CDOs, however, S&P's analytical models look only to the credit rating of each RMBS (or other structured finance security) in the underlying pool and do not include an analysis of the underlying loan pools collateralizing the RMBS.

**B.    The Market for Structured Finance Securities**

38.    The market for structured finance securities consists of the issuers (*i.e.*, sellers or sponsors), who create a trust to hold the underlying collateral and issue ABS such as RMBS and CDOs, and the buyers (*i.e.*, investors) that purchase these investments. Issuers of structured finance securities are financial companies such as banks, mortgage companies, finance companies and investment banks. Buyers of structured finance securities are institutional investors, including financial institutions, pension funds, insurance companies, mutual funds, hedge funds, money managers and investment banks.

39.    Structured finance securities are typically not marketed to or purchased by retail investors. However, the credit ratings that RMBS, CDOs and other ABS receive, and the performance of these investments, have significant real world implications for the finances of individual investors. In particular, structured finance securities are often included in mutual fund and pension fund portfolios that play significant roles in the retirement and investment strategies of many individuals, including citizens of Arizona.

40.    The consumers of S&P's analysis of structured finance securities are not limited to just investors. For example, S&P's analysis is routinely used by government

-12-

regulators within Arizona such as the Department of Insurance to assist with capital adequacy evaluations and other assessments of the financial health of regulated entities.

41.    There are few credit rating agencies that assign ratings to structured finance securities.   Consequently, the market for rating structured finance securities is extremely concentrated.    S&P, and its primary competitor, Moody's Investors Service, Inc. ("Moody's"), dominate the rating of these investments.  For example, according to industry publication Asset-Backed Alert, S&P rated 97.5% of the CDOs issued in 2006.

42.    The market for analyzing structured finance securities is also very lucrative. S&P charges three or four times as much to analyze and rate a structured finance security as it does for a rating on a corporate bond.  In 2006, S&P's revenues rose approximately 15% to $1.27 billion, with approximately one half of that growth derived from S&P's increased sale of structured finance security ratings.   Industry publications also estimate that as much as 40% of S&P's total revenue is derived from its analysis of structured finance securities.

43.    Finally, unlike the markets for most financial products, the market for structured finance securities is comprised of a relatively narrow group of sellers (i.e., investment banks) that act as repeat issuers or sponsors of RMBS, CDOs and other ABS. Accordingly, there are a relatively small group of banks that hire S&P to analyze their products on a regular basis.

44.    The implication of this reality has been described by Professor John C. Coffee of Columbia University, a frequent expert witness before Congress on the credit rating agencies' role in the most recent financial crisis:

-13-

> The major change that destabilized rating agencies appears to have been the rise of structured finance . . . The rating agency is no longer facing an atomized market of clients who each come to it only intermittently (and thus lack market power), but instead large repeat clients who have the ability to take their business elsewhere. Today, structured finance accounts for a major share of some rating agencies' total revenues; equally important, these amounts are paid by a small number of investment banks that know how to exploit their leverage. . . .

**C.      S&P's Role in the Market for Structured Finance Securities**

45.     Credit rating agencies distinguish among grades of debt creditworthiness.  In other words, a credit rating is a statement as to the likelihood that the borrower or issuer will meet its contractual, financial obligations as they become due.  Thus, S&P is a gatekeeper on whom investors, government regulators, and other consumers necessarily rely.

46.     As Professor Coffee noted in his Congressional testimony: "Gatekeepers are reputation intermediaries who provide verification and certification services to investors. . . . [T]he professional gatekeeper essentially assesses or vouches for the corporate clients own statements about itself or a specific transaction.  This duplication is necessary because the market recognizes that the gatekeeper has a lesser incentive to lie than does its client and thus regards the gatekeeper's assurance or evaluation as more credible."

47.     S&P's role as a "gatekeeper" takes on special importance in the market for structured finance securities because historically its investment grade rating has been a necessary condition before many institutional investors are permitted under SEC regulations to buy debt securities.  In this sense, S&P's rating also acts as a de facto regulatory license that expands the universe of potential buyers / investors capable of purchasing a particular structured finance security.  S&P knows this fact.

48.   S&P's role as a "gatekeeper" is also affected by the fact that structured finance securities are fundamentally different from other debt investments (*i.e.*, corporate and public bonds).  For example, the issuing entity of a corporate bond has some independent existence and measurable value in and of itself that usually can be verified, at least in part, by reference to publicly available materials.  This characteristic does not exist in the world of structured finance.

49.   As a former senior managing director at a competing credit rating agency has publicly noted, "[s]omewhat unique to the structured finance [security] market is the opacity of the rated securities.  In certain situations, the details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny. . . . Moreover, the tools to analyze credit risk, even with transparent assets, are beyond the grasp of many investors.   Rating methods are quite technical, often relying on advanced statistical techniques.  Documentation supporting a transaction can be equally daunting, reading more like a legal brief than helpful financial guidance.

50.   In light of the opaque nature of structured finance securities as an investment, buyers / investors in structured finance securities, government regulators, and other consumers depend on S&P's analysis to obtain some relative assessment of the credit risk associated with the various RMBS, CDOs and other ABS tranches that are issued.  Indeed, issuers obtain a credit rating from S&P for the specific purpose of making the risk characteristics of the structured finance security understandable to the financial markets.

-15-

51.     As such, the rating that S&P assigns to a particular structured finance security is a significant factor in any investor's decision to purchase or not to purchase a structured finance security and also influences the decision making of government regulators and other consumers within Arizona.   S&P is well aware that buyers / investors, government regulators, and other consumers use and rely on S&P's analysis in this manner.

52.     For example, in its Code of Conduct, S&P explains that it "fully supports . . . promot[ing] investor protection by safeguarding the integrity of the rating process." Additionally, in its 2004 Annual Report, McGraw-Hill noted:  "[S&P] provides investors with the independent benchmarks they need to feel more confident about their investment and financial decisions."

53.     Similarly, in its 2007 Annual Report, McGraw-Hill acknowledged that:  "S&P is highly valued by investors and financial decision-makers everywhere for its analytical independence, its market expertise and its incisive thought leadership."  Along these same lines, Deven Sharma, the former President of Standard & Poor's Financial Services LLC, testified before Congress in 2008 as follows:  "Ratings have been, and we believe will continue to be, an important tool for investors looking for a common and transparent language for evaluation and comparing creditworthiness across all sectors in both mature and developing global markets."

54.     There are many buyers / investors of structured finance securities, government regulators and other consumers located in Arizona that expect and depend on S&P to independently and objectively fulfill its self described role as alleged above.

**D.    S&P's Credit Rating Scale for Structured Finance Securities**

55.    The result of S&P's analysis of structured finance securities is summarized in a rating on a letter-based scale ranging from AAA to D.  According to its ratings definitions, S&P's letter grades are expressed in relative rank order, with a structured finance security rated "AAA" by S&P having "the highest rating assigned by [S&P,]" meaning that "the [issuer's] capacity to meets is financial commitment on the structured finance security is extremely strong."  Structured finance securities rated "AA," "A," "BBB," "BB," "B," "CCC," "CC," "C," and "D" are represented by S&P to have progressively less creditworthiness with each succeeding reduction in grade level.

**E.    The Issuer Pays Business Model**

56.    S&P is selected by the same entities that issue the structured finance securities that S&P is tasked with evaluating.  In exchange for analyzing the transaction and assigning a credit rating to a security, S&P charges the issuer, or "special-purpose vehicle," a fee based on the complexity and size of the structured finance transaction being analyzed.  Typically, this fee is ultimately passed on to the investors in the transaction.  Nevertheless, as has been repeatedly noted in Congressional testimony, this business model ensures that S&P is essentially "a watchdog paid by the persons it is to watch."

57.    The financial incentives and conflicts of interest inherent in the Issuer Pays business model have led S&P to violate its public representations of independence and objectivity in S&P's credit analysis of structure finance securities.

58.     Specifically, as the volume of RMBS and CDO issuance increased, the volume of opportunities to earn lucrative fees for issuing "AAA" ratings on these structured finance securities increased as well.  For S&P to take advantage of these opportunities and, therefore, realize additional revenue, it consistently had to please the relatively small number of issuers of structured finance securities who had become S&P's repeat customers, or run the risk of not being retained by these issuers in the future.

59.     S&P's ability to please issuers of structured finance securities is dependent on its analytical models requiring the least amount of credit enhancement in order to achieve a desired rating.  The smaller or lower the credit enhancement, the more profitable the security is to the issuer.

60.     Issuers of structured finance securities are well aware of S&P's incentive to alter its credit analysis in favor of higher ratings and therefore more fees.  An issuer typically requests ratings from not only S&P but also from S&P's main competitors, Moody's and Fitch, Inc. ("Fitch.")  If the issuer is unhappy with the credit enhancement levels proposed by S&P after it conducts its analysis, the issuer can inform S&P of the credit enhancement levels proposed by either Moody's or Fitch in order to influence the outcome of S&P's analysis.  In such a situation, S&P can either adjust its assumptions in its analytical model to win the business, or stay true to its original analytical judgments (and public representations) and potentially lose the business.

61.     This practice is known as "ratings shopping" because issuers offer their business to competing rating agencies and usually give the business to the firm (or firms)

-18-

1  that find the least amount of credit enhancement necessary to achieve the rating levels

2  desired by the issuer.

3      62.   A high ranking S&P managing director described this dynamic when he

4  testified before Congress in September 2007: "[R]ating agencies can come under pressure to

5  loosen their standards for a whole sector.  And this can happen from behavior from the

6  issuers called ratings shopping, where . . . an issuer . . . shows a deal to multiple rating

7  agencies and then picks one or two that have the easiest standards to rate the deal.  Then the

8  other rating agencies that had tougher standards become invisible, and, once more, they don't

9  make any money, because the way you make money . . . is you rate the deal and charge the

10  issuer.  So it puts pressure on the rating agencies to loosen their standards . . . .  [W]e call this

11  competitive laxity."

## IV.   S&P REPRESENTS ITSELF TO THE PUBLIC AS PROVIDING INDEPENDENT AND OBJECTIVE ANALYSIS OF STRUCTURED FINANCE SECURITIES

### A.   S&P's Pledge to Safeguard the Integrity of the Rating's Process

63.   S&P represents to investors, government regulators and other consumers, including those in Arizona, that its analysis of structured finance securities is independent, objective and free from outside influence.  S&P repeatedly and publicly emphasizes its independence and objectivity to investors and other consumers in a variety of public statements.

64.   For example, S&P's web site has stated that: "[S&P's] mission is to provide high quality, objective, independent, and rigorous analytical information to the marketplace" and explained that S&P "endeavors to conduct the rating and surveillance processes in a

-19-

manner that is transparent and credible and that also maintains the integrity and independence of such processes in order to avoid any compromise by conflicts of interest, abuse of confidential information, or other undue influences."

65.    Harold McGraw III, the Chairman, President and Chief Executive Officer of McGraw-Hill, described S&P in the company's 2002 Annual Report as "the world's leading provider of independent opinions and analysis on the debt and equity markets," and noted that "securitization, disintermediation and privatization create a growing demand for our independent ratings and analysis."

66.    In McGraw-Hill's 2003 Annual Report, Mr. McGraw further emphasized that "[S&P] enjoys a preeminent position in the world's financial architecture" and stated that the company's "ongoing commitment to improving transparency facilitates the global capital-formation process."   Similarly, Mr. McGraw noted that S&P is responding to the new challenges created by the structured finance market "by building on its market leadership as the world's foremost provider of independent credit ratings and risk evaluation."

67.    In McGraw-Hill's 2004 Annual Report, the company reiterated that "[f]or more than a century, The McGraw-Hill Companies has been opening opportunity in the markets it serves by providing essential information and insight.  The Corporation is aligned around three powerful and enduring forces driving economic growth worldwide:  the need for capital, the need for knowledge and the need for information transparency." To that end, McGraw-Hill further stated that "[S&P] provides investors with the independent benchmarks they need to feel more confident about their investment and financial decisions."

68.   Similarly, in its 2004 Code of Practices and Procedures, S&P noted that it "endeavors to conduct the rating and surveillance process in a manner that is transparent and credible and that also ensures that the integrity and independence of such processes are not compromised by conflicts of interest, abuse of confidential information, or other undue influences." In this same document, S&P also promised that S&P's "mission has always remained the same – to provide high-quality, objective, independent, and rigorous analytical information to the marketplace" and that "in all analytic processes, [S&P] must preserve the objectivity, integrity and independence of its ratings. In particular, the fact that [S&P] receives a fee from the issuer must not be a factor in the decision to rate an issuer or in the analysis and the rating opinion."

69.   S&P's vow of independence, objectivity and integrity were further codified in October of 2005, when it adopted a Code of Professional Conduct ("S&P's Code" or the "Code") for its ratings practices. In a 2006 report explaining its implementation of the Code, S&P noted that:   (a) "[S&P] recognizes its role in the global capital markets and is committed to providing ratings that are objective, independent and credible;" (b) "It is a central tenet of [S&P] that its ratings decisions not be influenced by the fact that S&P receives fees from issuers;" (c) "Ratings are monitored on an ongoing basis in accordance with S&P's policies unless the rating is a point in time confidential rating without surveillance;" and (d) "[S&P's] Code reflects further alignment of its policies and procedures with the [International Organization of Securities Commissions] ("IOSCO") Code of Conduct."

-21-

70.     Echoing the above pledge, S&P's Code also notes that "[S&P] fully supports the essential purpose of the IOSCO Code, which is to promote investor protection by safeguarding the integrity of the rating process.  [S&P] believes that the Code is consistent with the IOSCO Code and appropriately implements IOSCO's Statements of Principles Regarding the Activities of Credit Rating Agencies"

71.     One of the key principles set forth in the IOSCO Code (first published in December of 2004) was the need for credit rating agencies such as S&P to maintain independence from the issuers who pay it for its ratings.

72.     In particular, the IOSCO Code sets forth the principle that "the essential purpose of the Code Fundamentals is to promote investor protection by safeguarding the integrity of the rating process.  IOSCO members recognize that credit ratings, despite their numerous other uses, exist primarily to help investors assess the credit risks they face when making certain kinds of investments.  Maintaining the independence of credit rating agencies vis-à-vis the issuers they rate is vital to achieving this goal.  Provisions of the Code Fundamentals dealing with credit rating obligations to issuers are designed to improve the quality of credit ratings and their usefulness to investors."

73.     Similarly, the IOSCO Code also emphasizes that "[r]ating analyses of low quality or produced through a process of questionable integrity are of little use to market participants," and that "[w]here conflicts of interest or a lack of independence is common at a credit rating agency and hidden from investors, overall investor confidence in the transparency and integrity of a market can be harmed."

74.     With these principles as a guide, since October of 2005, S&P has made several representations in its Code about the manner in which S&P maintains the independence and objectivity of its analysis and avoids conflicts of interest with issuers.  The most important of these representations are found in sections 1.12, 2.1 – 2.4, and 1.9 of the Code, which currently remain in effect as purported limitations on the factors that S&P considers when analyzing structured finance securities.

75.     Specifically, Section 1.12 of S&P's Code states:  "[S&P] and its employees shall deal fairly and honestly with issuers, investors, other market participants, and the public."

76.     Section 2.1 of S&P's Code states:  "[S&P] shall not forbear or refrain from taking a Rating Action, if appropriate, based on the potential effect (economic, political, or otherwise) of the Rating Action on [S&P], an issuer, an investor, or other market participant."

77.     Section 2.2 of S&P's Code states:  "[S&P] and its Analysts shall use care and analytic judgment to maintain both the substance and appearance of independence and objectivity."

78.     Section 2.3 of S&P's Code states:  "The determination of a rating by a rating committee shall be based only on factors known to the rating committee that are believed by it to be relevant to the credit analysis."

79.     Section 2.4 of S&P's Code states:  "Ratings assigned by [S&P] to an issuer or issue shall not be affected by the existence of, or potential for, a business relationship

-23-

between [S&P] (or any Non-Ratings Business) and the Issuer (or its affiliates), or any other party, or the non-existence of any such relationship."

80. Section 1.9 of S&P's Code states: "[S&P] shall allocate adequate personnel and financial resources to monitoring and updating its ratings. . . . [O]nce a rating is assigned [S&P] shall monitor on an ongoing basis and update the rating by: (a) regularly reviewing the issuer's creditworthiness; (b) initiating review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a Rating Action (including withdrawal of a rating), consistent with the applicable rating criteria and methodology; and (c) updating on a timely basis the rating, as appropriate, based on the results of such review."

81. S&P's Code is available on its web site and the requirements of Sections 1.12, 2.1 through 2.4, and 1.9 have continued to be referenced in several public statements by S&P since the Code's adoption in October of 2005.

**B.     S&P Reassures the Public of its Role as an "Independent Expert"**

82. McGraw Hill's 2006 Annual Report picked up on the same themes and once again reiterated claims of S&P's long history of independence and objectivity. Specifically, McGraw-Hill stated that "[m]any investors know [S&P] for its respected role as an independent provider of credit ratings. . . As financial markets grow more complex, the independent analysis, critical thinking, opinions, news and data offered by [S&P] are an integral part of the global financial infrastructure."

-24-

83.     Similarly, in its 2007 Annual Report, McGraw-Hill emphasized that: "[s]ince 1916, markets across the globe have relied on the independent analysis and integrity of [S&P's] credit ratings," and further stated that "S&P is highly valued by investors and financial decision-makers everywhere for its analytical independence, its market expertise and its incisive thought leadership."

84.     Furthermore, in testimony before the Senate Committee on Banking, Housing and Urban Affairs in April 2007, S&P's then Managing Director of RMBS, Susan Barnes, also testified at length regarding S&P's commitment to "ongoing" monitoring of the accuracy and integrity of its ratings.  For instance, Ms. Barnes testified that "[a]fter a rating is assigned, S&P monitors or 'surveils' the ratings to adjust for any developments that would impact the original rating.  The purpose of this surveillance process is to ensure that the rating continues to reflect our credit opinion based on our assumption of the future performance of the transaction."

85.     In her testimony before Congress, Ms. Barnes underscored that S&P's credit ratings are "grounded in the cornerstone principles of independence, transparency, credibility, and quality.  These principles have driven our long-standing track record of analytical excellence and objective commentary."

86.     Similarly, McGraw-Hill stated in the company's 2008 Annual Report that "[i]t is important to note that S&P has effectively served the global capital markets with high quality, independent and transparent credit ratings for many decades" and highlighted that "[t]o ensure the continued integrity and relevance of its ratings business, [S&P] . . . has

-25-

undertaken a series of actions which further enhance transparency and the independence of its ratings process."

87.    These themes were reiterated by Deven Sharma, the former President of Standard & Poor's Financial Services LLC, in October 2008 testimony before the House Committee on Oversight and Government Reform.  Mr. Sharma testified that "[t]he real question is not whether there are potential conflicts of interest in the 'issuer pays' model, but whether they can be effectively managed. . . .  S&P maintains rigorous policies and procedures around the integrity of our analytical processes through a number of checks and balances. . . . Taken together, we believe these measures provide robust safeguards against the potential conflict of interest inherent in the 'issuer pays' model."

88.    Mr. Sharma further explained that "[t]he key question for any approach, whether it be investor or issuer paid, is then whether the rating agency takes appropriate steps to preserve its independence.  For S&P, that independence is a core principle of our business."

89.    In sum, the statements made by S&P in its Code of Conduct, web site, and public filings depict a pattern and practice of public statements intended to repeatedly emphasize several basic representations by S&P to buyers / investors, government regulators and other consumers.  First, that S&P's analysis of structured finance securities has been, and continues to be, independent, objective and free from consideration of S&P's desire for revenue or winning additional business from issuers.

90.    Second, recognizing that S&P holds a position of trust in the marketplace, S&P represents that it deals fairly and honestly with the public, including the buyers / investors of the structured finance securities that it rates.

91.    Third, that S&P agrees with and has implemented the principles set forth in the IOSCO Code of Conduct by maintaining independence, objectivity and integrity of its analysis of structured finance securities.

92.    Fourth, that S&P understands the Issuer Pays business model creates conflicts of interest, but that these conflicts have been adequately managed by the company as demonstrated by the principles set forth in S&P's Code so as to ensure that its credit ratings are purely a function of credit analytics.   Investors, government regulators, and other consumers depend on S&P to properly manage this conflict and reasonably interpret S&P's representations to understand that S&P does so.

93.    Fifth, that S&P dedicates the resources necessary and does in fact conduct timely and thorough surveillance on its analysis of structured finance securities to ensure that the rating assigned by S&P continues to reflect S&P's assessment of the credit risk associated with the obligation.

94.    The above representations made by S&P are material to buyers / investors of structured finance securities, government regulators, as well as other consumers located in Arizona, and also have been reasonably interpreted by those same individuals and entities in light of the circumstances in which the representations have been made.

95.    None of the above representations made by S&P were true and S&P knew they were not true.

## V.    S&P'S ANALYSIS OF STRUCTURED FINANCE SECURITIES WAS NOT INDEPENDENT AND OBJECTIVE

96.    S&P's sacrifice of its independence and objectivity due to its desire to earn more revenue has manifested itself in several ways.

### A.    Ratings Shopping Corrupts the Integrity of the Process

97.    "Ratings shopping" refers to the practice of an issuer offering its business to the rating agency requiring the least amount of credit enhancement necessary to achieve the issuer's desired rating.

98.    In describing the effect of ratings shopping, a former S&P executive has been quoted as follows: "The discussion tends to proceed in this sort of way. 'Look, I know that you aren't comfortable with such and such assumption but apparently Moody's are even lower and if that is the only thing standing between rating this deal and not rating this deal, are we really hung up on that assumption?' You don't have infinite information. Nothing is perfect. So the line in the sand shifts and shifts, and can shift quite a bit."

99.    Between at least 2004 and 2007, when the markets for RMBS and CDOs were particularly active, S&P experienced this pressure on a daily basis and the pressure did in fact influence S&P's analysis, the ratings that S&P assigned to structured finance securities, the recommendations that S&P's analysts made to their superiors, and the feedback that S&P provided to issuers.

-28-

100.    The fact that these outside influences did affect S&P's analysis of structured finance securities was not disclosed by S&P in its public statements.  To the contrary, S&P represented quite the opposite by repeatedly stating that its analysis was not influenced by its business relationships.

**B.    S&P's Quest for Revenue Influenced its Analytical Models**

101.    S&P's desire for more revenue led S&P to make adjustments to the assumptions built into its analytical models used to rate RMBS and CDOs or, alternatively, to intentionally refrain from updating its analytical models based on the best information available to S&P in order to preserve the use of analytical models that were appealing to issuers.  S&P engaged in this conduct knowingly and for the explicit purpose of allowing it to assign its highest rating of "AAA" to as large a portion of the structured finance securities it rated as possible.

102.    By at least 2001, S&P's focus on monitoring and growing its market share and generating additional revenue dominated the attention of S&P's senior management.  This compulsion to maximize revenue influenced the analytical models that S&P developed and implemented for rating RMBS and other structured finance securities.

103.    S&P believed that the only way for it to successfully compete for an issuer's structured finance business was to adjust its analytical models so that S&P's levels of proposed credit enhancement reflected the issuer's expectations.  As a result, S&P focused on meeting the demands of the repeat issuers that paid it its fees, rather than providing an

objective credit analysis that was not influenced by the financial interests of either S&P or its clients.

104.  S&P's decision to compete on the basis of loosening its analytical models, thereby making it easier to assign a "AAA" rating to as large a portion of the structured finance securities it rated as possible, was entirely inconsistent with its public representations and resulted in a race to the bottom in the credit rating industry where robust credit analysis was actually an impediment to a credit rating agency maintaining or growing its revenue.  In short, S&P chose to compete for business by lying to consumers.  Given S&P's dominant position in the market for rating structured finance securities, S&P's decision to compete for business in this manner also punished those credit rating agencies interested in living up to their public representations and made it impossible for such entities to successfully compete based on the strength of their credit analysis.

105.  S&P's adjustment to its analytical models based on revenue and market share concerns began as early as 2001 and laid the foundation for S&P's mass downgrades of RMBS during the summer of 2007.

106.  For example, beginning in approximately 1996, S&P used an analytical model it developed called "*LEVELs*" to estimate the likelihood of default and expected loss associated with a pool of residential mortgages used as collateral for RMBS. As described in section III.A, the loss estimate for a pool of loans determines how much credit enhancement is necessary for S&P to issue "AAA" rated securities backed by the identified collateral.

107.   S&P's *LEVELs* model uses a statistically based methodology to estimate the default and loss of residential home loans and loan pools based in part on historical loan performance data.   Put simply, based on how other loans have performed over time, S&P's *LEVELs* model estimates the default probability and expected loss for a particular pool of loans and structure proposed by an issuer of an RMBS and determines the credit protection required to obtain a given S&P rating.

108.   As of 1999, S&P's *LEVELs* model for rating RMBS used a database that aggregated loan performance data for approximately 166,000 primarily first-lien, fixed rated, prime residential loans.   Upon implementing *LEVELs* and publicizing its use to market participants, S&P's original intention was to refine and improve the model by making at least annual updates to *LEVELs* by adding additional loan performance data, thus increasing the size of its databases.   This plan was a function of the fact that S&P knew that the predictive quality of its *LEVELs* model was only as accurate as the quality of the data underlying the analytical model.

109.   As acknowledged by a former senior S&P executive responsible for rating RMBS, these updates were critical to the *LEVELs* model's success because each new version was built with growing data on both traditional and new mortgage products, particularly with respect to the growing subprime mortgage market.

110.   Beginning in 2001, as the number of RMBS transactions in the United States increased and, therefore, the number of opportunities for S&P to earn lucrative fees for rating structured finance securities also greatly increased, S&P's upper level management stopped

refining S&P's *LEVELs* model by adding new loan data. S&P adopted this new approach despite the fact that its senior managers in the residential mortgage backed securities group repeatedly emphasized the importance of keeping the analytical model up to date given the constantly changing nature of the residential mortgages issuers sought to securitize.

111.   For example, at the insistence of the managing director responsible for rating RMBS, S&P's *LEVELs* development team continued to collect data on historical loan performance. Based on this work, in 2001 S&P developed a new version of its *LEVELs* model based on significant performance data for 642,000 loans. Unfortunately, S&P did not implement this updated model.

112.   Similarly, in early 2004, S&P's residential mortgage backed securities unit completed another update of the *LEVELs* model based on performance data from approximately 2.9 million loans covering the full spectrum of new mortgage products, particularly those in the area of sub-prime lending, which was the fastest growing segment of residential lending. Despite the urgings of the managing director in charge of rating RMBS, S&P did not implement this more comprehensive model for rating RMBS upon its completion in 2004, which would have required more credit enhancement to achieve S&P's highest ratings.

113.   Furthermore, as one former senior S&P managing director testified before Congress, although S&P still maintained a trove of additional residential loan data, as of October of 2008, it still had not implemented any meaningful updates to its *LEVELs* model based on the much more comprehensive database developed by its analysts.

114.   S&P's conscious decision between at least 2001 and 2008 to use an outdated version of its *LEVELs* model for analyzing RMBS was motivated by S&P's desire to continue to assign the "AAA" ratings with minimal credit enhancement that issuers coveted, thus preserving S&P's market share and earning much more revenue for the company.

115.   In the words of one former senior S&P managing director in charge of rating RMBS, a primary factor in S&P's break down in ratings standards and lack of interest in keeping the *LEVELs* model current was that "the RMBS group enjoyed the largest ratings market share among the three major rating agencies (often 92% or better), and improving the model would not add to S&P's revenues."

116.   Rather than run the risk of disrupting its already dominant and highly profitable business of rating RMBS, S&P simply kept using a model that it knew to be outdated because the model already provided the "AAA" ratings with minimal levels of credit enhancement that S&P's most important customers desired.

117.   Indeed, this reality was acknowledged in 2005 by a frustrated member of the S&P team responsible for the *LEVELs* analytical model when he stated as follows: "[*LEVELs*] Version 6.0 could have been released months ago and resources assigned elsewhere if we didn't have to massage the subprime and Alt-A numbers to preserve market share . . . . We have known for some time (based on pool level data and LEVELS 6.0 testing that subprime . . . levels need to be raised . . . . (we have had a disproportionate number of downgrades.)"

-33-

118.   As presciently noted by another S&P analyst to senior S&P executives, S&P's consideration of market share and revenue when conducting its analysis had dire consequences both for S&P and the financial markets as a whole:  "Screwing with the criteria to 'get the deal' is putting the entire S&P franchise at risk – it's a bad idea."

119.   In sum, as stated by a former senior S&P executive, between at least 2001 and 2008, when analyzing RMBS S&P's internal business strategy valued revenues over ratings quality, while at the same time promising independence and objectivity in its public statements.

> Well, profits were what drove it starting in about 2001 at [S&P].  It was the growth in the market and the growth – profits were running the show.  In a nutshell, that was the simple answer.  And the business managers that were in charge just wanted to get as much of the [revenue] as they saw like this, growing out in the street, into their coffers . . . .

> I believe that [S&P] at this time, there was a raging debate between the business managers and the analysts.  The analysts were in the trenches.  We saw the transactions coming in.  We could see the shifts that were taking place in the collateral.  And we were asking for more staff and more investment in being able to build the databases and the models that would allow us to track what was going on.  The corporation, on the other hand was interested in trying to maximize the money that was being sent up to McGraw-Hill, and the requests were routinely denied.  So, by 2005 . . . we did have two very excellent models that were developed but not implemented.  And it's my opinion that had we built the databases and been allowed to run those models and continually populated that base and do the analysis on a monthly quarterly basis, we could have identified the problems as they occurred.

120.   S&P's desire for increased revenue and maintenance of its high market share also led S&P to make several adjustments to the analytical model used by S&P to rate CDOs in order to make them more business friendly and appealing to CDO issuers.

121.    Indeed, by at least 2004, S&P's unstated willingness to cater to the demands of issuers intruded on the entire analytical model that S&P developed for rating CDOs.  During this time frame, S&P's senior management was primarily concerned about losing out on revenue to either Moody's or Fitch and believed that the only way for S&P to successfully compete for an issuer's business was to make sure that S&P's levels of proposed credit enhancement allowed S&P to assign a "AAA" rating to as large a portion of the CDOs it rated as possible.

122.    For example, in July of 2004, S&P summarized its process going forward for implementing new analytical criteria.  Step one of this process was "Rating Implications," which required analysts to "specify generally the type and number of deals that may be impacted and how those deals could be impacted.  Indicate both new, pipeline and existing ratings."  These instructions prompted the head of S&P's RMBS group to inquire "[a]re you implying that we might actually reject or stifle superior analytics for market consideration?"  As S&P's ensuing conduct demonstrates, that is exactly what S&P senior management had in mind.

123.    In August of 2004, one of S&P's managing directors informed her colleagues as follows: "We are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets . . . because of the ongoing threat of losing deals."  The head of S&P's CDO unit and a member of its Executive Committee endorsed lessening the standards by noting:  "Ok with me to revise criteria."  Although not revealed publicly, S&P engaged in

-35-

this conduct for the specific purpose of not losing deals to Moody's or Fitch, increasing its revenue, and making its analysis no more conservative than that of its closest competitors.

124.   Similarly, as succinctly stated in S&P's 2005 CDO Strategic Plan:  "Ratings criteria and associated credit support levels for the rated tranches in any CDO transaction are another key revenue driver.  Criteria is one of the key competitive elements among the main rating agencies globally and regionally . . . .  [H]aving criteria and analytical tools that enable us to rate the transactions and meet the needs of the players in the market will ensure that S&P will continue to be the one agency rating the largest share of transactions."

125.   The above statements foreshadow a special project undertaken by S&P during this time frame to update its CDO Evaluator model, which was the primary analytical model that S&P used to rate CDOs.  The stated purpose of this project was for S&P's analytical team to study the assumptions that served as the underpinnings of the model and make recommendations regarding changes that would allow the model to more accurately predict credit risk.  In reality, a significant goal of the project was also to develop assumptions that would allow S&P to maintain and grow its market share for rating as many different types of CDOs as possible.

126.   Indeed, the release of S&P's revised CDO Evaluator model was specifically delayed due to negative feedback from S&P's CDO issuer clients.  In the words of senior leaders in S&P's structured finance department:  "Due to the not insignificant impact on lowly rated . . . synthetic reference pools . . . we have toned down and slowed down our roll out of [CDO Evaluator] to the market, pending further measures to deal with such negative

results . . . . Bear Sterns pointed out that the potential business opportunities we would miss by effectively having to walk away from such high yield structures would NOT be compensated for by any increase in rating volume for highly rated collateral pools."

127. As a result, the analytical team at S&P responsible for making recommendations on how best to improve S&P's analysis of CDOs was repeatedly pressured by senior S&P executives responsible for revenue generation to adjust their recommendations so that S&P's analysis would not become any more conservative than S&P's closest competitors. This pressure was placed on the analytical team for the explicit purpose of allowing S&P to increase its revenue and grow its market share.

128. For example, a frustrated S&P analyst involved with the updates to CDO Evaluator noted: "Remember the dream of being able to defend the model with sound empirical research? The sort of activity a true quant . . . should be doing perhaps? If we are just going to make it up in order to rate deals, then quants are of precious little value."

129. At the conclusion of this special project, S&P introduced a revised CDO Evaluator analytical model ("E3") that explicitly took into consideration S&P's revenue and market share goals. In particular, the correlations and probability of default assumptions underlying this model were adjusted to reflect what was best for S&P's ratings business. Concerns of revenue generation and market share preservation were the prime influences on the assumptions ultimately adopted by S&P in its analysis. These influences directly contradicted S&P's public representations and were not disclosed to consumers in Arizona.

130.   As noted by the S&P Managing Director responsible for updating the assumptions to the E3 analytical model: "[H]ow do we balance these risks and rewards to achieve our business objectives?   [I] do not believe that market share is our only objective. However, we cannot ignore the real risk of losing transaction revenue.   My proposal would be to look carefully at the different risks and rewards of E3, and attempt to create a balance based on our 'best guess' of the negative and positive impact of the model in each business objective."

131.   To make matters even worse, in addition to secretly allowing market share and revenue goals to influence its E3 analytical model, for several months after publically releasing E3 S&P routinely did not even use E3 in its analysis if it determined that the model would make it difficult to assign the issuer's desired rating to a particular transaction and, thereby, jeopardize S&P's market share.   Instead, S&P created another, non-public analytical model termed "E3 Low."   The assumptions that served as the underpinnings of E3 Low were even further watered down relative to E3 and made it easier for S&P to assign its highest ratings to as large a portion of the CDOs it rated as possible.   The primary factor influencing S&P's development and use of E3 Low was what was best for S&P's and its investment banking clients' financial interests.

132.   As noted by S&P internal documents, with respect to the use of E3 Low, S&P advised its analysts as follows: "For new transactions, the dealers are encouraged to use E3 . . . . If the transaction passes E3.0, GREAT!!   The deal is modeled, rated and surveiled with

-38-

E3.0 . . . ."  However, if the deal does not pass E3.0, but "the transaction passes E3 Low, then rate the deal or tranche with attachment point generated by E3 Low."

133.  Following S&P's introduction of its E3 analytical model, S&P' investment banking clients continued to put direct pressure on S&P to further loosen its analytical assumptions.  E3's already watered down analysis based on market share and revenue concerns still did not consistently allow S&P to deliver the high percentage of "AAA" ratings on CDOs that its investment banking clients desired.  This reality is noted directly in an update provided to the head of S&P's structured finance group:  "Several CMBS market participants have expressed concern about the potential impact CDO Evaluator 3.0 may have on CRE CDOs and ReREMICs.  Members of the CDO group have made adjustments to the E3 default table in an effort to preserve ABS market share levels; however, the adjustments do not help for CRE CDOs and Re-REMICS.  The CMBS group will now need to derive a real estate specific default table in an effort to avoid a decline in S&P's market share for both CRE CDOs/re-REMICs . . . ."

134.  In May of 2007, S&P privately acknowledged the full extent that its desire for increased revenue and market share had played, and was continuing to play, in its analysis of CDOs as part of a presentation made to the senior leaders of S&P's structured finance group.  In particular, in a slide titled "A Better Mousetrap," S&P summarized its past analytical approach as follows:  "To come up with [probability of defaults] and asset correlations in [CDO Evaluator], we look at our raw data and come up with a statistical best fit.  When this

does not meet our business needs, we have to change our parameters ex-post to accommodate."

135.   This private acknowledgment directly contradicts all of S&P's public representations with respect to the factors it considers when analyzing CDOs and other structured finance securities. But S&P went even further. The "Better Mousetrap" that S&P was developing called for S&P to first start with a set of assumptions that were best for its ratings business and then try to fit those assumptions into the available data. In the words of the analysts making the presentation: "[W]e came up with a new methodology emphasizing [] flexibility. We decide on a number of business friendly [probability of default] matrices first" and then decide whether that "set is reasonable." If the selected matrices were not "reasonable" for some reason, S&P simply tried a different set of business friendly matrices and started the process anew. This proposal for how S&P should conduct its analysis going forward was met with approval from S&P's structured finance leadership.

136.   Those S&P employees who resisted S&P management's drive to adjust S&P's analysis in order to maximize revenue were ignored within the company and marginalized. In the words of frustrated S&P analysts shocked by S&P's new extremely lax correlation assumptions for CDOs made up of parts of other CDOs: "I am interested to see if any career consequences occur. Does company care about deal volume or sound credit standards? Some people try to hold line (like you) . . . and don't get recognition – or get held back."

137.   Unfortunately, the undisclosed influences of market share and increased revenue outlined above did not just drive S&P analysis in the years leading up to the

-40-

financial crisis. In 2011, S&P continued to adjust the assumptions of the analytical models that it used to rate structured finance securities so that S&P could more easily assign its highest ratings and, thereby, increase its market share and revenue. S&P engaged in this conduct in late 2011 at the request of and with the full knowledge and support of its senior leadership.

C.     **S&P's Surveillance Group Was Ignored and Designed to Fail**

138.   S&P's focus on business considerations also influenced the manner in which it monitored, or conducted surveillance, on the structured finance securities that it had already rated.

139.   Prior to 2008, S&P performed only a sporadic and cursory review of its RMBS ratings and intentionally did not use the best surveillance tools that were at its disposal. This reality was in sharp contrast to the public representations of S&P's senior executives, including the managing director of RMBS, highlighting that the company maintained a robust surveillance process with substantial resources at its disposal that allowed S&P to timely and thoroughly monitor the performance of previously rated RMBS.

140.   S&P did not dedicate the necessary resources to effectively conduct surveillance on previously rated RMBS and failed to use its analytical models as part of the monitoring process of these obligations. As noted by a senior S&P managing director in Congressional testimony:

> [T]here are two sides to the rating. You have an initial rating when the bonds are sold, and then you have the surveillance. And at some point in the mid-1990s, the management in [S&P] decided to make surveillance a profit center instead of an adjunct critical key part of keeping investors informed as to how their investments were

-41-

performing after they bought bonds.  And as a result, they didn't have the staff or the information.  They didn't even run the ratings model in the surveillance area which would have allowed them to have basically re-rated every deal S&P had rated to that time and see exactly what was going on and whether the support was there for those triple-A bonds.

The [internal] reason [S&P management] gave for not doing it was because they were concerned that the ratings would get volatile and people would start to feel like all triple-As aren't the same.  And it was a much more pragmatic business decision than really focusing on how to protect the franchise and the reputation by doing the right thing for the investors.

141.   As this candid statement demonstrates, S&P knew that there was very little profit in diligently monitoring the performance of previously rated RMBS because S&P had already been paid its fee and issuers continued to want only AAA ratings.  Indeed, proper surveillance could actually lead to S&P earning less revenue because it could be perceived as calling S&P's initial analysis into question.

142.   Accordingly, S&P failed to properly fund and dedicate the appropriate number of personnel to surveillance, and did not use the best tools that it had available to conduct surveillance on previously rated RMBS.  This failure by S&P reached a breaking point in late 2006 and early 2007.  In the words of one of the leaders of S&P's surveillance team: "[W]hat can we do now?  My group is under serious pressure to respond to the burgeoning poor performance of sub-prime deals.  [W]e are really falling behind.  I am seeing evidence that I really need to add to staff to keep up with what is going on with sub-prime and mortgage performance in general."

143.   In response to the suggestion that additional resources may be available by August of 2007, the same surveillance executive noted in early February of 2007 as follows:

"Let's talk about anything that we might be able to do in the interim.  I talked to [a senior S&P executive] yesterday and he thinks that the ratings are not going to hold through 2007. He asked me to begin discussing taking rating actions earlier on the poor performing deals . . . . We do not have the resources to support what we are doing now.  A new process, without the right support, would be overwhelming."

144.   S&P's desire for increased revenue and market share also resulted in it ignoring the recommendations of its surveillance group and delaying the downgrade of impaired RMBS in order to further its own financial interests, as well as the financial interests of its issuer clients.  Specifically, despite its meager resources, by January of 2007 S&P's surveillance group concluded that they needed to intensify their review of 2006 vintage subprime RMBS and begin taking large scale negative rating action.  In February of 2007, S&P's surveillance team made formal recommendations to that effect to S&P senior management.

145.   S&P senior management overruled the recommendations of S&P's surveillance group.   S&P's delay in taking action on its surveillance group's recommendations was directly influenced by its desire to continue earning lucrative fees by rating CDOs and not upsetting its investment banking clients.

146.   As an S&P employee noted on July 5, 2007 when S&P was in crisis mode in the days immediately preceding S&P's mass downgrades of impaired RMBS: "The fact is, there was a lot of internal pressure in S&P to downgrade lots of deals earlier on before this thing started blowing up.  But the leadership was concerned of p[i]issing off too many clients

and jumping the gun ahead of Fitch and Moody's."  Indeed, on July 8, 2007 as the task of assigning blame began within S&P, S&P's surveillance leadership noted: ". . . we were ahead of the curve with our original recommendations in February.  We had a process in place, but we were told it was too stressful."

147.   Moreover, on or about June 11, 2007, S&P's surveillance group determined that, on average, tranches of subprime RMBS rated BBB and lower had greater than 100% severe delinquencies versus available credit support, which meant that the ratings of these RMBS tranches were, on average, almost certainly to be lowered.   Despite this determination, after June 11, 2007, S&P continued to assign and confirm ratings for CDOs exposed to significant amounts of subprime RMBS tranches rated BBB and below.  In sum, S&P took these RMBS ratings at face value as inputs for its analytical model and did nothing to account for the fact that many of the underlying RMBS tranches would almost certainly be downgraded.  S&P engaged in this conduct in part because it wanted to maximize its revenue and continue to please its CDO issuer clients.

148.   This conduct is yet another example of how S&P's internal business decisions – motivated by its desire to achieve or maintain revenue and market share goals – influenced its analytic judgment and directly contradicted S&P's Code of Conduct and other public representations about maintaining independence and objectivity in its analysis of structured finance securities.

S&P's MISCONDUCT CONTINUES

149.   On February 7, 2008, S&P publicly announced that it would take "leadership actions" to further strengthen the rating process and help restore confidence in the markets following the financial crisis.   At the time of the announcement, S&P President Deven Sharma represented:

> The ongoing transformation of the financial markets requires us to continue to bring more innovative thinking, greater resources, and improved analytics to the rating process…By further enhancing independence, strengthening the ratings process, and increasing transparency, the actions we are taking will serve the public interest by building greater confidence in ratings and supporting the efficient operation of the global credit markets."

150.   S&P's "leadership actions" included separating S&P's criteria development groups from its commercial groups so they would be independent and not influenced by business concerns, and strengthening criteria on most of the major asset classes.

151.   In May 8, 2008, S&P hired Mark Adelson – a former vocal critic of rating agencies – as its Chief Credit Officer to manage the new independent criteria group and supervise key changes to S&P's rating criteria and methodologies.

152.   In August 2008, S&P hired David Jacob to manage S&P's Structured Finance group, on the commercial rating side of the business, as part of S&P's efforts "to improve transparency, build investor confidence, and continue to deliver high-quality, independent analytics." Jacob wanted to "ensure that S&P analysts didn't loosen standards at the request of bankers." Jacob, like Adelson, had been a critic of rating agency conduct. Prior to joining S&P, Jacob and Adelson had been been partners in a consulting firm.

-45-

153.  In October 2008, S&P President Deven Sharma reaffirmed S&P's promises of reform to the House Committee on Oversight and Government Reform, testifying that S&P had taken a number of actions to enhance its rating process and restore the market's confidence in its ratings following the financial crisis.

154.   In keeping with his philosophy that rating criteria should be as reliable "as jet engines on an airplane," Adelson helped revise S&P's rating methodology for CMBS to a more conservative model that established an "AAA credit enhancement level that would be sufficient to enable tranches rated at that level to withstand market conditions commensurate with an extreme economic downturn without defaulting."   With the release of the new criteria on June 26, 2009, the ratings on 1,586 tranches of  CMBS transactions were immediately placed on Credit Watch negative, indicating that the rating may be lowered. After the revised methodology went into effect, S&P lost CMBS business to its competitors, Moody's and Fitch.

155.  On September 2009, S&P President Sharma again reaffirmed S&P's promises of reform in testimony before the House Financial Services Subcommittee, who he assured that S&P had learned from the past regarding its ratings on structured finance securities, and that it had made "major changes" to restore confidence in its ratings. Sharma cited to S&P's separation of its criteria development groups from its commercial groups and other actions taken to avoid conflicts of interest.

156.  In December 2010, under Adelson's leadership, S&P published an update that toughened its methodologies and assumptions for counterparty criteria.  Counterparty risk is an important factor in determining the credit risk of structured finance securities. The

updated criteria were criticized by market participants who contended that they were too onerous.

157.   Despite the reform efforts by Adelson and Jacob, the emphasis on market share at the expense of analytics began growing again at S&P.  In the spring of 2011, S&P President Sharma called Jacob and "gave him hell" about loss in business.  Jacob explained that the loss was due in part to securities which required counterparty criteria that Adelson had toughened.  Sharma pressured Jacob to do something about it, but Jacob said he was not able to do so because of the separation between the business and analytical sides at S&P.  Sharma was unhappy with Jacob's response.  Following the conversation, Sharma sent an email to Jacob and Paul Coughlin, global head of corporates and governments, stating that they needed to consider "changing direction."

158.   In June 2011, S&P ratcheted up the pressure on Adelson and Jacob. It brought them to an S&P leadership meeting organized by Sharma based on the theme: "Relentlessly Driving Global Growth."  Contrary to S&P's public claims that it was "further enhancing [its] independence," S&P executives were explicitly urged to let issuers influence them. For example, speakers and meeting materials emphasized that, "Structured finance criteria can easily be irrelevant if market feedback [is] ignored."

159.   Meeting materials described S&P's strategy as follows: "Success in criteria development depends on ongoing collaboration between the criteria group and the business." Further, "Efforts are underway to improve the current processes and interactions in the development and dissemination of new criteria. This includes . . . integrating marketplace/investor viewpoints into the criteria process."

160.   However, Adelson and Jacob still failed to "collaborate" or "change direction." In mid-2011 a report by S&P's Structured Finance Department emphasized that since

January 2011, S&P was not asked to rate 13 deals due at in part to its counterparty criteria, and that as a result, S&P lost approximately $2.275 million in potential revenue.

161.  In December 2011, S&P announced Jacob's departure from the company, and Adelson's removal from his position of Chief Credit Officer.

162.  In May 2012, S&P's counterparty criteria were made generally more lenient.

163.  Despite representations by S&P to the contrary, once S&P began to lose market share to its competitors as a result of toughening its criteria, the promised reforms were rolled back. S&P executives began to pressure staff to adjust methodologies and assumptions used to rate structured finance securities so that S&P could more easily assign its highest rating and increase its market share and revenue.

## VI.    CAUSE OF ACTION

### Arizona Consumer Fraud Act
### A.R.S. §§ 44-1522, 44-1528 and 44-1531

164.  Paragraphs 1 through 163 of the Complaint are hereby repeated and re-alleged as Paragraphs 1 through 163 of this First Count as if fully set forth herein.

165.  At all times relevant to this Complaint, S&P was engaged in the trade or commerce of providing credit analysis to issuers located in Arizona and providing credit analysis for use by investors, government regulators, and other consumers within the State of Arizona.

166.  S&P engaged in, directly or indirectly, explicitly or by implication, acts and practices that constitute deception, deceptive acts or practices, fraud and/or misrepresentations in connection with the sale or advertisement of merchandise, including, but not limited to the following:

a.      that S&P's analysis of structured finance securities is independent, objective, and free from consideration of S&P's desire for revenue or additional business from issuers;

b.      that S&P understands that it holds a position of trust in the marketplace and, as such, deals fairly and honestly with the public;

c.      that S&P understands that the Issuer Pays business model creates conflicts of interest but that these conflicts have been adequately managed and neutralized by the company as demonstrated by the principles set forth in S&P's Code of Conduct;

d.      that S&P agrees with and has implemented the principles set forth in the IOSCO Code of Conduct pertaining to its obligation as a credit rating agency to maintain the independence, objectivity and integrity of its analysis of structured finance securities; and

e.      that S&P conducts timely and thorough surveillance on its analysis of structured finance securities to ensure that the rating assigned by S&P continues to reflect S&P's best assessment of the credit risk associated with the obligation.

167.    S&P engaged in acts and practices that constitute concealment, suppression or omission of material fact that it had a duty to disclose, with intent that others rely upon such concealment, suppression or omission in connection with the sale or advertisement of merchandise, including, but not limited to the following:

-49-

a.   that S&P's analysis of structured finance securities was influenced by its desire to please its clients, increase market share, and enhance revenue for the company;

b.   that S&P does not deal fairly and honestly with buyers / investors of structured finance securities or other market participants;

c.   that S&P allowed business and revenue considerations to influence the analytical models it developed to rate structured finance securities;

d.   that S&P's surveillance of its ratings on RMBS and judgment regarding when to downgrade certain structured finance securities was influenced by business concerns such as revenue enhancement and maintaining market share;

e.   that S&P did not operate its business in conformance with either its own Code of Conduct, or the principles set forth in the IOSCO Code;

f.   that S&P's analysis of structured finance securities was based in part on the preferences of the narrow group of repeat issuers of structured finance securities that dominated S&P's revenues; and

g.   that S&P's analysis of structured finance securities was based in part on a desire to promote S&P's own economic interests.

168.   S&P's acts and practices as alleged herein have directly and proximately caused substantial injury to consumers within the State of Arizona.

-50-

169.    While engaging in the acts and practices alleged in this Complaint, S&P was was at all times acting willfully within the meaning of A.R.S. § 44-1531(B).

170.    S&P's acts and practices alleged herein constitute unlawful acts or practices in violation of A.R.S. § 44-1522(A).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff State of Arizona requests the following relief:

1.      A finding that by the acts alleged herein, S&P engaged in unlawful acts and practices in the course of engaging in the trade or commerce of a credit rating agency within the State of Arizona in violation of the Arizona Consumer Fraud Act, A.R.S. § 44-1522;

2.      An injunction pursuant to A.R.S. § 44-1528 enjoining S&P from engaging in any acts that violate the Arizona Consumer Fraud Act, including, but not limited to, the unlawful acts and practices alleged herein;

3.      An order pursuant to A.R.S. § 44-1528 requiring that S&P submit to an accounting to determine the amount of improper fees and revenue paid to S&P as a result of its unfair and deceptive acts and practices;

4.      An order pursuant to A.R.S. § 44-1531 directing S&P to pay a civil penalty of up to $10,000 for each and every willful violation of the Arizona Consumer Fraud Act;

5.      An order pursuant to A.R.S. § 44-1528 directing S&P to restore to any person in interest any monies or property, real or personal, which may have been acquired through the unfair acts or practices complained of herein;

-51-

6.      An order pursuant to A.R.S. § 44-1534 directing S&P to pay reasonable attorneys' fees and investigative costs to the State of Arizona;

7.      Costs of suit; and

8.      Such other relief as this Court deems just and equitable.

Plaintiff State of Arizona hereby demands a trial by jury on all issues and causes of action so triable.

DATED this ___5th___ day of February 2013.


THOMAS C. HORNE
Attorney General



Nancy Bonnell
Antitrust Unit Chief
Susan V. Myers
Assistant Attorney General
Consumer Protection and Advocacy Section
1275 West Washington
Phoenix, Arizona 85007
Telephone:  (602) 542-7752
Facsimile:  (602) 542-9088