USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__06/03/2014__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

IN RE:

STANDARD & POOR'S RATING AGENCY LITIGATION

*This Document Relates to All Actions*

--------------------------------------------------------------------------x

13-MD-2446 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

     This multidistrict litigation ("MDL") proceeding, comprised of nineteen cases, pits States

and the District of Columbia (collectively, the "States") against a national credit-rating agency,

McGraw Hill Financial, Inc. (formerly the McGraw-Hill Companies, Inc.) and its subsidiary,

Standard & Poor's Financial Services LLC (collectively, "S&P").  (As discussed below, one of

the States — Mississippi — also names Moody's Corporation and its subsidiary Moody's

Investor's Service, Inc. (together, "Moody's") as Defendants.)  In seventeen of the cases (the

"State Cases"), the States brought suit in their own courts to enforce state consumer-protection

and deceptive trade practice laws, only to see S&P (and, in Mississippi, Moody's) remove the

cases to federal court.  The gravamen of the States' Complaints in those cases is that S&P (and,

in the case of Mississippi, Moody's) misled the States' citizens in representing that bond ratings

were objective and independent rather than influenced by undisclosed and unmanaged conflicts

of interest.  In the remaining two cases (the "Declaratory Judgment Cases"), S&P is on the

plaintiff's side of the "v." suing South Carolina and Tennessee.  S&P filed those lawsuits just

before the two States filed their civil enforcement actions in state court (actions that were

subsequently removed and are among the State Cases that form part of this MDL).  S&P

principally seeks (1) declarations that the relief requested by South Carolina and Tennessee in

their civil enforcement actions would be unconstitutional or otherwise violate federal law; and (2) injunctions against those two States' civil enforcement actions.

At this stage of these cases, the merits of the States' and S&P's claims are not at issue. Instead, the question is *where* the parties' disputes should be resolved — namely, whether they should be heard in federal court or in the relevant state courts. The States do not — and, in light of the Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327 (2006) ("CRARA"), cannot — dispute that there is a strong federal interest in the regulation of national credit-rating agencies, including S&P and Moody's (the two largest credit-rating agencies in the country). Instead, relying on the well-established proposition that federal courts are courts of limited jurisdiction, and citing the long history of States seeking to enforce their own consumer-protection and deceptive trade practices laws in their own courts, the States argue that their disputes with S&P and Moody's should be litigated in the state courts.

By contrast, the rating agencies contend that the disputes should be litigated in federal court. Specifically, S&P contends that all of the State Cases present substantial federal questions giving rise to jurisdiction under Title 28, United States Code, Section 1331. With respect to the Mississippi case, S&P and Moody's jointly argue in the alternative that jurisdiction is proper pursuant to either the "mass action" provisions of the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005) ("CAFA"), or the general diversity statute, Title 28, United States Code, Section 1332(a). Finally, although the parties do not dispute the existence of federal jurisdiction with respect to the Declaratory Judgment Cases, South Carolina and Tennessee ask the Court to dismiss those cases in deference to their state civil enforcement actions.

Now pending are two joint motions raising these issues, addressed in three sets of briefs. First, all seventeen States involved in the MDL jointly move, pursuant to Rule 12(b)(1) of the

Federal Rules of Civil Procedure, to remand the State Cases back to state court on the ground that, as pleaded, they arise solely under state law, not federal law.  Mississippi joins in that motion, and — in light of the fact that S&P and Moody's removed its case on alternative grounds — argues in a separate set of briefs that federal jurisdiction is also lacking under both CAFA and the general diversity statute.  In addition, Mississippi seeks an order directing S&P and Moody's to pay the State's attorney's fees and costs on the ground that the removal of the case was not objectively reasonable.  Finally, Tennessee and South Carolina move to dismiss the Declaratory Judgment Cases brought by S&P, principally on the theory that the Court must refrain from deciding them in light of the States' parallel civil enforcement actions under the "abstention" doctrine established by the Supreme Court in *Younger v. Harris*, 401 U.S. 37 (1971).

For the reasons discussed below, the States' motions are granted (except insofar as Mississippi seeks attorney's fees and costs), the State Cases are all remanded back to state court, and the Declaratory Judgment Cases are dismissed altogether.  That result is compelled by the fundamental and oft-repeated proposition that, while state courts are courts of general jurisdiction, federal courts "are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (internal quotation marks omitted).  In light of that proposition, the Supreme Court has instructed that a federal court must "presume[] that a cause lies outside [its] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  The presumption against federal jurisdiction is especially strong in cases of this sort, involving States seeking to vindicate quasi-sovereign interests in enforcing state laws and protecting their own citizens from deceptive trade practices and the like.  Put simply, S&P

and Moody's fail in their efforts to rebut that presumption, as the State Cases arise solely under state law and Congress has not authorized federal courts to hear such cases.  Further, in light of that conclusion and the fact that S&P can raise any and all defenses it may have under federal law in state court, indulging S&P's Declaratory Judgment Cases would constitute an unwarranted interference in South Carolina's and Tennessee's state court proceedings.

## BACKGROUND

The following background is taken from the States' Complaints and federal regulatory materials, which are either referenced by the parties or are important to the understanding of the jurisdictional issues in question.  Because this Court has an independent obligation to establish the existence of subject-matter jurisdiction over these cases, the facts alleged in the Complaints are accepted as true for purposes of these motions, but no inferences are drawn in either party's favor; the party asserting jurisdiction must show it affirmatively.  *See, e.g.*, *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).  Moreover, in determining whether jurisdiction exists, consideration of extrinsic materials and documents of which judicial notice may be taken is permissible.  *See, e.g.*, *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002).  For the sake of simplicity — and following the parties' lead in their briefing — citations to information common to the Complaints are to the Complaint filed by the State of Tennessee. (Docket No. 1-1, 13 Civ. 4098 ("Tenn. Compl.")).[1]

### A.  The Rating Agencies

As noted, S&P and Moody's are in the business of selling credit ratings.  "A credit rating is a rating agency's assessment with respect to the ability and willingness of an issuer to make

---

[1]     Relatedly, the following facts focus more on S&P than Moody's, which is a party to only one of the cases before the Court.  In any event, to the extent there are differences between the two rating agencies, those differences are irrelevant to the issues discussed in this Opinion.

timely payments on a debt instrument, such as a bond, over the life of that instrument."  S. Rep. No. 109-326, at 2 (2005) (Conf. Rep.).  Put more simply, a credit rating is an attempt to predict how likely it is that an entity that has borrowed money will pay that money back.[2]  Credit-rating agencies develop their ratings by inputting a series of variables into a computerized model that analyzes the risks associated with the financial instrument in question.  (Tenn. Compl. ¶ 43).  For residential-mortgage-backed financial products, for example, that information would include the loan principal amount, loan-to-value ratios, price data for the relevant geographic markets, credit scores of the borrowers, and the structure of the product being offered.  (*Id.*).  S&P's analytical models "are built on a series of assumptions with respect to probability of default and asset correlation," so the models will give different outputs depending on the agency's estimate of the assumed variables.  (*Id.* ¶ 44).  Once the model has been applied to the data, the output is summarized using a letter-grade system that declines in quality as follows: AAA, AA, A, BBB, BB, B, CCC, CC, C, and D.  (Tenn. Compl. ¶ 45).  *See* S. Rep. No. 109-326, at 3.  The top four grades designate investment-grade products; the other six designate speculative-grade — or "junk" — bonds.  S. Rep. No. 109-326, at 3.

A rating of AAA reflects S&P's judgment that the issuer's "capacity to meet [its] financial commitment" with respect to the product being rated "is extremely strong."  (Tenn. Compl. ¶ 45).  More specifically, the AAA rating is appropriate only if a particular debt offering passes "the most severe stress test" S&P uses.  (Tenn. Compl. ¶ 46).  Some products, like collateralized debt obligations and residential-mortgage-backed securities, have multiple

---

[2]     John Moody, who gave his name to Moody's, was the first person to publish credit ratings publicly.  *See* S. Rep. No. 109-326, at 3 (2005) (Conf. Rep.); *see generally* John Moody, *Moody's Analyses of Railroad Investments* (1909).  Moody sought to provide "analytical commentary on the railroads of America from the standpoint of the owners of the securities," and his ratings purported to be "worked out on thoroughly sound and scientific lines."  *Id.* at 14.

"tranches," or tiers, which receive different credit ratings and are sold separately. (*Id.* ¶¶ 43, 49). In such cases, the expectation is often that the safest, or most "senior," tier would receive an AAA rating, allowing the issuer to offer a lower interest rate while still attracting customers to buy it. If the senior tier fails to receive such a rating on the first try, however, "S&P is supposed to let the issuer know that [that tier] could only receive a AA or lower rating." (*Id.* ¶ 48). In such cases, S&P also informs the issuer of the "credit enhancement" necessary to achieve an AAA rating. (*Id.* ¶¶ 68-69). The issuer can then choose to issue the security without the AAA rating or alter the product's structure to obtain the requisite credit enhancement. (*Id.*).

The supply side of the market for credit ratings is characterized by sharp competition among a small number of firms. Federal law deems only ten firms to be "nationally recognized statistical rating organizations" ("NRSROs").[3] *See* Securities & Exchange Commission, Office of Credit Ratings, http://www.sec.gov/about/offices/ocr.shtml (last visited June 2, 2014) (listing all current NRSRO registrations); *see also* Securities & Exchange Commission, Annual Report on Nationally Recognized Statistical Rating Organizations, at 4 (2012), *available at* http://www.sec.gov/divisions/marketreg/ratingagency/nrsroannrep1212.pdf ("Annual Report"). Because such a designation operates as a *de facto* license to enter the business of issuing credit ratings of financial products, those firms control nearly the entire market. (Tenn. Compl. ¶ 50). In fact, as of 2012, the top two firms — S&P and Moody's — controlled approximately eighty-

---

[3]     The NRSRO designation was introduced in 1975 as part of the administrative scheme implementing the Net Capital Rule, which governs the amount of capital broker-dealers are required to maintain on their balance sheets. *See* S. Rep. No. 109-326, at 4; *see also* Net Capital Rule, 17 C.F.R. § 240.15c3-1 (2008); Adoption of Uniform Net Capital Rule and an Alternative Net Capital Requirement for Certain Brokers and Dealers, 40 Fed. Reg. 29795 (July 16, 1975). Under that scheme, broker-dealers are required to hold less capital against assets that have been rated investment-grade by one of the NRSROs than against those that have not. *See* S. Rep. No. 109-326, at 4. In other words, the NRSRO designation was originally intended to ensure the reliability of credit ratings for the largely unrelated purpose of federal banking regulation.

three percent of the market share for credit ratings; they and Fitch, the third largest firm, issued ninety-six percent of all ratings.  *See* Annual Report, at 8.  In short, the credit-rating industry is concentrated and, for the last forty years, has been significantly influenced by federal regulation.

The business is also very lucrative to the few firms who control it.  S&P's annual revenues exceed $1 billion, forty percent of which is attributable to rating structured financial products like residential-mortgage-backed securities.  (Tenn. Compl. ¶ 51).  There are two primary ways for credit-rating agencies to make money: the issuer-pays model and the subscription model.  When the NRSRO designation came into use, the dominant model in the industry was the latter.  Under that paradigm, "investors pay the rating agency a subscription fee to access its ratings."  Annual Report, at 13.  Today, however, NRSROs tend to employ the issuer-pays model, in which the companies seeking ratings from the rating agencies — who tend to be repeat players — pay the fees associated with issuing their own ratings.  (Tenn. Compl. ¶¶ 65, 67).  For complex instruments like structured financial products, the fee charged is determined based on "the complexity and size of the . . . [product] being analyzed."  (*Id.* ¶ 65).

The combination of those forces, the States complain, yields a market in which S&P is systematically incentivized to "please" its customers.  (*Id.* ¶ 67).  Because S&P can influence its ratings by changing the assumptions that underlie its models, the States allege, S&P is motivated to do so.  The threat, should S&P refuse to tinker with its analytical models, is that the issuers will engage in "ratings shopping" to find a competitor who is not as scrupulous.  (*Id.* ¶ 69-70).  And because issuers get a second bite at the apple if their initial structure does not yield AAA-rated senior-tier debt, the issuers "can inform S&P of the credit enhancement levels proposed by either Moody's or Fitch in order to influence the outcome of S&P's analysis."  (*Id.* ¶ 69).

Significantly, however, the States explicitly do *not* challenge the issuer-pays model itself, let alone any individual ratings.  (*Id.* ¶ 12).  Instead, the States allege that S&P's public statements about the integrity, independence, and objectivity of its ratings (and in Mississippi's case, Moody's as well) violated their respective consumer-protection laws.  (*Id.* ¶ 260).  The States point, for example, to various assertions S&P made that were either contained in, or regarded its adherence to, its Code of Professional Conduct (the "Code of Conduct").  (*See, e.g.*, *id.* ¶¶ 7, 13, 61, 73, 78, 90-91, 99-105, 260).  S&P adopted its Code of Conduct in October 2005, and it explicitly stated that the adoption of the Code of Conduct "represented further alignment of [S&P's] policies and procedures with the [International Organization of Securities Commissions] ('IOSCO') Code of Conduct [Fundamentals for Credit Rating Agencies]."  (*Id.* ¶ 78 (first alteration in original)).  The IOSCO Code of Conduct, first published in December 2004, is a voluntary set of rules promulgated by an international organization of national securities regulators.  *See* Technical Comm. of the Int'l Org. of Sec. Comm'ns, Code of Conduct Fundamentals for Credit Rating Agencies (2004) ("IOSCO Code"), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD180.pdf.  According to the States, a "key principle" of the IOSCO Code of Conduct is "the need for credit rating agencies . . . to maintain independence from the issuers who pay it for its ratings."  (Tenn. Compl. ¶ 80).

## B.  CRARA

In 2006, Congress enacted CRARA to reform the regulatory scheme applicable to credit-rating agencies "by fostering accountability, transparency, and competition."  S. Rep. No. 109-326, at 2.  Among other things, CRARA requires NRSROs to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to address and manage any conflicts of

interest that can arise from such business." 15 U.S.C. § 78o-7(h).  The statute further authorizes

the Securities and Exchange Commission ("SEC") to

> issue final rules . . . to prohibit, or require the management and disclosure of, any conflicts of interest relating to the issuance of credit ratings by a [NRSRO], including, without limitation, conflicts of interest relating to . . . the manner in which a [NRSRO] is compensated by the obligor . . . for issuing credit ratings.

*Id.*  Although this exclusively delegated power unambiguously includes the authority to

"prohibit" conflicts of interest arising from the issuer-pays model, the SEC has chosen a more

measured course.  Through notice-and-comment rulemaking, the SEC issued regulations

permitting, albeit closely regulating, use of the issuer-pays model.  *See, e.g.*, 17 C.F.R.

§ 240.17g-5 (2014) (deeming the issuer-pays model to represent a "conflict of interest" for

purposes of federal regulations and regulating such conflicts).[4]  As a general matter, the

regulations permit NRSROs to employ the issuer-pays model only if they (1) disclose such

conflicts of interest; and (2) maintain written policies to address and manage such conflicts.  *See*

17 C.F.R. § 240.17g-5(a) (2014).  In announcing its regulations, the SEC stated that prohibiting

the issuer-pays model might "adversely impact the ability of an NRSRO to operate as a credit

rating agency."  Oversight of Credit Rating Agencies Registered as Nationally Recognized

Statistical Rating Organizations, Exchange Act Release No. 55857, 72 Fed. Reg. 33564, 33595

(June 18, 2007).  The SEC also stated that disclosure of such arrangements would be adequate to

allow consumers to evaluate whether, and to what extent, credit-rating agencies' judgment was

influenced by the fact that they were paid by the companies whose securities they rate.  *See id.*

      Importantly, CRARA does not purport to preempt all state laws as applied to NRSROs.

Indeed, CRARA's preemption is explicitly limited to "the substance of credit ratings or the

---

[4]      Elsewhere, the regulations prohibit certain conflicts of interest altogether.  *See, e.g.*, 17 C.F.R. § 240.17g-5(c).  Additionally, the SEC has authority to revoke NRSRO status or to impose civil penalties.  *See* 15 U.S.C. § 78o-7(d); 15 U.S.C. § 78u-2(a)(1)(C).

procedures and methodologies by which any [NRSRO] determines credit ratings."  15 U.S.C.

§ 78o-7(c)(2).  Underscoring the limited nature of CRARA's preemptive effect, the statute

explicitly provides that "[n]othing in this subsection prohibits the securities commission (or any

agency or office performing like functions) of any State from investigating and bringing an

enforcement action with respect to fraud or deceit against any [NRSRO]."  15 U.S.C. §§ 78o-

7(o).  Thus, CRARA delineates the respective duties of the SEC and its State counterparts.

Likewise, the SEC's regulations do not purport to trammel on the States' authority, explicitly

reserved by CRARA's text, to enforce state consumer-protection laws by bringing fraud suits

against NRSROs.  And while SEC regulations require NRSROs to disclose and manage conflicts

of interest — and indeed prohibit States from regulating the *substance* of credit ratings — those

regulations do not expressly prohibit States from preventing, through litigation, NRSROs from

publicly stating that they adequately disclose and manage conflicts of interest when they do not.

    As part of this scheme, CRARA and the regulations promulgated thereunder incorporate

— and make binding on NRSROs in the United States — many of the provisions of the IOSCO

Code of Conduct.  (*See* Def.'s Mem. Law Opp. Pls.' Mot. Remand (Docket No. 33) 17-18

(comparing IOSCO Code and CRARA provisions)).[5]  Like CRARA and its related regulations,

the IOSCO Code requires disclosure and promulgation of written procedures governing conflicts

of interest, including the use of the issuer-pays model.  *See* IOSCO Code §§ 2.6–2.8.  But S&P's

Code of Conduct, which was adopted in October 2005, "represented further alignment of its

policies and procedures with the [IOSCO Code of Conduct]."  (Tenn. Compl. ¶ 78).  Thus,

similarities between the S&P Code of Conduct, on the one hand, and IOSCO's and CRARA's

standards, on the other, are more likely attributable to S&P's desire to adhere to IOSCO's Code

---

[5]     Unless indicated otherwise, citations to docket entries refer to docket entries in the MDL,
13 MD 2446.

of Conduct than they are to the requirements of CRARA, for the simple reason that the S&P

Code of Conduct predated CRARA, which was enacted on September 29, 2006, and did not take

effect until June 26, 2007.  *See* Pub. L. No. 109-291, 120 Stat. 1327.  (Tenn. Compl. ¶¶ 78-80).

Today, unlike in 2005, SEC regulations require any aspiring NRSRO to file its Code of Conduct

with that agency, 17 C.F.R. §§ 240.17g-1(a) & (f); 17 C.F.R. § 240.17g-5(a)(2), and CRARA

requires that the SEC review such filings at least annually and any time they are changed, 15

U.S.C. § 78o-7(h)(4)(B).

## C.  Procedural History

The seventeen State Cases consolidated before this Court are part of a wave of state civil

enforcement actions brought against S&P and Moody's.  All of the suits are brought under state

consumer-protection and deceptive trade practices statutes; they seek various remedies, including

injunctive relief, civil penalties, and disgorgement.  (Tenn. Compl. 64-65).  Of the cases in the

MDL, Mississippi's suit — against both S&P and Moody's — was filed first, on May 10, 2011.

(Docket No. 1-1, 13 Civ. 4049).  S&P and Moody's removed that case to the United States

District Court for the Southern District of Mississippi on June 7, 2011, invoking federal

jurisdiction under both the general diversity statute, Title 28, United States Code, Section

1332(a), and CAFA.  (Docket No. 1, 13 Civ. 4049).  In February 2013, another thirteen States

and the District of Columbia filed similar suits, albeit only against S&P.  On March 6, 2013,

S&P removed those cases to federal court, but instead of relying on CAFA or the general

diversity statute, S&P invoked federal-question jurisdiction.  On that same date, S&P (but not

Moody's) filed a supplemental notice of removal in the Mississippi action asserting that the

federal court also had jurisdiction pursuant to the federal-question statute.  The last two State

Cases forming this MDL were filed against S&P on June 27, 2013, and October 9, 2013; S&P

removed them as well on the basis of federal-question jurisdiction.[6]

   As noted, the last two suits that form this MDL are declaratory judgment actions brought

by S&P against the States of South Carolina and Tennessee.  S&P filed the suits in federal court

after receiving statutory notice letters from the States advising S&P that they were contemplating

bringing civil enforcement proceedings in state court.  (Mem. Law Opp'n Defs.' Mots. To

Dismiss (Docket No. 34) 3).  S&P filed the suits on February 4, 2013, after receiving assurances

from at least one of the state attorneys general that the State would not file its own suit until at

least the following day.  (Decl. Olha N.M. Rybakoff Pursuant 28 U.S.C. § 1746 (Docket No. 21,

13 Civ. 4100) ¶ 5; Decl. Jennifer E. Peacock Pursuant 28 U.S.C. § 1746 (Docket No. 23, 13 Civ.

4100) ¶ 10).  On that following day, Tennessee did in fact file its state civil enforcement action,

which was subsequently removed to federal court and transferred here as part of the MDL.

(Notice of Removal (Docket No. 1, 13 Civ. 4098); *id.*, Ex. A).  Just over one week later, South

Carolina filed an analogous civil enforcement action; it too was later removed to federal court

and made part of this MDL.  (Notice of Removal (Docket No. 1, 13 Civ. 4051); *id.*, Ex. A).  In

---

[6]      In addition to those seventeen actions, S&P and Moody's are currently facing civil
enforcement actions brought by the federal government, California, Connecticut, and Illinois.
The federal suit against S&P is currently pending in the United States District Court for the
Central District of California.  *See United States v. McGraw-Hill Cos.*, No. CV 13-0779 DOC
(JCGx) (C.D. Cal.).  The suits brought by California, Connecticut, and Illinois are pending in
their respective state courts, as S&P elected not to remove the California action and the other
two, which S&P did remove, were remanded to state court prior to the MDL's creation.  *See
Illinois v. McGraw-Hill Cos.*, No. 13 C 1725, 2013 WL 1874279 (N.D. Ill. May 2, 2013);
*Connecticut v. McGraw-Hill Cos.*, No. 3:13-cv-311 (SRU), 2013 WL 1759864 (D. Conn. Apr.
24, 2013); *Connecticut v. Moody's Corp.*, No. 3:10cv546 (JBA), 2011 WL 63905 (D. Conn. Jan.
5, 2011); *see also, e.g.*, *Connecticut v. Moody's Corp.*, 664 F. Supp. 2d 196 (D. Conn. 2009)
(remanding to state court an earlier civil enforcement action brought against Moody's); *Flynn ex
rel. Moody's Corp. v. McDaniel*, 689 F. Supp. 2d 686, 687 (S.D.N.Y. 2010) (remanding to state
court a derivative suit alleging that Moody's committed fraud and breached its fiduciary duties in
connection with its use of the issuer-pays model).

its declaratory judgment action Complaints, as amended, S&P seeks (1) declarations that the relief requested by South Carolina and Tennessee in their civil enforcement actions would be unconstitutional; and (2) injunctions against the state civil enforcement actions, as well as attorneys' fees and costs.  (Am. Compl. (Docket No. 15, 13 Civ. 4052) 7-8; Am. Compl. (Docket No. 12, 13 Civ. 4100) 6; Mem. Law Opp'n Defs.' Mots. To Dismiss 4-5).  Notably, S&P concedes that it filed the actions to preempt the States' civil enforcement actions and secure a federal forum.  (Oct. 4, 2013 Conference Tr. (Docket No. 54) ("Oral Arg. Tr.") 60; Decl. Jennifer E. Peacock (Docket No. 29), Am. Ex. A, at 26-27).

On June 6, 2013, with motions to dismiss pending in the two Declaratory Judgment Cases and motions to remand pending in most of the State Cases, the Judicial Panel on Multidistrict Litigation ("JPML") ordered that all the cases pending in federal court at the time (other than the federal civil enforcement action) be transferred to this District for pretrial purposes; the cases filed later by Indiana and New Jersey were transferred thereafter.  (Transfer Order (Docket No. 1) ("Transfer Order"), at 1; Conditional Transfer Order (CTO -1) (Docket No. 23); Conditional Transfer Order (CTO -2), Docket No. 56).[7]  On July 16, 2013, this Court ordered new briefing on the motions to dismiss the Declaratory Judgment Cases and the motions to remand the State Cases (including separate briefing on issues exclusive to the Mississippi case because of the rating agencies' alternative theories for removal).  (Docket No. 20).  (The United States Department of Justice submitted a Statement of Interest urging remand of the State Cases. (Docket No. 24).)  The Court heard oral argument on the motions on October 4, 2013, and ordered post-argument letter briefs on several issues.  (Docket Nos. 47, 48, 50, 51).  On

---

[7]     The JPML granted S&P's motion to transfer the cases to a single court, over the objections of the States and Moody's, in part to allow one court to address all of the motions to remand and motions to dismiss, thereby eliminating the risk of inconsistent rulings.  (Transfer Order 2-3).

December 12, 2013, the Court requested that S&P, Tennessee, and South Carolina file letter briefs addressing what impact, if any, the Supreme Court's decision in *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584 (2013), had on their arguments on the motion to dismiss.  (Docket No. 61).  On January 14, 2014, the Court requested that S&P, Moody's, and Mississippi file letter briefs addressing what impact, if any, the Supreme Court's decision in *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736 (2014), had on their arguments on Mississippi's motion to remand.  (Docket No. 67).

As a result of the foregoing, there are now three sets of briefs regarding the motions pending before the Court.  The first concerns the joint motion to remand filed by the States of Arizona, Arkansas, Colorado, Delaware, Idaho, Indiana, Iowa, Maine, Mississippi, Missouri, New Jersey, North Carolina, Pennsylvania, South Carolina, Tennessee, and Washington.  (Pls.' Consolidated Br. Supp. Pl. States Mot. Remand (Docket No. 31) 1; Docket No. 57 (permitting New Jersey to move for remand and join the States' previously filed consolidated remand briefs)).[8]  The question presented in that motion is whether the States' actions raise a federal question sufficient to support jurisdiction under Title 28, United States Code, Section 1331.  (*See* Docket Nos. 31, 33, 40).  The second set of briefs concerns issues particular to the motion to remand filed by the State of Mississippi — namely, whether this Court has jurisdiction over that case under the "mass action" removal provisions of CAFA or the general diversity statute, Title 28, United States Code, Section 1332(a).  (*See* Docket Nos. 27, 35, 38).  Those papers also include the parties' letter briefs in response to this Court's January 14th Order.  (*See* Docket Nos.

---

[8]     Although the District of Columbia has not moved for remand (*see* Docket, 13 Civ. 4012), there is no dispute that, if the Court lacks subject-matter jurisdiction with respect to the States' civil enforcement actions, its case would need to remanded as well.  *See, e.g.*, 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

69-70).  The third set of briefs concerns whether this Court should dismiss, primarily on *Younger* abstention grounds, S&P's Declaratory Judgment Cases against the States of Tennessee and South Carolina.  (*See* Docket Nos. 26, 34, 39).  That last set of papers also includes the letter briefs filed in response to this Court's December 12th Order.  (*See* Docket Nos. 62-63).  The Court addresses each set of arguments in turn.[9]

## DISCUSSION

### A.    The Motions To Remand

It is axiomatic that "federal courts are courts of limited jurisdiction and, as such, lack the power to disregard such limits as have been imposed by the Constitution or Congress."  *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (internal quotation marks omitted). As a general matter, Congress has granted federal district courts original jurisdiction over cases in which there is a federal question, *see* 28 U.S.C. § 1331, and certain cases between citizens of different States, *see* 28 U.S.C. § 1332.  *See generally Ortiz v. City of New York*, 13 Civ. 136 (JMF), 2013 WL 2413724, at *1 (S.D.N.Y. June 4, 2013).  Where a plaintiff files such a case in state court, Title 28, United States Code, Section 1441(a) allows a defendant — with some exceptions not relevant here — to "remove[]" the case to federal district court.  In other words, an action may be removed "only if the case could have been originally filed in federal court." *Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 38 (2d Cir. 1997).  "Judicial scrutiny is especially important in the context of removal, where considerations of comity play an important role."  *Veneruso v. Mount Vernon Neighborhood Health Ctr.*, 933 F. Supp. 2d 613, 618 (S.D.N.Y. 2013) (internal quotation marks omitted).  And the importance of such scrutiny is at

---

[9]    When an action is transferred pursuant to Title 28, United States Code, Section 1407, as all of the instant cases were, the transferee court applies "its interpretations of federal law, not the constructions of federal law of the transferor circuit."  *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993).  Accordingly, as the parties agree, Second Circuit law applies to these motions.

its zenith where, as here, the suit was brought by a State itself, as "the claim of sovereign protection from removal" in such circumstances "arises in its most powerful form." *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012) (internal quotation marks omitted).

In fact, "'[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability.'" *Purdue Pharma*, 704 F.3d at 213 (quoting *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994)); *accord Veneruso*, 933 F. Supp. 2d at 618.  Such "strict construction of the right of removal" also "makes good sense," as "[a]n order denying a motion to remand a case to state court is ordinarily not appealable until after a final judgment or order is filed in the case."  16 James Wm. Moore et al., Moore's Federal Practice § 107.05 (3d ed. 2012).  "If the court of appeals determines that the case should have been remanded on the ground that there was no federal jurisdiction, the judgment on the merits must also be vacated because of the lack of jurisdiction.  If the case was improperly remanded, at least the state court judgment will not be invalidated because of a lack of subject matter jurisdiction."  *Id.*; *cf. New York v. Shinnecock Indian Nation*, 686 F.3d 133, 136 (2d Cir. 2012) (vacating a judgment, after nine years of litigation and trial, for lack of subject-matter jurisdiction, where the district court had denied remand).

In considering a motion to remand, courts generally look at the original complaint.  *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 284-85 & 284 n.35 (S.D.N.Y. 2001).  The removing party — here, the rating agencies — bears the burden of establishing the existence of jurisdiction.  *See, e.g.*, *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57-58 (2d Cir. 2006).

16

### 1.   The Joint Motion To Remand for Lack of a Federal Question

S&P removed each State Case on the ground that it presents a federal question.[10]  As noted, under Title 28, United States Code, Section 1441(a), a party may remove "[a]ny civil action of which the district courts have original jurisdiction."  Section 1331, the federal-question statute, provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  As a general matter, a claim falls within that grant of jurisdiction "only [in] those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27-28 (1983).  Under this so-called "well-pleaded complaint rule, the plaintiff is the master of the complaint, free to avoid federal jurisdiction by pleading only state claims even where a federal claim is also available."  *Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998).

The well-pleaded complaint rule, however, has a "corollary . . . — the 'artful pleading' rule — pursuant to which plaintiff cannot avoid removal by declining to plead 'necessary federal questions.'"  *Romano v. Kazacos*, 609 F.3d 512, 518-19 (2d Cir. 2010) (quoting *Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998)); *see Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 271 (2d Cir. 2005) ("[A] plaintiff may not defeat federal subject-matter jurisdiction by 'artfully pleading' his complaint as if it arises under state law where the plaintiff's suit is, in essence, based on federal law.").  One application of that rule is the "substantial federal question doctrine," which

---

[10]     As noted, S&P and Moody's did not invoke federal-question jurisdiction in the initial notice of removal that they filed in the Mississippi case; S&P did so in the supplemental notice of removal filed in 2013.  Moody's did not join in that supplemental notice of removal (Notice of Supplemental Authority (Docket No. 34, 13 Civ. 4049)), and therefore does not join S&P's arguments with respect to the propriety of federal-question jurisdiction.

recognizes that "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005); *see also Veneruso*, 933 F. Supp. 2d at 619, 622-23; *Sung ex rel. Lazard Ltd. v. Wasserstein*, 415 F. Supp. 2d 393, 402 (S.D.N.Y. 2006).[11]  As the Supreme Court has explained, that doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312.

*Grable*, the leading modern case on the substantial federal-question doctrine, involved a suit to quiet title to property that the Internal Revenue Service ("IRS") had seized from the plaintiff to satisfy a federal tax delinquency, which the IRS then sold to the defendant.  The plaintiff alleged that the defendant's record title was invalid because, in providing notice of the seizure by mail rather than by personal service, the IRS had failed to comply with the notice requirements of federal law.  *See id.* at 311.  The defendant removed the case to federal court, and that removal was upheld by the lower courts.  In reviewing the case, the Supreme Court held that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 133 S. Ct. 1059,

---

[11]     Another application of the "artful pleading rule" is the complete preemption doctrine, pursuant to which removal is proper when Congress has "so completely preempted, or entirely substituted, a federal law cause of action for a state one." *Romano*, 609 F.3d at 519; *see also Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).  S&P concedes that the complete preemption doctrine does not apply here (*see* Defs.' Mem. Opp'n Pl.'s Mot. Remand and Costs (Docket No. 30, 13 Civ. 4098) 3) and relies solely on the substantial federal question doctrine enunciated in *Grable*.  S&P's concession is probably wise, if only because Congress expressly preserved the right of States to bring civil enforcement actions against NRSROs "with respect to fraud or deceit."  15 U.S.C. § 78o-7(o)(2).

1065 (2013) (discussing *Grable*). "Where all four of these requirements are met . . . , jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (quoting *Grable*, 545 U.S. at 313-14).

Applying that test, the *Grable* Court held that removal of the plaintiff's suit to quiet title was proper. First, the plaintiff had "premised its superior title claim on a failure by the IRS to give it adequate notice, as defined by federal law." 545 U.S. at 314-15. Thus, whether the plaintiff had received notice adequate within the meaning of federal law was "an essential element of its quiet title claim." *Id.* at 315. Second, "the meaning of the federal statute [was] actually in dispute"; in fact, it appeared "to be the only legal or factual issue contested in the case." *Id.* Third, the Court concluded that "[t]he meaning of the federal tax provision [was] an important issue of federal law that sensibly belong[ed] in a federal court" given the IRS's "strong interest in the prompt and certain collection of delinquent taxes," and the interest of "buyers (as well as tax delinquents)" in having "judges used to federal tax matters" resolve whether the IRS "has touched the bases necessary for good title." *Id.* (internal quotation marks omitted). Finally, the Court held that federal jurisdiction would not disrupt the federal-state balance "because it will be the rare state title case that raises a contested matter of federal law." *Id.* Thus, "federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id.*

Significantly, the Supreme Court has made clear that *Grable* calls for federal jurisdiction over only a "special and small category" of cases. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006); *see id.* at 701 (referring to "the slim category that *Grable* exemplifies"); *see also Gunn*, 133 S. Ct. at 1064-65 (same). For example, "[t]he 'mere presence'

of a federal issue in a state cause of action" and the "mere assertion of a federal interest" are not

enough to confer federal jurisdiction. *Veneruso*, 933 F. Supp. 2d at 622 (quoting *Merrell Dow*

*Pharm. Inc. v. Thompson*, 478 U.S. 804, 813 (1986), and citing *Empire Healthchoice*, 547 U.S.

at 701); *accord Bank of Am.*, 672 F.3d at 674-75.   Nor does the presence of a federal defense

suffice — "even if the parties concede that the defense is the only disputed issue in the case"

and, in that sense, "necessary to the resolution" of the state law claim. *Shinnecock Indian*

*Nation*, 686 F.3d at 138-40 & n.5; *see id.* at 140 n.4 (stating that jurisdiction is inappropriate

under *Grable* where a federal issue is "not necessarily raised by [the plaintiff's] affirmative

claims," but rather "comes into the case as a defense"); *see also, e.g.*, *Gilmore v. Weatherford*,

694 F.3d 1160, 1173 (10th Cir. 2012) ("To determine whether an issue is 'necessarily' raised, the

Supreme Court has focused on whether the issue is an 'essential element' of a plaintiff's claim."

(quoting *Grable*, 545 U.S. at 315)); *see generally Caterpillar*, 482 U.S. at 393 (holding that a

federal defense to a state cause of action does not support federal-question jurisdiction).   And

finally, if a claim does not present "a nearly pure issue of law, one that could be settled once and

for all and thereafter would govern numerous . . . cases," but rather is "fact-bound and situation

specific," federal-question jurisdiction will generally be inappropriate.   *Empire Healthchoice*,

547 U.S. at 700-01 (internal quotation marks omitted).

    Applying the foregoing standards, S&P's arguments for federal-question jurisdiction fail.

As an initial matter, there is no dispute that the States' Complaints exclusively assert state-law

causes of action — for fraud, deceptive business practices, violations of state consumer-

protection statutes, and the like.  (Tenn. Compl. ¶¶ 258-61; *accord* Mem. Law Opp'n Pls.' Mots.

Remand 13, 20).  The crux of those claims is that S&P made false representations, in its Code of

Conduct and otherwise, and that those representations harmed the citizens of the relevant State.

Tennessee's statute, by way of example, gives the attorney general authority to bring suit against a business that "[e]ngag[es] in any . . . act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b)(27). To establish a violation of that statute, he must show "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the [Tennessee Consumer Protection Act] and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . . .'" *Hanson v. J.C. Hobbs Co., Inc.*, No. W2001-02523-COA-R3-CV, 2012 WL 5873582, at *9 (Tenn. Ct. App. Nov. 21, 2012) (quoting Tenn. Code Ann. § 47-18-109(a)(1)). To prevail, therefore, the Tennessee attorney general need not show that S&P violated CRARA or any other federal provision. That is, the right that he seeks to vindicate "is the right not to be lied to in a fashion that causes reliance and results in financial injury, a right possessed by all [Tennessee] residents," not a right created by federal law. *Fin. & Trading Ltd. v. Rhodia S.A.*, No. 04 Civ. 6083 (MBM), 2004 WL 2754862, at *6 (S.D.N.Y. Nov. 30, 2004) (Mukasey, J.). Notwithstanding the fact that S&P is an NRSRO, and thus subject to federal regulation, Tennessee's claims "may be assessed entirely by applying [state] common law standards to the facts in this case." *Id.* at *7.

The contrast with *Grable* and its progeny is telling — and dispositive. In *Grable*, the plaintiff would "necessarily" have had to show a violation of federal law even if the defendant had never removed the case to federal court and even if the defendant had never invoked federal law as a defense. *See* 545 U.S. at 314-15; *see also Gunn*, 133 S. Ct. at 1065 (holding that the first *Grable* requirement was met where the plaintiff, in order to prevail on his legal malpractice claim, had to show that he would have prevailed on his claim under federal patent law); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195 (2d Cir. 2005) (holding the same where the plaintiff

21

alleged breach of a contract provision that incorporated federal law by reference and breach of a New York statute by failing to provide uniform rates allegedly required by federal law).  By contrast, if S&P had never invoked federal law in these cases, the States would not have had to prove a violation of CRARA or any other federal law (and may still not need to) in order to prevail on their claims.  In that sense, proving the States' claims does not *necessarily* depend on an interpretation of CRARA or any regulations enacted pursuant to CRARA.  *See, e.g.*, *Bank of Am.*, 672 F.3d at 674-75 (rejecting removal of claims alleging violations of Nevada's Deceptive Trade Practices Act even where they alleged that misrepresentations violated the federal Fair Debt Collection Practices Act); *Glazer Capital Mgmt., LP v. Elec. Clearing House, Inc.*, 672 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) ("That plaintiffs *could* have brought federal . . . claims based on the factual allegations contained in the complaint is not sufficient to convert the state law claims [of fraud and negligent misrepresentation] into federal questions."); *Baker v. BDO Seidman, L.L.P.*, 390 F. Supp. 2d 919, 925 (N.D. Cal. 2005) (holding that plaintiffs' "claims of fraud and deceit and all the other cognate claims derived therefrom are capable of being resolved on state law bases without the interpretation of federal law").

In arguing otherwise, S&P contends that, in order to determine whether its statements were false, a court will necessarily have to consult CRARA to determine the content of concepts such as "independence" and "objectivity" as applied to NRSROs.  (*See* Mem. Law Opp'n Pls.' Mots. To Remand 19, 22-23).  S&P acknowledges that the States allege violations of S&P's own internal Code of Conduct (that is, that S&P's representations in its Code of Conduct and elsewhere were false or fraudulent), but argues that because CRARA *requires* it to maintain such a Code of Conduct, the implication of the States' Complaints is that S&P has violated federal law.  (*Id.* at 14).  Noting that S&P's Code of Conduct is referenced at least 234 times by the

States' Complaints, S&P argues that the States' suits "turn on whether S&P was in compliance with CRARA's provisions requiring it to maintain and enforce written policies and procedures reasonably designed to manage conflicts of interest."  (*Id.* at 15).  According to S&P, therefore, the decisive factor conferring jurisdiction in this case is the fact that CRARA affirmatively requires S&P to maintain and make publicly available its Code of Conduct, and further that CRARA provides globally applicable definitions of concepts like "objectivity" and "independence."  Moreover, S&P asserts that the Complaints' frequent references to the IOSCO Code of Conduct are just a way to artfully plead around the federal issues upon which their claims rest.  (*Id.* at 16-19).

S&P's argument is creative but ultimately unpersuasive.  First, although S&P is indeed required by federal law to have a code of conduct, "[t]he *source* of" that requirement "is irrelevant to the theory of the [States'] complaint[s]."  *New York v. Grasso*, 350 F. Supp. 2d 498, 503 (S.D.N.Y. 2004).  Instead, "the *existence*" of S&P's code (and, of course, its truth or falsity) "is all that is necessary to ground the allegation[s]" of false representations and fraud.  *Id.*; *see also, e.g.*, *Sung*, 415 F. Supp. 2d at 406 ("[T]hat the [allegedly false and misleading] statements were made in a federally required document does not change the inquiry whether, standing alone, they were false or misleading . . . under state law.").  Second, and in any event, "nothing in CRARA says that the SEC defines the truth or falsity of statements made about the independence of S&P's credit rating process; indeed, the statute provides that the SEC may not regulate the substance of credit ratings or the procedures or methodologies used to determine them." *McGraw-Hill Cos.*, 2013 WL 1874279, at *4 (citing 15 U.S.C. § 78o–7(c)(2)).  At bottom, to the extent that there is anything in CRARA that speaks to the States' claims, S&P's argument is nothing more than a claim of defensive preemption — that is, a claim that the States' actions, or

certain aspects of the relief they seek, are preempted by the scope and nature of CRARA and its regulatory scheme.[12]  As noted above, it is well established that — except for the rare case of complete preemption, which S&P concedes this is not (*see* Defs.' Mem. Opp'n Pl.'s Mot. Remand and Costs (Docket No. 30, 13 Civ. 4098) 3) — claims of defensive preemption are not sufficient to give rise to federal jurisdiction.  *See, e.g.*, *Caterpillar*, 482 U.S. at 393.

For similar reasons, S&P's heavy reliance on *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93 (2d Cir. 2001), is misplaced.  *D'Alessio* involved a floor broker who was suspended by the New York Stock Exchange ("NYSE") after a Government investigation into his compliance with Section 11(a) of the Securities Exchange Act of 1934.  Thereafter, D'Alessio sued the NYSE in state court, "alleging that the NYSE and various senior officials employed by the NYSE conspired to violate applicable statutory and regulatory prohibitions governing unlawful trading," including Section 11(a) and regulations thereunder.  *Id.* at 97.  On appeal, the Second Circuit held that the case was properly removed to federal court because adjudication of the plaintiff's claims "necessarily require[d] an inquiry" into the meaning of Section 11(a) and other provisions of federal law.  *Id.* at 103; *see also id.* at 101 (noting that "the gravamen of D'Alessio's state law claims is that the NYSE and its officers conspired to violate the federal securities laws and various rules promulgated by the NYSE and failed to perform its statutory duty, *created under federal law*, to enforce its members' compliance with those laws").  In other words, D'Alessio's claim "involved an act that could be interpreted only in relation to federal securities laws.  As the facts were alleged in that complaint, D'Alessio would have had no state law cause of action if no federal law had been violated, thus his case rested substantially upon federal law and was justifiably removed."  *Fin. & Trading Ltd.*, 2004 WL 2754862 at *7.

---

[12]     This conclusion is underscored by the fact that S&P's Code of Conduct predates CRARA.  *See supra* Background, Section B.

In these cases, by contrast, the States' claims do not necessarily rest on violation of federal laws.  To be sure, CRARA and the rules promulgated thereunder require S&P to promulgate a code of conduct and, to some extent, regulate the content of that code.  But an assessment of whether S&P's statements, in its Code of Conduct and elsewhere, were false and misleading does not necessarily depend on an examination of federal standards; instead, the States could prevail merely by showing a gap between S&P's representations — whether required by law or not — and its conduct.  In that regard, these cases are closer to *Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49 (2d Cir. 1996), in which the Second Circuit disapproved of the removal of a lawsuit alleging that "disciplinary proceedings initiated by the NYSE were [in]consistent with its own internal rules and its contractual obligations to its members." *D'Alessio*, 258 F.3d at 101.  Significantly, it did so even though the NYSE had a duty under federal law "to promulgate and enforce rules governing the conduct of its members," and to submit those rules to the SEC for approval. *Barbara*, 99 F.3d at 51.  Despite that connection to federal law, the plaintiff's claims ultimately turned solely on "the internal rules of the NYSE, which are contractual in nature, and 'thus interpreted pursuant to ordinary principles of contract law, an area in which the federal courts have no special expertise.'" *D'Alessio*, 258 F.3d at 101 (quoting *Barbara*, 99 F.3d at 55).  So too here, "although federal . . . laws do indeed relate to the subject matter of plaintiffs' case, plaintiffs' claims do not rest upon violation of federal laws." *Fin. & Trading Ltd.*, 2004 WL 2754862 at *8.  Put simply, "[t]here is no reason why . . . state common law standards for determining fraud and negligent misrepresentation cannot form the sole basis for assessing" S&P's representations. *Id.*; *see also Glazer*, 672 F. Supp. 2d at 377 (holding that *D'Alessio* did not justify removal where "the gravamen of plaintiffs' complaint [was] that defendants made materially false statements to them in a manner

25

prohibited by New York law and in violation of duties created by New York law" and "[n]o construction or interpretation of federal law [was] required").

S&P's final argument — that the States' cases "arise under" federal law because many of the state statutes at issue contain statutory exemptions or carve-outs for conduct that complies with a federal regulatory regime (Mem. Law Opp'n Pls.' Mot. To Remand (Docket No. 33) 23-24) — also falls short.  First, only some of the state statutes even contain such a carve-out.  *See, e.g.*, Ariz. Rev. Stat. Ann. § 44-1523 (providing a carve-out for, among others, newspaper publishers, but not for general compliance with federal law).  Second, of those that do, some of the statutes have been construed to provide only a defense rather than to impose an additional element of the cause of action, *see, e.g.*, *Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207, 1219 & n.23 (4th Cir. 1983) (interpreting S.C. Code Ann. § 39-5-40 to provide an affirmative defense), which is plainly insufficient to support federal-question jurisdiction, *see, e.g.*, *Shinnecock Indian Nation*, 686 F.3d at 138-40.  Third, even where the statutes at issue have not been so read, it is likely that courts in their respective States would read them in that way.  At a minimum, there is no basis to conclude that the relevant State would have to prove a negative — S&P's non-compliance with federal law — as an "essential element" of its affirmative case.  *See, e.g.*, *McGraw-Hill Cos.*, 2013 WL 1874279, at *5 (rejecting S&P's argument based on the carve-out provisions of Illinois law, which are not expressly identified as defenses).[13]  In fact, S&P

---

[13]      Notably, the language of Illinois's statute, which the *McGraw-Hill Cos.* Court construed to provide only a defense, is virtually identical to the language of statutes from other States in this MDL.  *Compare* 815 Ill. Comp. Stat. 505/10b(1) ("Nothing in this Act shall apply to . . . [a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of . . . the United States."), *with, e.g.*, Ark. Code Ann. § 4-88-101(3) ("This chapter does not apply to . . . [a]ctions or transactions permitted under laws administered by . . . [a] regulatory body or officer acting under statutory authority of this state or the United States . . . ."); Idaho Code Ann. § 48-605(1) ("Nothing in this act shall apply to . . . [a]ctions or transactions permitted under laws administered by . . . [a] regulatory body or

effectively conceded as much at oral argument by acknowledging that the States did not need to plead S&P's non-compliance with federal law to survive a Rule 12(b)(6) motion for failure to state a plausible claim.  (Oral Arg. Tr. 37:9-38:7).

In any event, even if S&P were right that a court would "necessarily" have to grapple with federal law in some States because of the statutory exemptions for compliance with federal standards, federal jurisdiction would fail the *Grable* test for two other reasons.  First, whether the exemptions apply in a particular case requires an individualized assessment of both the scope of the exemption at issue and the particular conduct alleged to fall within (or without) that exemption.  *See, e.g.*, *Vogt v. Seattle-First Nat'l Bank*, 817 P.2d 1364, 1370 (Wash. 1991) (noting that the Washington Consumer Protection Act is to be liberally construed and "does not exempt actions or transactions merely because they are regulated generally," but "only if the *particular* practice found to be unfair or deceptive is *specifically* permitted, prohibited[,] or regulated" (emphasis added)); *see also, e.g.*, *Skinner v. Steele*, 730 S.W.2d 335, 337 (Tenn. Ct. App. 1987) (similar).  As a result, the applicability *vel non* of the exemptions at issue is the type of "fact-bound and situation-specific" issue that does not generally warrant federal jurisdiction. *Empire Healthchoice*, 547 U.S. at 681, 701.  Second, if the exemption provisions were sufficient to support federal jurisdiction, it would follow that any action brought under a state consumer-protection statute with such a provision would be subject to removal.  Such a result would plainly disturb the "congressionally approved balance of federal and state judicial responsibilities," *Grable*, 545 U.S. at 314, as "the long history of state common-law and statutory remedies against . . . unfair business practices" makes "plain that this is an area

---

officer acting under statutory authority of . . . the United States."); S.C. Code Ann. § 39-5-40(a) ("Nothing in this article shall apply to . . . [a]ctions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of . . . the United States . . . .").

traditionally regulated by the States," *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989); *cf.*

*Gunn*, 133 S. Ct. at 1068 (holding that federal jurisdiction would run afoul of *Grable*'s fourth

requirement where the issue implicated an area traditionally addressed by the States). In fact,

CRARA itself honors that "long history" by expressly preserving the right of States to

investigate and bring an enforcement action against an NRSRO "with respect to fraud or deceit."

15 U.S.C. § 78o-7(o)(2).

      In the final analysis, the States assert in these cases that S&P failed to adhere to its own

promises, not that S&P violated CRARA or any other provision of federal law. To separate

merits and defenses from jurisdiction: Whether or not S&P deceived consumers, and whether or

not S&P had license from the federal government to do so, the States' claims are derived entirely

from state law. That is, in order to prove their cases, the States will have to show only that S&P

made certain statements and that those statements were deceptive. They do not have to, and

indeed may very well have forgone the opportunity to, prove that S&P issued its Code of

Conduct in a way that violated CRARA or any other federal law. Having made that choice, the

States cannot now be forced to litigate in a forum they did not choose. *See Marcus*, 138 F.3d at

52 ("[T]he plaintiff is the master of the complaint, free to avoid federal jurisdiction by pleading

only state claims even where a federal claim is also available."); *see also, e.g.*, *Bank of Am.*, 672

F.3d at 676 (noting that where a State has brought suit in state court to enforce its own

consumer-protection laws, the "claim of sovereign protection from removal arises in its most

powerful form," and that "considerations of comity make federal courts reluctant to snatch [such]

cases . . . from the courts of that State, unless some clear rule demands it" or doing so "serve[s]

an overriding federal interest" (internal quotation marks and alterations omitted)). Accordingly,

Section 1331 provides no basis for federal jurisdiction over the State Cases.

### 2. Mississippi's Motion To Remand for Lack of CAFA Jurisdiction

The foregoing analysis disposes of all the State Cases but one: the Mississippi action, which S&P and Moody's independently removed under CAFA's "mass action" provisions and on diversity grounds.[14]   The parties' briefs with respect to the Mississippi case are largely devoted to the propriety of the removal as a "mass action" under CAFA, but those arguments have been mooted by the Supreme Court's January 14, 2014 decision in *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736 (2014) ("*Hood*").   In that case, the Court held that a "mass action" under CAFA "must involve monetary claims brought by 100 or more persons who propose to try those claims jointly as *named* plaintiffs," and remanded a case — like this one — brought in the name of Mississippi by the state attorney general for lack of federal jurisdiction. *Id.* at 739 (emphasis added).   The Court unambiguously held that CAFA's mass action provision does not "include[] suits brought by fewer than 100 named plaintiffs on the theory that there may be 100 or more unnamed persons who are real parties in interest as beneficiaries to any of the plaintiffs' claims."  *Id.* at 742.   That was precisely S&P's and Moody's theory of removal, and it is unquestionably invalid after *Hood*.   It follows that the Mississippi case was not removable under CAFA, a conclusion that S&P and Moody's all but concede.  (Docket. No. 98).[15]

---

[14]      Despite some ambiguity in their Notice of Removal, S&P and Moody's have abandoned any argument that they removed the case as a "class action" rather than as a "mass action."  (*See* Mem. Law Opp'n Mississippi's Mots. To Remand and Costs and Fees (Docket No. 35) ("Defs.' Remand Mem.") 17-19).  That is for good reason, as CAFA defines a "class action" as a civil action "*filed under*" a state-law equivalent to Rule 23, 28 U.S.C. § 1332(d)(1)(B) (emphasis added), and Mississippi has no class action procedure whatsoever, *see Am. Bankers Ins. Co. v. Booth*, 830 So. 2d 1205, 1212-14 (Miss. 2002).  *See generally Mississippi ex rel. Hood v. AU Optronics Corp.*, 701 F.3d 796, 799 (5th Cir. 2012), *rev'd and remanded on other grounds by Hood*, 134 S. Ct. 736 (2014).

[15]      In light of that conclusion, the Court need not reach Mississippi's argument that the 2011 notice of removal was defective.  (Mem. Law Supp. State Mississippi's Mots. To Remand and Costs and Fees (Docket No. 27) ("Miss. Mem.") 7-9).  In light of the Court's conclusion with

As a fallback position, however, S&P and Moody's continue to maintain that the Mississippi action was properly removed under the general diversity statute, Title 28, United States Code, Section 1332(a).  (*Id.*; *see also* Defs.' Remand Mem. 23-25).  At first glance, that would seem to be an even tougher sell, as the general diversity statute requires *complete* diversity of citizenship among the parties whereas CAFA requires only *minimal* diversity.  *See Hood*, 134 S. Ct. at 740.  Moreover, it is well established that a State is not a citizen for purposes of the general diversity statute, so if Mississippi is the only plaintiff, the Court would indisputably lack jurisdiction under the statute.  *See, e.g.*, *Moor v. Alameda County*, 411 U.S. 693, 717 (1973); *Stone v. South Carolina*, 117 U.S. 430, 433 (1886).  But whereas the Supreme Court in *Hood* held that a court may not look beyond the named plaintiffs for purposes of CAFA, it did not disturb the longstanding rule that, in determining citizenship for purposes of the general diversity statute, a court looks to the real parties in interest.  *See, e.g.*, *Hood*, 134 S. Ct. at 745-46 (acknowledging that "in cases involving a State or state official" where jurisdiction is premised on diversity, "we have inquired into the real party in interest because a State's presence as a party will destroy complete diversity"); *see also Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 460-61 (1980).  Relying on that principle, S&P and Moody's — both citizens of New York — contend that the complete diversity requirement is met because the real parties in interest on the plaintiff's side of this case are a discrete group of consumers in Mississippi — that is, Mississippi citizens — rather than the State of Mississippi itself.  (Defs.' Remand Mem. 23-25).

Complicating matters, there is disagreement with respect to how a court should analyze whether a State or rather some subset of its citizens is the real party in interest in cases of this sort.  The Fifth Circuit and some district courts, including some within this Circuit, have applied

---

respect to federal-question jurisdiction, there is also no need to address Mississippi's argument that S&P's supplemental notice of removal was untimely.  (*Id.* at 25-28).

a "claim-by-claim" analysis, under which a court must dissect the complaint and decide whether the State or a group of its citizens is the beneficiary for each type of relief. *See Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418, 430 (5th Cir. 2008); *see also, e.g.*, *Connecticut v. Chubb Grp. of Ins. Cos.*, No. 3:11-cv-997 (AWT), 2012 WL 1110488, at *3 (D. Conn. Mar. 31, 2012); *West Virginia ex rel. McGraw v. Comcast Corp.*, 705 F. Supp. 2d 441, 447-49 (E.D. Pa. 2010); *Butler v. Cadbury Beverages, Inc.*, No. 3:97-cv-2241 (EBB), 1998 WL 422863, at *2 (D. Conn. July 1, 1998); *Connecticut v. Levi Strauss & Co.*, 471 F. Supp. 363, 370-71 (D. Conn. 1979).  By contrast, the Fourth, Seventh, and Ninth Circuits, and district courts within this Circuit and beyond have applied a holistic approach, which requires a court to consider the complaint in its entirety to determine what interest, if any, the State possesses in the lawsuit as a whole. *See, e.g.*, *AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 392-94 (4th Cir. 2012), *cert. denied*, 134 S. Ct. 999 (2014); *LG Display Co., Ltd. v. Madigan*, 665 F.3d 768, 773 (7th Cir. 2011); *Bank of Am.*, 672 F.3d at 671; *see also, e.g.*, *MyInfoGuard v. Sorrell*, Nos. 2:12-cv-074, 2:12-cv-102, 2012 WL 5469913, at *4-5 (D. Vt. Nov. 9, 2012); *Connecticut v. Moody's Corp.*, No. 3:10cv546 (JBA), 2011 WL 63905, at *3-4 (D. Conn. Jan. 5, 2011); *New York ex rel. Cuomo v. Charles Schwab & Co., Inc.*, No. 09 Civ. 7709 (LMM), 2010 WL 286629, at *4-6 (S.D.N.Y. Jan. 19, 2010); *New York ex rel. Abrams v. Gen. Motors Corp.*, 547 F. Supp. 703, 704-07 (S.D.N.Y. 1982).  In *Purdue Pharma*, the Second Circuit "note[d] that the 'claim-by-claim' approach has been roundly criticized, and the 'whole complaint' approach has emerged as the majority rule."  704 F.3d at 219.  Ultimately, however, the Court of Appeals reserved judgment on the question of which approach should be used, *see id.*, and has not yet revisited it.

    This Court adopts the whole-complaint approach, for several reasons.  First, the majority of courts adopting the claim-by-claim approach in recent years have done so largely in the

CAFA context and for reasons specific to CAFA.  *See, e.g.*, *Caldwell*, 536 F.3d at 424 (noting, in

the course of adopting the claim-by-claim approach, that CAFA's definition of "class action"

was adopted "to prevent 'jurisdictional gamesmanship'"); *Comcast*, 705 F. Supp. 2d at 447-49

(adopting the claim-by-claim approach in principal part because "CAFA was intended to expand

federal jurisdiction over class actions, which suggests that courts should carefully examine

actions removed under CAFA to ensure that legitimate removal requests are not thwarted by

jurisdictional gamesmanship"); *cf. Purdue Pharma*, 704 F.3d at 218 (declining to follow

*Caldwell* even with respect to CAFA's class action provisions on the ground that "*Caldwell*'s

holding addresses only CAFA's '*mass action*' provisions").  Putting aside the fact that those

cases are no longer good law after the Supreme Court's decision in *Hood*, their reasoning never

applied to the general diversity statute.  (Moreover, even before *Hood*, courts raised doubts about

the reasoning on its own terms.  *See, e.g.*, *LG Display Co.*, 665 F.3d at 773; *In re TFT-LCD (Flat*

*Panel) Antitrust Litig.*, No. C 07-1827 SI, 2011 WL 560593, at *3 (N.D. Cal. Feb. 15, 2011).)

Subtracting those cases from the mix, the overwhelming weight of authority supports the whole-

complaint approach to determining who the real party in interest is for general diversity

purposes.  *See, e.g.*, *West Virginia ex rel. McGraw v. Bristol Myers Squibb Co.*, Civil Action No.

13-1603 (FLW), 2014 WL 793569, at *4 (D.N.J. Feb. 26, 2014) (citing cases).

   Second, although the Second Circuit did not formally reach the question in *Purdue*

*Pharma*, it is difficult to view that decision as anything but a thumb firmly on the whole-

complaint side of the scale.  The Court declined to follow *Caldwell*, limiting it to the "mass

action" context of CAFA and noting that, even in that context, its approach had "been roundly

criticized" and rejected by a majority of courts.  704 F.3d at 219; *see also id.* at 217 n.8

("tak[ing] issue with" the defendant's argument that the state was not the real party in interest

"for restitution claims allegedly brought on behalf, and for the benefit, of a circumscribed group of consumers," explaining that it was based on a "narrow characterization" of the State's allegations and ignored the fact that "the overall thrust of the complaint [was] to bring a single action by the sovereign to protect the health and welfare of its residents in general").  More broadly, the Court of Appeals reaffirmed the proposition that "[i]n determining whether a State is a real party in interest, . . . 'inquiry must be made as to the "essential nature and effect of the proceeding,"'" *id.* at 218 (quoting *Finkielstain v. Seidel*, 857 F.2d 893, 895 (2d Cir. 1988) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945))), and "'by a consideration of the nature of the case as presented *by the whole record*,'" *id.* (quoting *Ferguson v. Ross*, 38 F. 161, 162-63 (C.C.E.D.N.Y. 1889) (emphasis added in *Purdue Pharma*)).  As the Seventh and Ninth Circuits have reasoned, that proposition calls for examining the nature of the complaint as a whole rather than analyzing one claim at a time.  *See Bank of Am.*, 672 F.3d at 670; *LG Display*, 665 F.3d at 773; *see also Bristol Myers Squibb*, 2014 WL 793569, at *4 (adopting the whole-complaint approach based in part on the "Third Circuit's general proposition that in deciding whether a state is a real party in interest, courts must look to the 'essential nature and effect of the proceeding,'" explaining that "that language comports with examining the nature of the pleadings as a whole, rather than analyzing one claim at a time" (quoting *Ramada Inns, Inc. v. Rosemount Mem'l Park Ass'n*, 598 F.2d 1303, 1307 (3d Cir. 1979))).

Finally, the claim-by-claim approach leads courts to rewrite or carve up complaints in ways that the Federal Rules of Civil Procedure do not readily accommodate.  That is because, "despite its name," the claim-by-claim approach calls upon courts to look not at the particular *claims* a plaintiff brings, but rather at the particular types of *relief* a plaintiff seeks. *MyInfoGuard*, 2012 WL 5469913, at *4; *see also Illinois v. SDS W. Corp.*, 640 F. Supp. 2d 1047,

1052 (C.D. Ill. 2009). In the leading case of *Levi Strauss*, for example, Connecticut brought

claims under state antitrust law. *See* 471 F. Supp. at 365. In evaluating whether Connecticut

was the real party in interest, however, the Court not only pierced the veil of the complaint, but

also pierced the veil of individual claims *within* the complaint, breaking down Connecticut's

"money claim" into four "elements" and analyzing each of those elements separately. *Id.* at 370-

71; *see also Butler*, 1998 WL 422863, at *2 ("To determine whether the State had an interest in

the controversy for purposes of diversity, [the *Levi Strauss* Court] did not look to the nature of

the suit as a whole; rather, [it] analyzed separately each type of award sought by the State.").

Upon finding that different types of relief are brought on behalf of different real parties in

interest, courts taking the minority approach have indicated that the types of relief can then be

severed, with only a subset remanded to state court. *See, e.g.*, *Caldwell*, 536 F.3d at 430; *Ohio v.

GMAC Mortg., LLC*, 760 F. Supp. 2d 741, 746 (N.D. Ohio 2011). Such a result, however, would

be a strange creature indeed: a single claim brought by one named plaintiff proceeding on

parallel tracks in two different court systems, based solely on the type of relief being sought.

Although the Federal Rules license severance of *claims* under certain circumstances, *see* Fed. R.

Civ. P. 21; *see also, e.g.*, *Spencer, White & Prentis Inc. of Conn. v. Pfizer Inc.*, 498 F.2d 358,

361 (2d Cir. 1974), they do not appear to contemplate that level of judicial dissection or

interference with a plaintiff's choice of forum. In fact, "[t]o hold otherwise would be to prevent

the plaintiff from acting as the master of the complaint and choosing its forum." *Illinois v. AU

Optronics Corp.*, 794 F. Supp. 2d 845, 853 (N.D. Ill. 2011).[16]

---

[16]     Some courts have concluded that the whole-complaint approach is warranted in part
because of "the Supreme Court's caution that restraint is particularly important in the removal
context in light of the longstanding policy of strictly construing the statutory procedures for
removal, as well as the sovereignty concerns raised by asserting federal jurisdiction over cases
brought by states in their own courts." *Bristol Myers Squibb*, 2014 WL 793569, at *4 (citation

In short, the Court adopts the majority, whole-complaint approach to determine whether Mississippi is the real party in interest.  Applying that approach, Mississippi is plainly the real party in interest, and complete diversity is therefore lacking.  First, Mississippi's stake in the litigation is manifest in the fact that the case is brought by the state attorney general under his exclusive authority, derived from both statute and the common law, "'to institute, conduct and maintain all suits necessary for the enforcement of the laws of the State, preservation of order and the protection of public rights.'"  *Hood ex rel. Mississippi v. Microsoft Corp.*, 428 F. Supp. 2d 537, 544-45 (S.D. Miss. 2006) (quoting *Gandy v. Reserve Life Ins. Co.*, 279 So. 2d 648, 649 (Miss. 1973)); *see, e.g.*, Miss. Code Ann. § 75-24-9 (granting the state attorney general exclusive authority to seek injunctive relief with respect to deceptive practices prohibited by the Mississippi Consumer Protection Act); Miss. Code Ann. § 75-24-19(1)(b) (granting the state attorney general exclusive authority to seek civil penalties); *see also, e.g.*, Miss. Code Ann. § 7-5-1 (granting the attorney general "the powers of the Attorney General at common law and . . . the sole power to bring or defend a lawsuit on behalf of a state agency, the subject matter of which is of statewide interest").  "[B]ased on that authority, as a general matter, the Attorney General advances a quasi-sovereign interest when the State seeks relief under the [MCPA] for the protection and promotion of consumer welfare in the process."  *Bristol Myers Squibb*, 2014 WL 793569, at *5 (discussing West Virginia law); *accord Hood ex rel. Mississippi v. Bristol-*

---

omitted); *accord LG Display*, 665 F.3d at 774; *MyInfoGuard*, 2012 WL 5469913, at *5; *Charles Schwab*, 2010 WL 286629, at *5.  In the Court's view, however, while deference to the state's choice of forum should be a factor in applying the proper test to a particular set of facts — with all doubts resolved in the state's favor, *see, e.g.*, *Purdue Pharma*, 704 F.3d at 213 — it should not be a factor in choosing which test to apply in the first instance.  That is, the question of whether to apply the whole-complaint approach or the claim-by-claim approach should not turn on (or even be affected by) whether a State filed suit in state court or federal court.

*Myers Squibb Co.*, No. 1:12-CV-00179-GHD-DAS, 2013 WL 3280267, at *5-6 (N.D. Miss. June 27, 2013); *Moody's*, 2011 WL 63905, at *3; *Microsoft Corp.*, 428 F. Supp. 2d at 544-45.

Second, a review of the allegations in the Complaint reveals that Mississippi has a quasi-sovereign interest in the case.  It is well established that, for a State to have *parens patriae* standing, it "must articulate a 'quasi-sovereign interest' distinct 'from the interests of particular private parties,' such as an 'interest in the health and well-being — both physical and economic — of its residents in general.'  The State may show such an interest by alleging 'injury to a sufficiently substantial segment of its population.'"  *Purdue Pharma*, 704 F.3d at 215 (citation omitted) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)).  Here, Mississippi has done so.  Exemplary allegations of harms to particular consumers aside, the State asserts that the rating agencies' deceptive practices had a widespread impact on banks, insurance companies, government regulators, mutual funds, pension funds, and consumers throughout Mississippi — indeed, on the Mississippi economy as a whole.  (*See, e.g.*, Notice of Removal (Docket No. 1, 13 Civ. 4049), Ex. A ("Miss. Compl.") ¶ 1 (alleging harm to broad swaths of the Mississippi economy, including state regulators), ¶ 8 (explaining that Defendants "were key enablers of the financial meltdown"), ¶ 14 (describing the rating agencies' impact on government regulators, "the overall economy of the State of Mississippi," the many Mississippi consumers "whose retirement funds are invested in these securities," institutional investors, lenders, businesses, banks, broker-dealers, and insurance companies), ¶ 77 (stating that "the role that Moody's and S&P played . . . triggered the nationwide economic meltdown"), ¶ 81 (alleging that the rating agencies' misrepresentations were viewed by "Mississippi consumers, investors, government regulators and other members of the financial marketplace")).  Those allegations

plainly implicate the State's "quasi-sovereign interest in the economic well-being of its citizens."
*Microsoft Corp.*, 428 F. Supp. 2d at 545.

Third, that Mississippi "seeks civil penalties and a statewide injunction against [unfair
and deceptive acts and practices] — remedies unavailable to consumers — leaves no doubt that
the State has concrete interests in the litigation; put simply, the benefits of those remedies flow to
the State as a whole." *MyInfoGuard*, 2012 WL 5469913, at *5; *accord Moody's*, 2011 WL
63905 at *3-4; *see also Comcast*, 705 F. Supp. 2d at 447 (stating that "[c]ourts have universally
accepted the notion that a state is the real party in interest when it brings a claim for injunctive
relief" and that it is "also well accepted that a state is the real party in interest when it brings a
claim for civil penalties because such awards add only to the state's coffers rather than any
individual's bank account"). Indeed, the fact that the State is seeking injunctive relief, by itself,
"supports the position that the State is the only real party in interest." *Bristol Myers Squibb*,
2014 WL 793569, at *5-6. That "type of prospective relief goes beyond addressing the claims of
previously injured organizations or individuals. It is aimed at securing an honest marketplace,
promoting proper business practices, protecting Mississippi consumers, and advancing
Mississippi's interest in the economic well-being of its residents." *Microsoft*, 428 F. Supp. 2d at
546; *see also, e.g.*, *SDS West*, 640 F. Supp. 2d at 1051 (noting that "the indirect benefits of
barring unscrupulous companies from soliciting further business accrues to the population at
large"); *Gen. Motors*, 547 F. Supp. at 705 ("The purpose of seeking this wide-ranging relief is
not merely to vindicate the interests of a few private parties. Rather, it is to take a step toward
eliminating fraudulent and deceptive business practices in the marketplace.").

In arguing that Mississippi is not a real party in interest, S&P and Moody's rely
principally on the fact that the Complaint seeks disgorgement and other forms of "equitable

relief" under Miss. Code Ann. § 75-24-11, pursuant to which a court "may" order restitution. (Defs.' Remand Mem. 8).  In light of those requests, the rating agencies argue, it is "clear that the State is seeking restorative relief on behalf of individual citizens, even if the State chooses not to style this relief as 'restitution.'"  (*Id.*).[17]  That argument, however, is unpersuasive.  As an initial matter, it ignores the State's deliberate decision not to seek restitution as a form of relief (apparently to avoid the potential implications of doing so in light of the Fifth Circuit's decision in *Caldwell*).  (Miss. Mem. 17 & n.14).  The word "restitution" never appears in the Complaint. And before the case was transferred to this District as part of the MDL, Mississippi offered to stipulate that it is not pursuing any financial relief claims of individual consumers.  (State of Mississippi's Mem. Supp. Mot. To Remand and Fees and Costs (Docket No. 16, 13 Civ. 4049), Ex. A, at 2).  As for the disgorgement request, the Complaint seeks disgorgement of the agencies' "ill-gotten gains" (Miss. Compl. ¶ 90), which does not necessarily require the State to identify specific victims to whom payment is due.  *See, e.g.*, *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011); *see also* Miss. Code Ann. § 75-24-3(c) ("It is the intent of the Legislature that in construing what constitutes unfair or deceptive trade practices that the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C.A. § 45(a)(1)) as from

---

[17]      S&P and Moody's also cite the original Complaint's requests for punitive damages and "damages" in the disgorgement count.  (Defs.' Remand Mem. 9 n.5).  The State argues that those requests should be disregarded as a scrivener's error and notes that both requests were removed from the Amended Complaint filed after the case was removed.  (Miss. Mem. 13 n.9; Reply Mem. Law Supp. State of Mississippi's Mots. Remand and Costs and Fees (Docket No. 38) 6). *See Connecticut v. Moody's Corp.*, 664 F. Supp. 2d 196, 198 (D. Conn. 2009) (disregarding a request for punitive damages in similar circumstances as a scrivener's error).  In either case, however, the Complaint did not seek punitive damages on behalf of consumers.  And the request for damages referred expressly to damages "for the harms intentionally and wrongfully done *to the State*."  (Miss. Compl. ¶ 87 (emphasis added)).

time to time amended.").[18]  As the Second Circuit explained with respect to the federal analogue

to the MCPA, ""when a public entity seeks disgorgement it does not claim any entitlement to

particular property; it seeks only to 'deter violations of the [] laws by depriving violators of their

ill-gotten gains.'"  *Bronson Partners*, 654 F.3d at 373 (alteration in original) (quoting *SEC v.

Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997)); *see also SEC v. AMX, Int'l, Inc.*, 7 F.3d 71,

74 (5th Cir. 1993) (stating that disgorgement is "in essence an injunction in the public interest"

(internal quotation marks omitted)).[19]

Regardless, as the overwhelming weight of authority makes clear, the fact that individual

Mississippi consumers could ultimately benefit financially from a favorable resolution of this

case "does not minimize or negate the State's substantial interest."  *Hood v. AstraZeneca

Pharmas., LP*, 744 F. Supp. 2d 590, 596 (N.D. Miss. 2010); *accord AU Optronics*, 699 F.3d at

---

[18]      The Northern District of Mississippi's decision in *Bristol-Myers Squibb*, 2013 WL
3280267, upon which S&P and Moody's rely (Defs.' Remand Mem. 11), does not call for a
different result.  The Court in that case did find that Mississippi consumers were the real parties
in interest for purposes of the State's disgorgement claim, but that was based in part on language
in the complaint indicating that "the injury complained of was suffered by the user or purchaser
consumer" and that the purpose of the relief was to make those consumers (and the State)
"whole."  2013 WL 3280267, at *6 (quoting from the complaint).  The Complaint in this case
does not include the same (or similar) language.  Moreover, there is another reason not to follow
*Bristol-Myers Squibb*: Although it did not address the issue expressly, the Court applied the
claim-by-claim approach rather than the whole-complaint approach.

[19]      In light of the foregoing, a strong argument could be made that, even under the claim-by-
claim approach, Mississippi would be the sole real party in interest.  *See, e.g.*, *South Carolina v.
LG Display Co., Ltd.*, No. 3:11-cv-00729-JFA, 2011 WL 4344074, at *6 (D.S.C. Sept. 14, 2011)
(stating that the state would be a real party in interest to its restitution claim even under a claim-
by-claim approach because the state has a "a quasi-sovereign interest . . . in bringing an action to
enforce its laws, disgorge the proceeds of ill-gotten gains, and refund them to its citizens");
*South Carolina v. AU Optronics Corp.*, No. 3:11-cv-00731-JFA, 2011 WL 4344079, at *6
(D.S.C. Sept. 14, 2011) (same); *Illinois v. AU Optronics Corp.*, 794 F. Supp. 2d 845, 855 (N.D.
Ill. 2011) (holding that the state would be the real party in interest with respect to its claim for
restitution even under the claim-by-claim approach because it "has a quasi-sovereign interest" in
"seek[ing] recovery on behalf of a wide range of consumers and aim[ing] to deter future antitrust
conduct by corporations in [the state]").  The Court, however, need not reach that question.

394; *Bank of Am.*, 672 F.3d at 671; *Bristol Myers Squibb*, 2014 WL 793569, at *5;

*MyInfoGuard*, 2012 WL 5469913, at *5; *Moody's*, 2011 WL 63905, at *3; *Charles Schwab*,

2010 WL 286629, at *5; *Microsoft*, 428 F. Supp. 2d at 546; *Wisconsin v. Abbott Labs.*, 341 F.

Supp. 2d 1057, 1063 (W.D. Wis. 2004); *Gen. Motors*, 547 F. Supp. at 706-07.  As the Fourth

Circuit reasoned, "a claim for restitution, when tacked onto other claims being properly pursued

by the State, alters neither the State's quasi-sovereign interest in enforcing its own laws, nor the

nature and effect of the proceedings." *AU Optronics*, 699 F.3d at 394.  The purpose of

Mississippi's Complaint, like the purpose of South Carolina's complaint in *AU Optronics*, "is the

protection of the State's citizens and upholding the integrity of [State] law. . . .  That the statutes

authorizing [the action] in the name of the State also permit a court to award restitution to injured

citizens is incidental to the State's overriding interests and to the substance of these

proceedings." *Id.*  In short, Mississippi — the sole named plaintiff — is the sole real party in

interest in this case; Mississippi citizens, by contrast, are neither named plaintiffs nor real parties

in interest.  It follows that the parties are not completely diverse, and the case must be remanded.

    That does not end the matter, however, as Mississippi also seeks attorney's fees and

costs.  (Miss. Mem. 28-30).  A federal court remanding an action to state court "may require

payment of just costs and any actual expenses, including attorney fees, incurred as a result of

removal."  28 U.S.C. § 1447(c).  Such an award, however, is appropriate "only where the

removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin*

*Capital Corp.*, 546 U.S. 132, 141 (2005).  A basis for removal is "objectively reasonable" if the

removing party had a colorable argument that removal was proper. *See In re Methyl Tertiary*

*Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 1:00–1898, MDL 1358 (SAS), M 21-88, 2006

WL 1004725; *Fin. & Trading, Ltd.*, 2004 WL 2754862, at *8.  Applying those standards to the

present removal, no award of fees and costs is appropriate.  Given (1) the split of authority on

whether to apply the claim-by-claim or whole-complaint theory; (2) the conflicting nature of the

caselaw interpreting CAFA prior to the Supreme Court's decision in *Hood*; (3) the fact that

Defendants removed the case in the Fifth Circuit, where the legal basis for removal was strongest

prior to (and perhaps even after) *Hood*; and (4) the fact that CAFA is a recently enacted and

complex statute that presents "novel issues of law," *see Anwar v. Fairfield Greenwich Ltd.*, 676

F. Supp. 2d 285, 301 (S.D.N.Y. 2009), it is clear that Defendants had a colorable argument for

removing the case from state court.  Accordingly, Mississippi's motion for fees and costs must

be and is denied.  *Cf. Ortiz*, 2013 WL 2413724, at *5 (denying an application for fees and costs,

citing "the unusual circumstances" of the case and "the lack of any precedent directly on point").

**B.     The Motion To Dismiss S&P's Declaratory Judgment Cases**

Having disposed of all the State Cases, the Court turns finally to S&P's Declaratory

Judgment Cases against the States of South Carolina and Tennessee.  In its Complaints, as

amended, S&P seeks (1) a declaration that the relief requested by South Carolina and Tennessee

would be unconstitutional; and (2) an injunction against the state civil enforcement actions, as

well as attorneys' fees and costs.  (Am. Compl. (Docket No. 15, 13 Civ. 4052) 7-8; Am. Compl.

(Docket No. 12, 13 Civ. 4100) 6; Mem. Law Opp'n Defs.' Mots. To Dismiss 4-5).  S&P filed the

suits in federal court after receiving statutory notice letters from the States advising S&P that

they were contemplating bringing civil enforcement proceedings in state court.  (Mem. Law

Opp'n Defs.' Mots. To Dismiss 3).  It is undisputed that S&P filed the two actions to preempt the

state civil enforcement actions — which were filed the next day and one week or so later — and

to secure a federal forum.  (Oral Arg. Tr. 60).  Indeed, in proceedings before the JPML, counsel

for S&P candidly admitted that it had made a "tactical decision" to file preemptively in federal

court "to have the issues . . . heard by federal court rather than state courts."  (Decl. Jennifer E. Peacock (Docket No. 29, 13 Civ. 4100), Am. Ex. A, at 27).

As noted, South Carolina and Tennessee move to dismiss the Declaratory Judgment Cases under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971).[20]  Although the Supreme Court has repeatedly cautioned that a federal court's "obligation" to hear and decide a case over which it has jurisdiction is "virtually unflagging," *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), *Younger* recognized a limited exception to that general rule.  Specifically, under *Younger*, federal courts may "refrain from hearing cases that would interfere with a pending state criminal proceeding or with certain types of state civil proceedings."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (citation omitted). The doctrine expresses "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances."  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).  At bottom, it "is grounded in interrelated principles of comity and federalism.  Both considerations require federal courts to be 'cognizant that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'"  *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003) (citation omitted) (quoting *Younger*, 401 U.S. at 44); *accord Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002).

---

[20]     As a threshold matter, there is some reason to question whether the Court has subject-matter jurisdiction over S&P's Declaratory Judgment Cases insofar as they allege claims that, if S&P had been sued in federal court, could be raised only as defenses.  *See, e.g.*, *Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883, 887-88 (2d Cir. 1998); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 107-08 (2d Cir. 1997).  However, in light of the Supreme Court's decision in *Verizon Maryland Inc. v. Public Service Commission*, 535 U.S. 635 (2002), which held that declaratory-judgment actions premised on the Supremacy Clause and seeking injunctive relief are properly within the subject-matter jurisdiction of federal courts, the Court concludes that it has federal-question jurisdiction to consider these cases.  *See also, e.g.*, *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 590 (2013).

The Second Circuit has held that *Younger* abstention is "mandatory" when three conditions are met: "(1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Spargo*, 351 F.3d at 75.[21]  As the Supreme Court recently held, however, *Younger* abstention does not extend to "all parallel state and federal proceedings" that meet those three conditions, even "where a party could identify a plausibly important state interest." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 593 (2013). Instead, the *Younger* doctrine applies only to three classes of parallel proceedings: (1) "pending state criminal proceeding[s]"; (2) "particular state civil proceedings that are akin to criminal prosecutions"; and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Sprint*, 184 S. Ct. at 588; *see id.* at 591 ("We have not applied *Younger* outside these three 'exceptional' categories, and today hold . . . that they define *Younger*'s scope.").

Applying those standards here, the Court concludes that abstention is required.[22]  As an initial matter, several conditions for such abstention are plainly met.  First, in light of the Court's decision to remand South Carolina's and Tennessee's civil enforcement proceedings to state court, there is no dispute that there is — now — a pending state proceeding in each State.  (*Cf.* Mem. Law Opp'n Defs.' Mots. To Dismiss 17 ("*[S]o long as the State Actions remain in federal court*, there is no basis for abstaining under *Younger*." (emphasis added)).  *See, e.g.*,

---

[21]     Even if these three conditions are met, "a federal court may still intervene in state proceedings if the plaintiff demonstrates bad faith, harassment or any other unusual circumstance that would call for equitable relief." *Spargo*, 351 F.3d at 75 n.11 (internal quotation marks omitted).  S&P does not allege that any of those exceptions apply here.

[22]     In light of that conclusion, the Court need not reach the States' alternative argument that the Declaratory Judgment Cases should be dismissed as "improper anticipatory filings undertaken as a race to the courthouse."  (Defs.' Joint Br. Supp. Mots. To Dismiss 6).

*MyInfoGuard*, 2012 WL 5469913, at *4-5 (remanding a civil enforcement proceeding to state

court and, in light of that proceeding, abstaining under *Younger*); *Bronx Dough, LLC v. Dunkin'*

*Donuts, Inc.*, Nos. 03 Civ. 1398 DC, 03 Civ. 1455 DC, 2004 WL 112880, at *2 (S.D.N.Y. Jan.

23, 2004) (same).  Second, S&P does not dispute that the state proceeding affords it an adequate

opportunity for judicial review of its arguments based on federal law.  (Mem. Law Opp'n Defs.'

Mots. To Dismiss 16-21).  And third, there is no real dispute that the now-pending state

proceedings qualify as "proceedings that are akin to criminal prosecutions" as defined by *Sprint*.

(*See* Docket No. 62 (S&P's supplemental letter brief regarding *Sprint*, making no such

argument)).  In particular, each case bears all three hallmarks of such proceedings identified by

the Supreme Court: Each (1) was "initiate[d]" by "a state actor" (namely, the state attorney

general in his or her official capacity) to (2) "sanction the federal plaintiff . . . for some wrongful

act" (namely, S&P for its allegedly false and misleading representations); and (3) "involved" a

lengthy "investigation[] . . . culminating in the filing of a formal complaint or charges."  *Sprint*,

134 S. Ct. at 592.

    The dispositive question, therefore, is whether the States' interests are sufficiently

"important" to require *Younger* abstention.  The Second Circuit has held that "[a] state interest is

'important' for purposes of the second *Younger* abstention factor where 'exercise of the federal

judicial power would disregard the comity between the States and the National Government.'"

*Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001) (quoting *Pennzoil Co. v. Texaco, Inc.*, 481

U.S. 1, 13 (1987)); *accord Philip Morris, Inc. v. Blumenthal*, 123 F.3d 103, 105-06 (2d Cir.

1997).  Resolution of that question "turns on whether 'the state action concerns the central

sovereign functions of state government.'"  *Grieve*, 269 F.3d at 152 (quoting *Philip Morris*, 123

F.3d at 106).  Significantly, however, the Court of Appeals has cautioned that a court must "'not

look narrowly to [the State's] interest in the *outcome* of the particular case,' but rather look to

'the importance of the generic proceedings to the State.'"  *Philip Morris*, 123 F.3d at 106

(alteration in original) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491

U.S. 350, 365 (1989)).  Further, "[i]n order to ascertain the 'generic proceeding' involved in the

action brought by the state," a court "cannot focus solely or chiefly upon the style of the state's

pleading, such as the particular causes of action pleaded or statutes invoked."  *Id.*  Instead, it

"must consider the underlying nature of the state proceeding on which the federal lawsuit would

impinge."  *Id.*

    In light of those standards, courts have repeatedly held that state actions to enforce

consumer-protection statutes and laws against deceptive business practices are sufficiently

important for *Younger* purposes.  *See, e.g.*, *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d

874, 880 (8th Cir. 2002); *Williams v. State of Washington*, 554 F.2d 369, 370 (9th Cir. 1977);

*Merck Sharp & Dohme Corp. v. Conway*, 909 F. Supp. 2d 781, 785 (E.D. Ky. 2012);

*MyInfoGuard*, 2012 WL 5469913, at *8; *Marathon Petroleum Co. v. Stumbo*, 528 F. Supp. 2d

639, 645 (E.D. Ky. 2007); *Arbitron Inc. v. Cuomo*, No. 08 Civ. 8497 (DLC), 2008 WL 4735227,

at *5-6 (S.D.N.Y. Oct. 27, 2008); *Williams v. Lubin*, 516 F. Supp. 2d 535, 539-40 (D. Md. 2007);

*Goleta Nat. Bank v. Lingerfelt*, 211 F. Supp. 2d 711, 716 (E.D.N.C. 2002); *Bologna v. Allstate

Ins. Co.*, 138 F. Supp. 2d 310, 327 (E.D.N.Y. 2001); *State Farm Mut. Auto. Ins. Co. v. Metcalf*,

902 F. Supp. 1216, 1218 (D. Haw. 1995); *Bays v. Edgar*, No. 87 C5045, 1988 WL 13639, at *3

(N.D. Ill. Feb. 17, 1988).  Additionally, in other contexts, the Supreme Court itself has

recognized that States have an important interest in protecting the public from deceptive business

practices.  *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) (citing the

"general interest in protecting consumers and regulating commercial transactions" in stating that

"[t]he state interests implicated in this case are particularly strong"); *see also, e.g.*, *ARC Am. Corp.*, 490 U.S. at 101 (stating that "the long history of state common-law and statutory remedies against . . . unfair business practices" makes "plain that this is an area traditionally regulated by the States"); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (recognizing "the State's interest in preventing deception of consumers").[23]

Those principles and precedents compel the conclusion that South Carolina's and Tennessee's civil enforcement actions are important enough to warrant *Younger* abstention.  Like Mississippi's civil enforcement action discussed above (using the "essential nature and effect" standard, which is effectively the same as the "underlying nature of the state proceeding" standard applicable here), South Carolina's and Tennessee's suits were brought to vindicate "a well-established quasi-sovereign interest: securing an honest marketplace."  *SDS West*, 640 F. Supp. 2d at 1050 (citing cases).  Like Mississippi's, South Carolina's and Tennessee's cases were brought by their respective state attorneys general under their exclusive statutory authority to bring such cases.  *See* S.C. Code Ann. §§ 39-5-50, 39-5-110; Tenn. Code Ann. § 47-18-108.  And like Mississippi, South Carolina and Tennessee seek civil penalties and injunctive relief, "remedies only the State is entitled to seek."  *MyInfoGuard*, 2012 WL 5469913, at *8; *see* S.C. Code § 39-5-110(a); S.C. Code § 39-5-50(a); Tenn. Code Ann. § 47-18-108(b)(3); Tenn. Code Ann. §§ 47-18-108(a)(1) and (a)(4).  In short, the States' "primary aim" is not "to obtain

---

[23]     In the face of these cases, S&P relies heavily on *Harper v. Public Service Commission*, 396 F.3d 348 (4th Cir. 2005), in which the Fourth Circuit opined that *Younger* abstention is appropriate only where the pending state proceeding implicates "[i]nterests like education, land use law, family law, and criminal law [that] lie at the heart of state sovereignty."  *Id.* at 354; *see also id.* at 352-53.  As S&P concedes, however, *Harper* is not controlling here.  (Mem. Law Opp'n Defs.' Mots. To Dismiss 17 n.12).  Moreover, the Fourth Circuit's list was illustrative, not exhaustive, and the cases cited above stand for the proposition that the interest in enforcing state laws prohibiting deceptive business practices also lies at the heart of state sovereignty.

reimbursement . . . for expenditures caused by . . . allegedly tortious conduct," or to obtain

"monetary relief" that "would be available to a private citizen."  *Philip Morris*, 123 F.3d at 106.

Instead, their primary aim is "securing an honest marketplace, promoting proper business

practices, protecting [State] consumers, and advancing [the State's] interest in the economic

well-being of its residents."  *Microsoft*, 428 F. Supp. 2d at 546.  That is, each "State is acting

under its own authority to prevent and eradicate unfair and deceptive business practices, interests

the Second Circuit has already acknowledged are at the very least 'arguably important.'"

*MyInfoGuard*, 2012 WL 5469913, at *8 (quoting *Philip Morris*, 123 F.3d at 105-06).

  In arguing otherwise, S&P seeks first to frame the relevant question narrowly as whether

the States' have a sufficiently strong interest in "regulating the market for credit rating services."

(Mem. Law Opp'n Defs.' Mots. To Dismiss 19).  But taking such a myopic view of the relevant

question runs contrary to the Second Circuit's mandate "to ascertain the 'generic proceeding'"

by "consider[ing] the underlying nature of the state proceeding."  *Philip Morris*, 123 F.3d at 106.

It also ignores the gravamen of the States' claims in these cases.  As noted above, the States do

not challenge the credit ratings themselves or the methodology that S&P uses to produce its

ratings; they do not, in other words, seek to regulate the market for credit-rating services.

Instead, the States seek to hold S&P accountable for its alleged misrepresentations about its

ratings and to enjoin future such misrepresentations.  The nature of the business in which S&P

engages does not define the States' interests — the States' interests are in enforcing their

statutory prohibitions against deception and ensuring the integrity of the marketplace.

  In addition, citing the Second Circuit's decision in *Grieve* and a handful of other cases,

S&P contends that "*Younger* abstention would be unjustified" because "federal/state comity is

unnecessary in areas of law where the federal government has already intruded into state

prerogatives." (Mem. Law Opp'n Defs.' Mots. To Dismiss 19-20; *see also* Docket No. 47 (citing additional cases)). Admittedly, the proposition that the weight of the federal interest, if any, should be considered in the mix does find some support in *Grieve*, where the Second Circuit cited the "paramount federal interest in foreign relations and the enforcement of United States treaty obligations" in concluding that the State's interest did not "appear to raise the sort of substantial comity concerns that require *Younger* abstention." 269 F.3d at 153; *see also, e.g.*, *Harper*, 396 F.3d at 356 ("When there is an overwhelming federal interest . . . no state interest, for abstention purposes, can be nearly as strong at the same time."); *New York v. Trans World Airlines, Inc.*, 728 F. Supp. 162, 174-75 (S.D.N.Y. 1989) (questioning whether the state interest in enforcing false advertising laws against airlines was sufficient to justify *Younger* abstention in light of the fact that "the regulation of airline advertising is an area in which both the state and the federal government actively operate, and the federal government has the power — if it chooses to use it — to remove the state from this field entirely").

But S&P's argument is ultimately unpersuasive. As an initial matter, loose language in *Grieve* aside, it is far from clear that the weight of the federal interest, if any, should factor into the *Younger* analysis. The Second Circuit has repeatedly enumerated the three conditions necessary for *Younger* abstention, *see, e.g.*, *Spargo*, 351 F.3d at 75, but it has never included the weight of the federal interest, if any, in its list of such conditions. Nor has the Supreme Court, which initially identified the three factors, *see Middlesex Cnty. Ethics Comm.*, 457 U.S. at 432, and recently reaffirmed them, *see Sprint*, 134 S. Ct. at 593. More fundamentally, S&P's argument is difficult to reconcile with the analysis and conclusion of *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 364-66 (1989), in which the Supreme Court held that the mere assertion of a federal preemption claim — even a "substantial"

48

one — is not enough to defeat *Younger* abstention.  *See, e.g., J. & W. Seligman & Co. Inc. v. Spitzer*, No. 05 Civ. 7781 (KMW), 2007 WL 2822208, at *6 (S.D.N.Y. Sept. 27, 2007).  And finally, refraining from abstention in light of a federal interest (at least in the absence of a "facially conclusive" preemption claim, *see, e.g., id.* at *4) would "entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility, equally with the federal courts to guard, enforce, and protect every right granted or secured by the [C]onstitution of the United States."  *Steffel v. Thompson*, 415 U.S. 452, 460-61 (1974) (internal quotation marks omitted); *see also Temple of Lost Sheep Inc. v. Abrams*, 930 F.2d 178, 183 (2d Cir. 1991) (noting that "*Younger* abstention derives from the recognition that a pending state proceeding, in all but unusual cases, would provide the federal plaintiff with the necessary vehicle for vindicating his constitutional rights" (internal quotation marks omitted)); *Cuomo v. Dreamland Amusements, Inc.*, Nos. 08 Civ. 7100 (JGK), 08 Civ. 6321 (JGK), 2008 WL 4369270, at *10 (S.D.N.Y. Sept. 22, 2008) (rejecting an argument that the State did not have a "valid interest" in light of federal regulation of the same area and noting that the issue of preemption could be raised as a defense in the state proceeding).

Ultimately, however, the Court need not resolve the question of whether the weight of the federal interest, if any, factors into the *Younger* analysis, because even if it does, abstention would be warranted here.  To be sure, CRARA makes clear that the market for credit ratings is a national concern.  *See* CRARA, § 2 pmbl., 120 Stat. at 1327 (stating that "credit rating agencies are of national importance").  But CRARA itself provides that it does not prohibit state agencies "from investigating and bringing an enforcement action with respect to fraud or deceit against any nationally recognized statistical rating organization or person associated with a nationally recognized statistical rating organization."  15 U.S.C. § 78o-7(o)(2).  That provision makes clear

that the state interests in enforcing consumer-protection laws and combatting deceptive business practices — the interests South Carolina and Tennessee seek to vindicate in their cases — do not tread on the federal interest in regulating the market for credit ratings.  Moreover, that provision is, in itself, a recognition and vindication of the importance of the States' interests in this case. That is, Congress intended for States to retain their ability to enforce their consumer-protection laws against NRSROs; it is for neither federal courts nor those NRSROs to question that judgment.  *See, e.g.*, *Cedar Rapids Cellular Tel.*, 280 F.3d at 880 (holding, in a suit by cellphone providers, that "[f]ederal telecommunications law implicitly acknowledges the importance of" the state interest in enforcing its consumer-protection statutes "by leaving states some latitude to 'protect the public safety and welfare' and 'safeguard the rights of consumers'" (quoting 47 U.S.C. § 253(b))); *State Farm Mut. Auto. Ins. Co.*, 902 F. Supp. at 1218 (citing, as evidence of the State's "vital interest in regulating the insurance industry," a federal law that "vests states with the authority to regulate insurance carriers and stresses that state regulation of the business of insurance is 'in the public interest'" (quoting 15 U.S.C. § 1011)).

In sum, S&P's Declaratory Judgment Cases present the "exceptional" circumstances that call for application of the *Younger* doctrine.  *Sprint*, 134 S. Ct. at 588.  Accordingly, the Court is compelled to grant the States' motion and to dismiss S&P's cases.  *See, e.g.*, *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973) ("*Younger v. Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts."); *Diamond "D" Const. Corp.*, 282 F.3d at 197 ("[W]hen *Younger* applies, abstention is mandatory and its application deprives the federal court of jurisdiction in the matter.").

## CONCLUSION

For the foregoing reasons, the Court concludes that subject-matter jurisdiction is lacking with respect to the State Cases and that those cases must be remanded to the state courts from which they were removed.  Additionally, in light of that result, and the important state interests implicated by the State Cases, the Court is compelled to dismiss the Declaratory Judgment Cases on the grounds of *Younger* abstention.

The Court does not reach those conclusions lightly.  Putting aside the natural "tempt[ation] to find federal jurisdiction every time a multi-billion dollar case with national implications arrives at the doorstep of a federal court," *Greenwich Fin. Servs. Distressed Mortg. v. Countrywide Fin. Corp.*, 654 F. Supp. 2d 192, 204 (S.D.N.Y. 2009), the federal courts undoubtedly have advantages over their state counterparts when it comes to managing a set of substantial cases filed in jurisdictions throughout the country.  Through the MDL process, federal cases can be consolidated for pretrial purposes or more, promoting efficiency and minimizing the risks of inconsistent rulings and unnecessary duplication of efforts.  Nevertheless, the state courts have devised creative means to coordinate among themselves when appropriate.  *See, e.g.*, Paula L. Hannaford-Agor, *Comment: Federal MCL Fourth and Suggestions for State Court Management of Mass Litigation* (National Center for State Courts 2006), *available at* http://cdm16501.contentdm.oclc.org/cdm/ref/collection/civil/id/58 (last visited June 3, 2014).  And in any event, as any student of the Constitution knows, efficiency is not the only interest served by this country's federalist system of state and federal courts.

In the final analysis, this Court is not free to disregard or evade "[t]he limits upon federal jurisdiction, whether imposed by the Constitution or by Congress."  *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  That is, "[w]ith few exceptions, the doors to federal court

do not swing open merely because a [party] has a national presence or is alleged to have committed wrongdoing that is national in scope," *McGraw-Hill Cos.*, 2013 WL 1759864, at *4-5, or merely because litigation in federal court might be more efficient.  As discussed above, these cases do not trigger any of the relevant exceptions that would allow the Court to open its doors to federal jurisdiction.  At bottom, the disputes in these cases are disputes arising under state law that belong in state courts.  Accordingly, the States' motions are GRANTED, the State Cases are remanded back to state court, and the Declaratory Judgment Cases are dismissed. Mississippi's motion for fees and costs, on the other hand, is DENIED.

The Clerk of Court is directed to (1) terminate all open motions in 13 MD 2446 and all its member cases; (2) dismiss the Declaratory Judgment Cases, 13 Civ. 4100 and 13 Civ. 4052; and (3) remand all other member cases to the state courts from which they were removed in the first instance.  As that disposes of all cases pending before this Court, there is no reason for the MDL to remain open.  Accordingly, the Clerk of Court is also directed to close 13 MD 2446 and all its member cases, and to notify the Judicial Panel on Multidistrict Litigation of that closure.

SO ORDERED.

Dated: June 3, 2014
New York, New York

JESSE M. FURMAN
United States District Judge